**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| CHICAGO ORNAMENTAL IRON, INC., et al., <br><br> Plaintiffs, <br><br> v. <br><br> SELECTIVE INSURANCE COMPANY OF AMERICA, a New Jersey Corporation, and ASSUREDPARTNERS OF ILLINOIS, LLC, an Illinois Limited Liability Company, <br><br> Defendants, | Case No: 1:25-cv-5131 <br> Honorable Mary M. Rowland |

## DEFENDANT SELECTIVE INSURANCE COMPANY OF AMERICA'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFFS' COMPLAINT

Defendant, SELECTIVE INSURANCE COMPANY OF AMERICA (hereafter "Selective"), by and through its attorneys, Litchfield Cavo, LLP, and for its Answer and Affirmative Defenses to Plaintiffs' Complaint at Law, states as follows:

1.  Plaintiff Chicago Ornamental Iron, Inc. ("COI") is an Illinois corporation. COI engineers, designs, details, fabricates and erects a wide array of custom metal structures from structural steel to high end finished metal in brass and nickel silver. COI completes all aspects of its fabrication and assembly in-house at its 62,500 sq. ft. fabrication facility located at 4340 W. 47th St, Chicago, IL 60632 (the "Building").

**ANSWER:** **On information and belief, Selective admits that Plaintiff COI is an Illinois Corporation with a fabrication facility located at 4340 W. 47th St., Chicago IL 60632. Selective has insufficient knowledge as to the truth or falsity of the remaining allegations contained in paragraph 1 and therefore neither admits nor denies said allegations and demands strict proof thereof.**

2.  Plaintiff 4340 W. 47th St. LLC is an Illinois limited liability company and the owner of record of the real property located at 4340 West 47th Street, Chicago, Illinois 60632.

**ANSWER:** **On information and belief, Selective admits that Plaintiff 4340 W. 47th St. LLC is an Illinois limited liability company. Selective has insufficient knowledge as to the truth or falsity of the remaining allegations contained in paragraph 2 and therefore neither admits nor denies said allegations and demands strict proof thereof.**

3.    Plaintiff 4340 Holdings LLC is an Illinois liability company and the owner of record of certain real property located adjacent to 4340 West 47th Street, Chicago, Illinois 60632.

**ANSWER:** **On information and belief, Selective admits that Plaintiff 4340 Holdings LLC is an Illinois limited liability company. Selective has insufficient knowledge as to the truth or falsity of the remaining allegations contained in paragraph 3 and therefore neither admits nor denies said allegations and demands strict proof thereof.**

4.    Defendant Selective Insurance Company of America ("Selective") is a corporation incorporated under the laws of New Jersey. Selective offers insurance coverage to the general public, including to manufacturers and owners of real estate in Illinois. Selective represents to the business community that it offers a wide range of manufacturer's insurance coverages designed to help protect their business, specialty equipment, employees, and more. Selective specifically markets its insurance coverage to businesses, like COI, that fabricate metal products

**ANSWER:** **Selective admits the allegations contained in paragraph 4.**

5.    Defendant AssuredPartners of Illinois ("Assured") is an Illinois limited liability company. Assured is an independent insurance broker offering its services to the general public, and specifically markets its services to manufacturing businesses, like COI.

**ANSWER:** **On information and belief, Selective admits the allegations contained in paragraph 5. Answering further, Selective states that Assured has represented that it is a citizen of Delaware and Florida for purposes of diversity jurisdiction.**

6.    Jurisdiction over Selective and Assured is proper because they transact and/or have transacted business in Illinois, and because the occurrences, acts and omissions which form the basis for this action occurred in Illinois.

**ANSWER:** **Selective admits the allegations contained in paragraph 6.**

7.     Venue is proper in Cook County because Selective and Assured transact and/or have transacted business in Cook County; the occurrences, acts and omissions which form the basis for this action occurred in Cook County; the insured property at issue is located in Cook County; and the subject insurance policy was issued in Cook County.

**ANSWER:**     **Selective admits that venue is proper in the Northern District of Illinois and in Cook County.**

### Factual Background

8.     Plaintiffs maintained an insurance policy with Selective. Specifically, Selective issued to plaintiffs Commercial Policy No. S 2351080 (the "Policy") for the policy period December 15, 2022, through December 15, 2023. A copy of the Policy with all endorsements is attached as **Exhibit A.**

**ANSWER:**     **Selective admits that it issued Policy No. S 2351080 to named insureds Chicago Ornamental Iron Inc. d/b/a COI, and 4340 W 47th, with effective dates of December 15, 2022 to December 15, 2023, and that the document attached as Exhibit A appears to be a copy of that policy.**

9.     In addition to the base coverage, plaintiffs purchased the ElitePac coverages for the Policy, which include numerous addendums and coverages beyond the base coverage.

**ANSWER:**     **Selective admits the allegations contained in paragraph 9.**

10.     The Policy contains a coinsurance provision which reads, in part: "[Selective] will not pay the full amount of any loss if the value of the Covered Property at the time of the loss times the Coinsurance percentage shown for it in the Declarations is greater than the Limit of Insurance for the property."

**ANSWER:**     **Selective admits that the language cited in paragraph 10 appears in the Policy. Selective denies that these terms are an accurate or complete recitation of the Policy's relevant terms and conditions.**

11.     The coinsurance provision further reads**:**

Instead, we will determine the most we will pay, using the following steps:

3

(1) Multiply the value of the Covered Property at the time of the loss by the Coinsurance percentage;

(2) Divide the Limit of Insurance of the property by the figure in Step (1);

(3) Multiply the total amount of the loss, before the application of any deductible, by the figure determined in Step (2); and

(4) Subtract the deductible from the figure in Step (3).

We will pay the amount in Step (4) or the Limit of Insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

**ANSWER:** **Selective admits that the language cited in paragraph 11 appears in the Policy. Selective denies that these terms are an accurate or complete recitation of the Policy's relevant terms and conditions.**

12. Pursuant to the Policy, Selective advised plaintiffs that "you may obtain your own insurance replacement cost appraisal" for the Property. The Policy further stated that Selective "will consider and accept, if reasonable, [plaintiffs'] appraisal."

**ANSWER:** **Selective admits that the language cited in paragraph 12 appears in the Policy. Selective denies that these terms are an accurate or complete recitation of the Policy's relevant terms and conditions.**

13. Prior to purchasing the Policy, plaintiffs engaged Assured to procure appropriate insurance coverages and limits. To that end, plaintiffs sought, and Assured conducted and provided plaintiffs with a replacement cost appraisal for the Building. Assured's appraisal determined that the estimated cost to reconstruct the Building, as of September 23, 2022, was $8,888,743. A copy of Assured's appraisal which is titled Valuation Detailed Report is attached as **Exhibit B.**

**ANSWER:** **Selective admits that Exhibit B appears to be a reconstruction cost appraisal as to the 4340 W 47th St. facility, dated September 23, 2022, and noting the reconstruction cost estimate to be $8,888,743. Selective denies that this document is an accurate and sufficient statement of the valuation of the building at the applicable time. Selective has insufficient knowledge as to the truth or falsity of the remaining allegations contained in paragraph 13 and therefore neither admits nor denies said allegations and demands strict proof thereof.**

14.     Based on Assured's replacement cost appraisal and advice, plaintiffs purchased the Policy from Selective with coverage limits of $9,244,293 for the Building.

**ANSWER:**     **Selective admits that the policy issued to named insureds had a stated coverage limit of $9,244,293 for the Building. Selective has insufficient knowledge as to the truth or falsity of the remaining allegations contained in paragraph 14 and therefore neither admits nor denies said allegations and demands strict proof thereof.**

15.     The Policy includes, without limitation, the following Policy Coverages and Limits:

    (a)     Building - $9,244,293
    (b)     Business Personal Property - $6,344,000
    (c)     Personal Property of Others - $1,200,000
    (d)     Business Income with Extra Expense - $4,000,000
    (e)     Ordinance or Law – Increased Cost of Construction - $500,000
    (f)     Ordinance or Law – Demolition Cost - $500,000
    (g)     Tenant Improvements and Betterments - $25,000
    (h)     Outdoor Property - $100,000
    (i)     Inland Marine Related Coverages (limits based on specific coverages)

**ANSWER:**     **Selective admits that the information cited in paragraph 15 appears in the Policy. Selective denies that these abbreviated terms are an accurate or complete recitation of the Policy's relevant terms and conditions.**

### *The Peddinghaus Machine*

16.     COI's business relies heavily on various pieces of heavy-duty machinery.

**ANSWER:**     **Selective has insufficient knowledge as to the truth or falsity of the allegations contained in paragraph 16 and therefore neither admits nor denies said allegations and demands strict proof thereof.**

17.     The most integral machine to COI's business is a model BDL1250/9B automated saw and drill beam line handler that was manufactured by the Peddinghaus Corporation (the "Peddinghaus Machine").

**ANSWER:**     **Selective has insufficient knowledge as to the truth or falsity of the allegations contained in paragraph 17 and therefore neither admits nor denies said allegations and demands strict proof thereof.**

18.     COI purchased the Peddinghaus Machine in February 2023 and contracted with Peddinghaus to install it.

**ANSWER:**     **Selective has insufficient knowledge as to the truth or falsity of the allegations contained in paragraph 18 and therefore neither admits nor denies said allegations and demands strict proof thereof.**

19.     On May 13, 2023, Peddinghaus completed its installation of the Peddinghaus Machine at the Building and certified that it was operational and in good working order.

**ANSWER:**     **Selective has insufficient knowledge as to the truth or falsity of the allegations contained in paragraph 19 and therefore neither admits nor denies said allegations and demands strict proof thereof.**

20.     In May and June of 2023, COI used the Peddinghaus Machine to fabricate 150 tons of structural steel for a project.

**ANSWER:**     **Selective has insufficient knowledge as to the truth or falsity of the allegations contained in paragraph 20 and therefore neither admits nor denies said allegations and demands strict proof thereof.**

21.     The Peddinghaus Machine performed without any issues or errors during the course of the May-June 2023 project.

**ANSWER:**     **Selective has insufficient knowledge as to the truth or falsity of the allegations contained in paragraph 21 and therefore neither admits nor denies said allegations and demands strict proof thereof.**

### *The Roof Collapse*

22.     On July 2, 2023, a heavy rainstorm occurred in Chicago, Illinois. According to the National Weather Service, "Chicago-O'Hare Airport received 3.35" of rain on July 2nd, [2023] which surpassed Chicago's previous daily record rainfall for this date of 2.06" set on July 2, 1982."[1] In fact, "[t]his was the highest daily rainfall total to be observed at Chicago-O'Hare Airport since

---

[1] *July 2, 2023: Significant Flash Flooding in Chicago and Nearby Suburbs,* National Weather Service *available at* https://www.weather.gov/lot/2023_07_02_Flooding (last visited March 26, 2025).

May 2020, when O'Hare received 3.53" of rain on May 14 and 3.11" of rain on May 17."[2] Federal

and state authorities declared the event a major disaster.

**ANSWER:** **Selective admits that COI reported a heavy rainfall event to Selective on the date of loss. Regarding the remaining allegations of paragraph 22, Selective lacks sufficient information to admit or deny the allegations, and therefore denies them.**

23.     The excessive rainfall caused the roof covering roughly one-third of the Building

to collapse.

**ANSWER:** **Selective admits to occurrence of the collapse of the roof covering roughly one-third of the building. Selective denies all remaining allegations contained in paragraph 23.**

24.     The July 2, 2023 catastrophe was a true "boom" event. Due to the sheer weight of

the water, the force of the collapse bent several structural steel roof support beams, shattered the

concrete floor and plumbing and sewer lines, and caused the fire sprinkler system to break apart

and spray water until first responders arrived to turn off the main water valve. The hundreds of

thousands of pounds of water that had collected on and collapsed the roof flooded into the Building

and caused extensive damage to plaintiffs' Building, equipment, and machinery. All the while, the

heavy rain continued to fall unimpeded into the Building.

**ANSWER:** **Selective admits that a roof collapse occurred on or about July 2, 2023, and that water entered the Building. Selective has insufficient knowledge as to the truth or falsity of all remaining allegations contained in paragraph 24 and therefore neither admits nor denies said allegations and demands strict proof thereof.**

25.     As a direct result of the roof collapse, the Building and other Covered Property (as

defined in the Policy), including COI's business inventory and equipment and machinery used for

its fabrication work, suffered catastrophic physical damage.

**ANSWER:** **Selective admits that certain, but not all, of Plaintiffs' Building and Business Personal Property was damaged. Selective denies all remaining allegations contained in paragraph 25.**

---

[2] *Id.*

26. The Peddinghaus Machine suffered significant damage due to water infiltration when the roof collapsed.

**ANSWER:** **Selective denies the allegations contained in paragraph 26.**

27. Immediately after the collapse, COI's operations manager, Enrique Montes, went to the Property and assessed the damage.

**ANSWER:** **Selective has insufficient knowledge as to the truth or falsity of the allegations contained in paragraph 27 and therefore neither admits nor denies said allegations and demands strict proof thereof.**

28. Montes noted that, in addition to the massive amounts of water that had infiltrated the Building, the roof collapse also caused the sprinkler system at the Property to activate, further damaging the COI's machinery within the Building.

**ANSWER:** **Selective has insufficient knowledge as to the truth or falsity of the allegations contained in paragraph 28 and therefore neither admits nor denies said allegations and demands strict proof thereof.**

29. In an effort to mitigate moisture damage to the Peddinghaus Machine, Montes placed tarps over it.

**ANSWER:** **Selective has insufficient knowledge as to the truth or falsity of the allegations contained in paragraph 29 and therefore neither admits nor denies said allegations and demands strict proof thereof.**

30. COI is co-owned by Jonathan Samek and Munish Mehta. When the roof collapsed, both owners of COI were out of state. Samek was in Florida, Mehta was in Europe.

**ANSWER:** **Selective has insufficient knowledge as to the truth or falsity of the allegations contained in paragraph 30 and therefore neither admits nor denies said allegations and demands strict proof thereof.**

31. Upon learning of the collapse, Samek returned to Chicago within six hours. Mehta was back within forty-eight hours.

**ANSWER:** **Selective has insufficient knowledge as to the truth or falsity of the allegations contained in paragraph 31 and therefore neither admits nor denies said allegations and demands strict proof thereof.**

32.     Selective assigned Ronald Rudow, its Executive General Adjuster, to adjust plaintiffs' claim.

**ANSWER:**     **Selective admits the allegations contained in paragraph 32.**

33.     Rudow first appeared at the Building one week following the roof collapse.

**ANSWER:**     **Selective admits that Rudow conducted a site inspection on July 6, 2023 beginning at 9:30 a.m.**

### *Claim History*

34.     On July 2, 2023, the same day the roof collapsed, Assured submitted a property loss notification on plaintiffs' behalf to Selective under the Policy. Plaintiffs' claim on their Policy proceeded under Claim No. 22504865.

**ANSWER:**     **Selective admits the allegations contained in paragraph 34.**

35.     On September 1, 2023, plaintiffs sent a letter forwarding a draft list of the submitted portion of plaintiffs' claim that identified over $3,500,000 in equipment property losses. The September 1, 2023 letter (including the list) is attached as **Exhibit C.**

**ANSWER:**     **Selective admits only that Plaintiffs sent the referenced letter, and that Exhibit C appears to be Plaintiffs' September 1, 2023, letter containing a draft list of Plaintiffs' alleged equipment property losses totaling $3,559,384.68.**

36.     In their September 1, 2023 letter, plaintiffs advised Selective that COI "has been put in an untenable financial position by the delay in the initial adjustment of this claim." *See* **Exhibit C.**

**ANSWER:**     **Selective admits that the letter attached as Exhibit C contains the referenced language. Selective denies the characterizations, assertions, and accusations contained therein.**

37.     On September 6, 2023, two months after the roof collapsed, plaintiffs, through its hired consultant, BDO USA, P.C. ("BDO"), made their first claim submission to Selective in the amount of $7,268,031. That claim submission did not include the cost to reconstruct the Building.

In connection with its claim submission, BDO included voluminous documentation with links available on the designated tabs for ease of reference by Selective.

**ANSWER:** **Selective admits that BDO provided information to Selective on September 6, 2023 and that the information provided did not include the total cost to reconstruct the Building. Selective denies all remaining allegations of paragraph 37.**

38.     On October 23, 2023, Selective acknowledged receipt of the property loss notification sent by plaintiffs on July 2, 2023.

**ANSWER:** **Selective denies the allegations contained in paragraph 38.**

39.     On December 22, 2023, nearly six months after the catastrophic roof collapse, plaintiffs emailed Selective and pointed out that they had made virtually everything available that Selective had requested, and specifically noted that "the pace of the adjustment of these claims continues to place unnecessary financial pressure on COI and its principals. Selective needs to staff this claim in a commercially reasonable manner. COI should be in receipt of final adjustments for the BPP and building claim by now."

**ANSWER:** **To the extent that paragraph 39 purports to cite language from the December 22, 2023, email attached to Plaintiffs' Complaint as Exhibit D, Selective admits that the cited language is present in the email, and that the email was sent on December 22, 2023, approximately 174 days (5 months and 21 days) after the July 2, 2023, date of loss. Selective denies the characterizations, assertions, and accusations contained in this paragraph, and all other allegations therein.**

40.     In the same December 22, 2023 email, plaintiffs stated that "[t]he principals of COI are under enough stress and pressure trying to operate under the circumstances caused by this loss and have been extremely timely and responsive to each and every request by Selective." Plaintiffs further requested that Selective proceed "with the same sense of urgency as its insured has been. In sum, COI is asking [Selective] to treat its claim with the sense of urgency the claims deserve as we approach the 6-month anniversary of the catastrophe." The December 22, 2023 email is attached as **Exhibit D.**

**ANSWER:**     **Selective admits that Exhibit D appears to be the referenced email sent from Plaintiffs' Counsel to Selective. Selective further admits that the cited language is present in the email, and that the email was sent on December 22, 2023. Selective denies the characterizations, assertions, and accusations contained in this paragraph, and all other allegations therein.**

41.     On January 5, 2024, Samek, on behalf of plaintiffs, wrote to Selective and asked if Selective would "please review the Elite Pac and advise what other ElitePac coverages we may be entitled to beyond the claim expenses?"

**ANSWER:**     **To the extent that paragraph 41 purports to cite language from the emails dated January 5, 2024, through January 8, 2024, attached to Plaintiffs' Complaint as Exhibit E, Selective admits that the quoted language is present in Samek's January 5, 2024, email on behalf of Plaintiffs. Selective denies all remaining allegations of this paragraph.**

42.     On January 8, 2024, plaintiffs followed up with Selective and emphasized that "Insurers have a duty to review the policy and advise the insured of all available coverage. To the extent there is a gray area the insurer must inquire of the insured whether the insured is requesting a coverage review." Plaintiffs followed up with a demand for Selective to conduct a coverage review and inform plaintiffs of all coverage available to them under all policy coverages.

**ANSWER:**     **To the extent that paragraph 42 purports to cite information or language from the emails dated January 5, 2024, through January 8, 2024, attached to Plaintiffs' Complaint as Exhibit E, Selective admits only that the quoted language and referenced request are present in Plaintiffs' January 8, 2024, email directed to Selective. Selective denies the characterizations, assertions, and accusations contained in this paragraph, and all other allegations therein.**

43.     Selective's adjuster responded on January 8, 2024, asserting that "I am fully aware of Selective's responsibilities to communicate available coverage to COI.". The January 5, 2024 through January 8, 2024, emails are attached as **Exhibit E.**

**ANSWER:**     **Selective admits that Exhibit E appears to be the referenced emails exchanged between Selective and Plaintiffs from January 5, 2024, through January 8, 2024. Selective further admits that the quoted language appears within Exhibit E in an email dated January 8, 2024.**

44.     On February 16, 2024, plaintiffs, through BDO, their hired consultant, made their second claim submission to Selective, this time for the claim amount of $20,266,886. This claim submission included expansive supporting documentation clearly labeled and with links available on designated tabs for ease of reference by Selective.

**ANSWER:**     **Selective admits that BDO provided information to Selective on February 16, 2024. Selective denies all remaining allegations of paragraph 44.**

45.     On February 20, 2024, plaintiffs again wrote to Selective, attaching a Sworn Statement dated February 16, 2024, as well as a letter dated February 20, 2024. The Sworn Statement is attached as **Exhibit F**; the February 20, 2024 letter is attached as **Exhibit G.**

**ANSWER:**     **Selective admits to the existence of the referenced materials, and that Exhibit F appears to be Plaintiffs' February 16, 2024, Sworn Statement of Loss, and Exhibit G appears to be Plaintiffs' February 20, 2024, Letter.**

46.     The Sworn Statement reflected that the amount claimed by plaintiffs under the Policy, as of February 16, 2024, was $20,266,866.00. The Sworn Statement also noted that the total amount of insurance available under the policy was $21,413,293.00 plus supplemental coverage in addition to the limits.

**ANSWER:**     **Selective admits that the policy information cited in paragraph 46 appears in the February 16, 2024, Sworn Statement of Loss, attached to Plaintiff's Complaint as Exhibit F. Selective denies that the abbreviated description of the terms and conditions of the Policy is an accurate or complete recitation of the Policy's relevant terms and conditions.**

47.     In their February 20, 2024 letter, plaintiffs noted that they were "nonplussed by the delays adjusting this claim. The loss or damage occurred more than eight months ago and Selective continues to take interim positions rather than providing final adjustment positions as necessary for COI to make large equipment purchases and other financial commitments so the company can restore operations to pre-loss levels."

**ANSWER:**     **Selective admits only that Plaintiffs' February 20, 2024, Letter, includes the quoted language in paragraph 47. Selective denies the characterizations, assertions, and accusations contained therein.**

48.     Plaintiffs' February 20, 2024 letter continued: "[t]he record is replete with examples of significant and unjustifiable delays during the adjustment of Claims. We have asked repeatedly for the building claim adjustment to be completed based on reconstruction as the building existed at the time of loss."

**ANSWER:** **Selective admits only that Plaintiffs' February 20, 2024, Letter, includes the quoted language in paragraph 48. Selective denies the characterizations, assertions, and accusations contained therein.**

49.     In addition, the February 20, 2024 letter pointed out that, "despite repeated communications advising that the Peddinghaus Machine is inoperative, and a subsequent inspection by the Selective equipment consultant in early January, 2024, no action, aside from a request to confirm the EE amounts attributable to this machine being inoperative, has been taken to adjust this portion of the Claims."

**ANSWER:** **Selective admits only that Plaintiffs' February 20, 2024, Letter, includes the quoted language in paragraph 49. Selective denies the characterizations, assertions, and accusations contained therein.**

50.     On March 1, 2024, eight months after the catastrophic roof collapse, Selective advised plaintiffs that it had retained counsel. Selective's counsel noted that they were "in the process of evaluating this claim to prepare a response" to COI's February 20, 2024 letter.

**ANSWER:** **Selective admits the allegations contained in paragraph 50.**

51.     Plaintiffs responded on March 4, 2024, and requested that Selective provide them "a date when we can expect to receive your response and your client's adjustment of these claims. As you may know, Selective is on the clock and its response to the proof of loss ("POL") delivered by its insured (whether via payment or denial) must be received no later than March 20, 2024."

**ANSWER:** **Selective admits only that Plaintiffs' March 4, 2024, email, includes the quoted language in paragraph 51. Selective denies the characterizations, assertions, and accusations contained therein.**

52.     On March 20, 2024, Selective sent a more expansive response to the February 20, 2024 letter. A copy of the March 20, 2024 response from Selective is attached as **Exhibit H.** In the March 20, 2024 letter, Selective acknowledged that plaintiffs had submitted "thousands of pages of back-up documents including tax filings, financial statements, inventory records and expert evaluations."

**ANSWER:**     **Selective admits the allegations contained in paragraph 52, including that Exhibit H appears to be Selective's March 20, 2024, Response letter to Plaintiffs' February 20, 2024, letter.**

53.     Additionally, in its March 20, 2024 letter, Selective wrote that "it has not been established that any alleged issues with [the Peddinghaus] machine were caused by or relate to this loss. This remains an open issue that requires further investigation and evaluation."

**ANSWER:**     **Selective admits the allegations contained in paragraph 53.**

54.     On April 15, 2024, Selective wrote to plaintiffs, advising of "a potential coverage issue under the Policy." The April 15, 2024 letter is attached as **Exhibit I.** Selective asserted that its "initial evaluations did not indicate there was a coinsurance concern. However, as we have obtained additional estimates and further evaluated the repair costs, it appears that there might be a coinsurance issue."

**ANSWER:**     **Selective admits the allegations contained in paragraph 54, including that Exhibit I appears to be Selective's April 15, 2024, letter advising of potential coinsurance coverage concerns.**

55.     In its April 15, 2024 letter, Selective claimed for the first time that "[b]ased on Selective's estimate outlined above, the estimated cost to replace the Building is $12,129,261. Therefore, it appears that the Building is underinsured." The estimate was not based on the overall cost to replace the Building but rather on a prorated calculation based on repair costs for the roughly one-third of the Building that was damaged when the roof collapsed.

**ANSWER:**     **Selective admits that the quoted language appears in its April 15, 2024, Letter. Selective denies the remaining allegations contained in paragraph 55.**

56.     Selective acknowledged its obligation to pay plaintiffs on a Replacement Cost Valuation ("RCV") basis.

**ANSWER:**     **Selective admits the allegations contained in paragraph 56.**

57.     Neither Rudow nor anyone else at Selective disclosed that Selective had previously completed a replacement cost appraisal for the Building in the amount of $10,161,303.78 five days after the roof collapsed. With a 90% coinsurance calculation, as set forth in the Policy, the relevant coinsurance calculation based on Selective's replacement cost appraisal was $9,145,173.40, less than the coverage limits purchased by plaintiffs. Based on Selective's replacement cost appraisal, no coinsurance limit or penalty applies, and plaintiffs are entitled to recover for the full extent of their losses.

**ANSWER:**     **Selective denies the allegations contained in paragraph 57.**

58.     On July 5, 2024, one year after the catastrophic roof collapse, plaintiffs wrote again to Selective. The July 5, 2024 letter is attached as **Exhibit J.** In their July 5, 2024 letter, plaintiffs detailed the litany of occasions where they had produced information that Selective had failed to review regarding the Peddinghaus Machine. In particular, plaintiffs noted that Selective "failed to respond to important communications related to the beam line and, more often than not, contended he did not receive data that was sent weeks and often months earlier."

**ANSWER:**     **Selective admits only that Exhibit J appears to be Plaintiffs' July 5, 2024, letter, as well as that the quoted language and cited information appears in the letter. Selective denies the characterizations, assertions, and accusations contained therein, including any implication that Selective failed to review or respond to relevant information regarding the Peddinghaus Machine**

59.     On August 14, 2024, plaintiffs wrote yet again to Selective. A copy of the August 14, 2024 letter is attached as **Exhibit K.** In their August 14, 2024 letter, plaintiffs noted that Selective "failed to respond or substantively address over $6 million in claims related from the loss and has done nothing but equivocate for the last 10 months."

15

**ANSWER:**     **Selective admits only that Exhibit K appears to be Plaintiffs' August 14, 2024, letter, as well as that the quoted language appears in the letter. Selective denies the characterizations, assertions, and accusations contained therein.**

60.     Plaintiffs also pointed out that Selective's delays in addressing plaintiffs' claims relating to the Peddinghaus Machine continued to harm COI on an ongoing basis, and provided specific examples of issues COI was experiencing, including that the Peddinghaus Machine was experiencing a "failure of the internal electronic systems that read CNC files (DSTV format) and auto-measure cuts and holes in steel beams resulting in smooth finished ends and accurate drilled holes up to 0.1mm" and that from "January to July 31, 2024 COI has incurred at least $3 million in extra labor costs due to the failure of the automation system incorporated into the [Peddinghaus Machine] by the manufacturer."

**ANSWER:**     **Selective admits only the cited information and quoted language appear in Plaintiffs' August 14, 2024, letter. Selective denies all characterizations, assertions, and accusations contained therein.**

61.     On November 21, 2024, plaintiffs sent Selective a proposal for repair work at the Building totaling $6,336,172, which included line items for concrete and slab work. A copy of the November 21, 2024 email is attached as **Exhibit L.**

**ANSWER:**     **Selective admits only that on November 21, 2024, Plaintiffs sent Selective an email including a proposal for repair work at the building totaling $6,336.172, which included line items for concrete and slab work, as well as that Exhibit L appears to be Plaintiffs' November 21, 2024, Email. Selective denies the characterizations, assertions, and accusations contained therein.**

62.     On November 25, 2024, plaintiffs sent Selective a proposal for plumbing and sewer repairs in the amount of $590,430. A copy of the November 25, 2024 email is attached as **Exhibit M.**

**ANSWER:**     **Selective admits only that on November 25, 2024, Plaintiffs sent Selective an email including a proposal for plumbing and sewer repairs in the amount of $590,430, as well as that Exhibit M appears to be Plaintiffs' November 25, 2024, Email. Selective denies the characterizations, assertions, and accusations contained therein.**

63.     On December 5, 2024, plaintiffs wrote to Selective and requested that Selective withdraw its coinsurance contention. A copy of the December 5, 2024 letter is attached as **Exhibit N.**

**ANSWER:**     **Selective admits only that on December 5, 2024, Plaintiffs wrote to Selective requesting that it withdraw its coinsurance contention, as well as that Exhibit N appears to be Plaintiffs' December 5, 2024, letter. Selective denies the characterizations, assertions, and accusations contained therein.**

64.     On December 9, 2024, plaintiffs wrote to Assured and put them on notice of plaintiffs' potential claims for professional negligence in connection with Assured's brokerage services in procuring the Policy. A copy of the December 9, 2024 letter (without its enclosure) is attached as **Exhibit O.**

**ANSWER:**     **Selective admits that Exhibit O appears to be the referenced letter sent from Plaintiffs' Counsel to Defendant Assured. Selective has insufficient knowledge as to the truth or falsity of the remaining allegations contained in paragraph 64 and therefore neither admits nor denies said allegations and demands strict proof thereof.**

65.     On December 20, 2024, plaintiffs wrote another letter to Selective, listing plaintiffs' continued and repeated attempts to prod Selective to address outstanding claim items. A copy of the December 20, 2024 letter is attached as **Exhibit P.** As noted in the December 20, 2024 letter, plaintiffs referred to email correspondence on November 25, 26, and 27, 2024, providing information and documentation, and "[n]ot only has Selective failed to issue any payment, it failed, despite our requests, to provide us a date by which we can expect payment or even some type of response."

**ANSWER:**     **Selective admits only that on December 20, 2024, Plaintiffs sent an additional letter to Selective as indicated, as well as that Exhibit P appears to be Plaintiffs' December 20, 2024, letter. Selective denies all characterizations, assertions, and accusations contained therein.**

66.    In the December 20, 2024 letter, plaintiffs sent Selective a chart reflecting the unaddressed coverage items, amounting to a $7,814,153.40 in covered items that had not been paid (or denied) by Selective.

**ANSWER:**    **Selective admits that Plaintiffs sent Selective a chart attached to their December 20, 2024, letter, reflecting what was alleged to be $7,814,153.40 in unaddressed coverage items. Selective denies all characterizations, assertions, and accusations contained therein.**

67.    On January 14, 2025, more than 18 months after the roof collapse, Selective finally conducted an Examination Under Oath ("EUO") of Samek regarding COI's claim related to the Peddinghaus Machine. Ahead of the examination, plaintiffs provided Selective with a report from Philip Anderson, the owner of AIG Machine Services, who had been servicing the Peddinghaus Machine. In his report of January 11, 2025, Anderson concluded that the issues with the Peddinghaus machine were "Most likely [caused when] moisture entered through the connector and caused one or more of the conductors to short out causing the cable to overheat, which melted the insulation." He stated: "These issues will continue due to the exposure to water…Due to the exposure to water and the sensitivity that these machines have to it, I would recommend replacing the machine in its entirety." A copy of Anderson's January 11, 2025 report is attached as **Exhibit Q.**

**ANSWER:**    **Selective admits that on January 14, 2025, it conducted an Examination Under Oath of Samek regarding COI's claim related to the Peddinghaus Machine, as well as that Plaintiffs provided Selective with the referenced report from Philip Anderson. Answering further, Selective admits that Exhibit Q appears to be Philip Anderson's January 11, 2025, report, and that the report contains the quoted language. Selective denies the characterizations, assertions, and accusations contained therein.**

68.    On January 21, 2025, Selective provided plaintiffs with a spreadsheet, indicating the replacement cost for the Building was $4,829,555 pursuant to an "ITV360 valuation". Selective later indicated that the valuation was for an unrelated claim and was inadvertently

included in the spreadsheet. Plaintiffs subsequently made a written demand for any building valuation for the Building.

**ANSWER:** **Selective admits only that it sent Plaintiffs a spreadsheet on January 21, 2025 that included an unrelated vestigial sheet from an entirely unrelated claim. Selective denies all characterizations, assertions, and accusations contained therein.**

69.     On January 31, 2025, plaintiffs wrote to Selective and set forth an itemized list of outstanding coverage matters that remain unresolved. The January 31, 2025 letter to Selective is attached as **Exhibit R.** Among other things, plaintiffs pointed out that Selective repeatedly failed to follow up with decisions or information regarding coverage in conjunction with numerous different coverage provisions that had been discussed on an ongoing basis for the prior several months.

**ANSWER:** **Selective admits only that on January 31, 2025, Plaintiffs sent a letter to Selective setting forth an itemized list of alleged outstanding coverage matters remaining unresolved, as well as that Exhibit R appears to be Plaintiffs' December January 31, 2025, letter. Selective denies all characterizations, assertions, and accusations contained therein.**

70.     Plaintiffs concluded the January 31, 2025 letter by noting that "once more COI is in a position of waiting for Selective not only to respond and make coverage decisions but to even advise when a response or decision will be forthcoming. COI continues to suffer economically from Selective's delay[.]"

**ANSWER:** **Selective admits only that Plaintiffs' January 31, 2025, letter concludes with the quoted language. Selective denies all characterizations, assertions, and accusations contained therein.**

71.     Plaintiffs followed up via email on February 4, 2025, writing: "Gentlemen, Selective's delay on the plumbing issue has hit the critical stage. Deadlines are being missed. We need a decision. Please advise."

**ANSWER:** **Selective admits only that Plaintiffs' February 4, 2025, email contains the quoted language. Selective denies all characterizations, assertions, and accusations contained therein.**

72.     On February 11, 2025, plaintiffs sent Selective their proposal for the concrete/slab work totaling $798,899 (exclusive of the general contractor's customary fee of 20%), which had been omitted from Selective's adjustment. A copy of the February 11, 2025 email is attached as **Exhibit S.** Selective has failed to explain why it has not adjusted a nearly $800,000 claim despite the passing of 20 months since the loss.

**ANSWER:**      **Selective admits only that on February 11, 2025, Plaintiffs sent an email to Selective providing a proposal for concrete/slab work totaling $798,899, and that Exhibit S appears to be Plaintiffs' February 11, 2025, email. Selective denies all characterizations, assertions, and accusations contained therein, and further denies all remaining allegations contained in paragraph 72.**

73.     Plaintiffs had previously sent Selective the same proposal on November 21, 2024, nearly three months earlier. *See* **Exhibit L.**

**ANSWER:**      **Selective admits only that Plaintiffs' November 21, 2024, email, attached to Plaintiffs' Complaint as Exhibit L, included line items for concrete and slab work. Selective denies all other characterizations, assertions, and accusations contained therein and further denies all remaining allegations contained in paragraph 73.**

74.     Selective has failed to explain why it has not adjusted a nearly $800,000 claim despite the passing of 20 months since the loss.

**ANSWER:**      **Selective denies the allegations contained in paragraph 74.**

75.     Additionally, in the February 11, 2025 email, plaintiffs explained that the Peddinghaus Machine has not operated properly since the loss, "and it wasn't until COI started running jobs that it became evident that the machine was not running properly. Prior to the loss, COI had a run a significant job without any issue."

**ANSWER:**      **Selective admits only that Plaintiffs' February 11, 2025, email contained allegations that the Peddinghaus Machine had not operated properly since the loss, as well as that it contained the quoted language. Selective denies all characterizations, assertions, and accusations contained therein.**

76. On February 20, 2025, plaintiffs wrote to Selective stating that Selective "cannot avoid its legal and contractual obligations by refusing to take a position on COI's claimed losses and extending the adjustment period indefinitely." A copy of the February 20, 2025 letter is attached as **Exhibit T.** The letter continued, stating: "[t]o put Selective's delay in perspective, COI submitted its Sworn Statement in Proof of Loss on February 16, 2024, over one year ago. Since (and even before) then, COI's efforts to have its claim adjusted have been met with delay and requests for information that was previously provided."

**ANSWER:** Selective admits only that on February 20, 2025, Plaintiffs sent the referenced letter to Selective, that Exhibit T appears to be Plaintiffs' February 20, 2025, letter, and that the letter contains the quoted language. Selective denies all characterizations, assertions, and accusations contained therein.

77. The February 20, 2025 letter itemized eleven separate items that plaintiffs had repeatedly sought coverage for, and that Selective had failed to adjust. As stated in the letter, plaintiffs have "seen no progress in Selective's adjustment of the outstanding claims, and its continued delay is not only vexatious and unreasonable; it is inexplicable."

**ANSWER:** Selective admits only that Plaintiffs' February 20, 2025, letter itemized eleven items. Selective denies all characterizations, assertions, and accusations contained therein.

78. On February 28, 2025, pursuant to plaintiffs' earlier request, Selective sent plaintiffs a letter disclosing for the first time the replacement cost appraisal for the Building, which Selective prepared on July 7, 2023, five days after the catastrophic roof collapse. A copy of the February 28, 2025 letter is attached as **Exhibit U**. In its letter, Selective admitted that its appraisal showed that "the [B]uilding was properly insured from a co-insurance perspective". Meanwhile, Selective had withheld its replacement cost appraisal and told plaintiffs that their recovery would be limited under the Policy's coinsurance provision which Selective's own valuation showed was patently false.

**ANSWER:** **Selective admits only that on February 28, 2025, Selective sent Plaintiffs a letter disclosing the replacement cost appraisal for the building, that Exhibit U appears to be Selective's February 28, 2025, letter, and that the letter contains the quoted language. Selective denies all characterizations, assertions, and accusations contained therein, as well as all remaining allegations contained in paragraph 78.**

79.     Selective's own replacement cost appraisal, prepared by its Executive Adjuster, Ronald Rudow, five days after the loss, estimated the replacement cost for the Building was $10,161,303.78. With a 90% coinsurance calculation, as set forth in the Policy, the coinsurance amount based on Selective's valuation was $9,145,173.40. That amount is *less* than the $9,244,293.00 amount of coverage limits plaintiffs obtained for the Building.

**ANSWER:**     **Selective denies the allegations contained in paragraph 79.**

80.     Had it not been for Selective's inadvertent inclusion of the replacement cost appraisal for an alleged unrelated claim, it is likely that plaintiffs would still be unaware that Selective had performed a replacement cost analysis that showed the Building was adequately insured and plaintiffs' recovery would not be limited by the Policy's coinsurance provision.

**ANSWER:**     **Selective denies the allegations contained in paragraph 80.**

81.     Despite plaintiffs' requests, Selective has failed and refused to provide the replacement cost valuation Selective calculated *prior* to issuing the Policy.

**ANSWER:**     **Selective denies the allegations contained in paragraph 81.**

82.     In short, less than a week after the loss, Selective: (a) determined that plaintiffs had purchased appropriate coverage limits for the Building and that the Policy's coinsurance provision would not limit plaintiffs' recovery but; (b) withheld the valuation; and (c) then informed plaintiffs that they their recovery would be limited by the coinsurance provision.

**ANSWER:**     **Selective denies the allegations contained in paragraph 82.**

83.     Selective has subsequently advised plaintiffs that it will not provide any additional coverage for the reconstruction of the Building due to the coinsurance provision.

**ANSWER**:     **Selective admits the allegations contained in paragraph 83.**

84.     In its February 28, 2025 letter, Selective said it would pay outstanding Claim Expenses in the amount of $1,322.50 and outstanding Additional Costs in the amount of $25,000. Despite agreeing to pay these amounts, Selective without cause or justification has failed to remit these payments. *See* **Exhibit U**.

**ANSWER**:     **Selective admits that it stated in its February 28, 2025, letter that it would pay outstanding claim expenses in the amount of $1,322.50 and outstanding costs in the amount of $25,000. Selective denies all remaining allegations contained in paragraph 84.**

### *The Policy*

85.     The Policy contains a Building and Personal Property Coverage Form, which requires Selective "to pay for direct physical loss or damage to Covered Property at the premises described in the Declarations caused by or resulting from a Covered Cause of Loss."

**ANSWER**:     **Selective admits that the language cited in paragraph 85 (incorrectly numbered as paragraph 84 in Plaintiffs' Complaint) appears in the Policy. Selective denies that the abbreviated description of the terms and conditions of the Policy are a complete or accurate recitation of the Policy's relevant terms and conditions.**

86.     The Policy contains and [*sic*] ElitePac Property Extension Endorsement which modifies the base coverage of the Policy adding numerous coverage extensions, including but not limited to providing coverage the increased cost of construction and outdoor property to comply with Law and Ordinances.

**ANSWER**:     **Selective admits that the information cited in paragraph 86 (incorrectly numbered as paragraph 85 in Plaintiffs' Complaint) appears in the Policy. Selective denies that the abbreviated description of the terms and conditions of the Policy is an accurate or complete recitation of the Policy's relevant terms and conditions.**

87.     The Policy defines Covered Property to include, without limitation, plaintiffs' "Building, meaning the building or structure described in the Declarations…." and "Your Business Personal Property… [which] consists of…: (1) Furniture and fixtures; (2) Machinery and

equipment; (3) "Stock"; (4) All other personal property owned by you and used in your business;

(5) Labor, materials or services furnished or arranged by your on personal property of others…."

**ANSWER:** **Selective admits that the language cited in paragraph 87 (incorrectly numbered as paragraph 86 in Plaintiffs' Complaint) appears in the Policy. Selective denies that the abbreviated description of the terms and conditions of the Policy are a complete or accurate recitation of the Policy's relevant terms and conditions.**

88.     The Policy defines "Covered Causes of Loss" as "direct physical loss unless the

loss is excluded in this policy".

**ANSWER:** **Selective admits that the language cited in paragraph 88 (incorrectly numbered as paragraph 87 in Plaintiffs' Complaint) appears in the Policy. Selective denies that the abbreviated description of the terms and conditions of the Policy are a complete or accurate recitation of the Policy's relevant terms and conditions.**

89.     Direct physical loss of or damage to plaintiffs' Covered Property, including without

limitation, the Building and Business Personal Property, resulted from the July 2, 2023, storm,

which falls within the Policy definition of Covered Cause of Loss.

**ANSWER:** **Selective admits that certain portions of Plaintiff's claim for damage to its Covered Property resulted from the July 2, 2023, fall within the Policy definition of Covered Cause of Loss, but denies that the entire claimed loss does.**

90.     The Policy further provides that Selective "will pay for the cost to replace or restore

electronic data [defined to include computer software] which has been destroyed or corrupted by

a Covered Cause of Loss."

**ANSWER:** **Selective admits that the language cited in paragraph 90 (incorrectly numbered as paragraph 89 in Plaintiffs' Complaint) appears in the Policy. Selective denies that the abbreviated description of the terms and conditions of the Policy are a complete or accurate recitation of the Policy's relevant terms and conditions.**

91.     The Policy further requires Selective to pay for plaintiffs' "expense to remove

debris of Covered Property and other debris that is on the described premises, when such debris is

caused by or results from a Covered Cause of Loss…."

**ANSWER:**     **Selective admits that the language cited in paragraph 91 (incorrectly numbered as paragraph 90 in Plaintiffs' Complaint) appears in the Policy. Selective denies that the abbreviated description of the terms and conditions of the Policy is an accurate or complete recitation of the Policy's relevant terms and conditions.**

92.     The Policy further provides: "In the event of damage by a Covered Cause of Loss to a building that is Covered Property, we will pay the increased costs incurred to comply with the minimum standards of an ordinance or law in the course of repair, rebuilding or replacement of damaged parts of that property…."

**ANSWER:**     **Selective admits that the language cited in paragraph 92 (incorrectly numbered as paragraph 91 in Plaintiffs' Complaint) appears in the Policy. Selective denies that the abbreviated description of the terms and conditions of the Policy is an accurate or complete recitation of the Policy's relevant terms and conditions.**

93.     The Policy further provides that Selective: "[W]ill pay Extra Expense (other than the expense to repair or replace property) to: (1) Avoid or minimize the "suspension" of business and to continue operations at the described premises or at replacement premises or temporary locations, including relocation expenses and costs to equip and operate the replacement location or temporary location."

**ANSWER:**     **Selective admits that the language cited in paragraph 93 (incorrectly numbered as paragraph 92 in Plaintiffs' Complaint) appears in the Policy. Selective denies that the abbreviated description of the terms and conditions of the Policy is an accurate or complete recitation of the Policy's relevant terms and conditions.**

94.     The Policy obligates Selective to pay for Additional Costs in the form of legal and accounting fees not to exceed $25,000 resulting from the damage to the Building.

**ANSWER:**     **Selective admits that the information cited in paragraph 94 (incorrectly numbered as paragraph 93 in Plaintiffs' Complaint) appears in the Policy. Selective denies that the abbreviated description of the terms and conditions of the Policy is an accurate or complete recitation of the Policy's relevant terms and conditions.**

95. The Policy contains a Business Income (and Extra Expense) Coverage Form, which provides coverage for lost income and expenses incurred while the Covered Property is restored.

**ANSWER:** **Selective admits that the information cited in paragraph 95 (incorrectly numbered as paragraph 94 in Plaintiffs' Complaint) appears in the Policy. Selective denies that the abbreviated description of the terms and conditions of the Policy is an accurate or complete recitation of the Policy's relevant terms and conditions.**

96. The Policy contains a form titled Inland Marine Premier PAC, which provides in pertinent part that: "We will pay for direct physical loss or damage to Covered Property from any of the Covered Causes of Loss." The Covered Property in that coverage form includes COI's "mobile machinery and equipment normally used in [its] contracting, servicing, installation, erection, fabrication, repair or moving operations or projects and similar mobile machinery and equipment of others[.]"

**ANSWER:** **Selective admits that the language cited in paragraph 96 (incorrectly numbered as paragraph 95 in Plaintiffs' Complaint) appears in the Policy. Selective denies that the abbreviated description of the terms and conditions of the Policy is an accurate or complete recitation of the Policy's relevant terms and conditions.**

97. The Policy contains a Systems Power PAC endorsement that provides in part, "[Selective] will pay for the direct physical damage to Covered Property" that is the direct result of "an accident". The provision further defines "accident" as "a fortuitous event that causes direct physical damage to "covered equipment". Pursuant to the endorsement, "If 'covered equipment' requires replacement due to an 'accident', [Selective] will pay [plaintiffs'] additional cost to replace with equipment that is better for the environment, safer, or more efficient than the equipment being replaced." The endorsement defines "covered equipment" as "Covered Property that generates, transmits or utilizes energy." The endorsement limits Selective's payment obligation to no more than "125% of what the cost would have been to replace with like kind and quality."

**ANSWER:**     **Selective admits that the language and information cited in paragraph 97 (incorrectly numbered as paragraph 96 in Plaintiffs' Complaint) appears in the Policy. Selective denies that the abbreviated description of the terms and conditions of the Policy is an accurate or complete recitation of the Policy's relevant terms and conditions.**

## COUNT I
## BREACH OF CONTRACT
### (*Plaintiffs v. Selective*)

98.     Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 96 [*sic*] above as Paragraph 97 [*sic*] of this Count I as though fully set forth herein.

**ANSWER:**     **Selective restates and realleges by reference each and every response to paragraphs 1-97, inclusive, as though fully set forth herein for its response to paragraph 98 (incorrectly numbered as paragraph 97 in Plaintiffs' Complaint).**

99.     The storm and roof collapse constituted a Covered Caused of Loss to the Covered Property under the Policy. Therefore, the Policy provided insurance coverage for plaintiffs' claim and required Selective to pay for resulting damage, including, without limitation to plaintiffs' Building and Business Personal Property due.

**ANSWER:**     **Selective admits that a storm occurred and that Plaintiffs submitted a claim for damage to the Covered Property. Selective denies the remaining allegations contained in paragraph 99 (incorrectly numbered as paragraph 97 in Plaintiffs' Complaint), including any implication that the Policy required payment for the claimed losses, as they call for legal conclusions to which no response is required. To the extent a response is required, Selective denies them.**

100.     Selective accepted coverage for plaintiffs' claim under the Policy.

**ANSWER**     **Selective admits that certain portions of Plaintiffs' claimed loss are covered by the Policy and that Selective has paid all that it owes for that claimed loss.**

101.     Selective has not denied plaintiffs' claim under the Policy.

**ANSWER:**     **Selective admits that certain portions of Plaintiffs' claimed loss are covered by the Policy and that Selective has paid all that it owes for that claimed loss.**

102.     Plaintiffs have repeatedly requested that Selective provide a comprehensive breakdown of coverage, including what items that Selective has provided coverage for.

**ANSWER:** **Selective admits that Plaintiffs have made the request described in paragraph 102 (incorrectly numbered as paragraph 101 in Plaintiffs' Complaint), and denies that Selective has failed to provide any information that it was obligated to provide.**

103. Although Selective has acknowledged its obligation to communicate available coverages and its coverage positions to plaintiffs, it has failed to do so.

**ANSWER:** **Selective denies the allegations contained in paragraph 103 (incorrectly numbered as paragraph 102 in Plaintiffs' Complaint).**

104. The Policy constitutes a valid and enforceable contract.

**ANSWER:** **Selective admits the allegations contained in paragraph 104 (incorrectly numbered as paragraph 103 in Plaintiffs' Complaint).**

105. Plaintiffs performed their material obligations under the Policy, including paying for all premiums.

**ANSWER:** **Selective admits that Plaintiffs paid insurance policy premiums under the Policy. Selective denies all remaining allegations contained in paragraph 105 (incorrectly numbered as paragraph 104 in Plaintiffs' Complaint).**

106. Selective has breached the Policy by failing to pay plaintiffs for matters insured by the Policy.

**ANSWER:** **Selective denies the allegations contained in paragraph 106 (incorrectly numbered in Plaintiffs' Complaint as paragraph 105).**

107. Pursuant to the Policy, Selective is obligated to provide insurance coverage for plaintiffs' covered losses and redress the damage caused to the plaintiffs' Covered Property, including without limitation, to the Building and Business Personal Property, as well as for other covered costs and expenses.

**ANSWER:** **Selective denies the allegations contained in paragraph 107 (incorrectly numbered as paragraph 106 in Plaintiffs' Complaint) to the extent that they assert that Selective has not provided all insurance coverage that is owed pursuant to the Policy.**

28

108.    Selective has breached the Policy by failing to pay plaintiffs for their covered losses, costs and expenses under the Policy, including without limitation, as follows:

(a)    Failed to adjust and/or pay for the loss to the Building in an amount in excess of $3,700,000.

(b)    Failed to adjust and/or pay for the loss of Business Personal Property, including without limitation, the Peddinghaus Machine in an amount in excess of $1,800,000; machinery known as the LS Blaster in the amount $203,091.07; welders in an amount in excess of $290,000; and machinery known as the Faro Scanner in the amount of $46,130.

(c)    Failed to adjust and/or pay plaintiffs their additional cost up to and including 125% of what the cost would have been to replace their covered equipment which generates, transmits or utilizes energy, including without limitation, the Peddinghaus Machine, the LS Blaster, the welders and the Faro Scanner with equipment that is better for the environment, safer or more efficient than the equipment being replaced.

(d)    Failed to adjust and/or pay plaintiffs' claim for plumbing and sewer repairs in excess of $628,000.

(e)    Failed to adjust and/or pay $253,018.17 in construction costs under the Ordinance and Law coverage provision despite previously authorizing the work on August 19, 2024.

(f)    Failed to adjust and/or pay $235,617.53 for debris removal following the storm.

(g)    Failed to adjust and/or pay plaintiffs for the full replacement cost for Business Personal Property in an amount in excess of $200,000.

(h)    Failed to adjust and/or pay for the loss of plaintiffs' Blue Beam software program in an amount in excess of $4,800 annually.

(i)    Failed to adjust and/or pay plaintiffs' claim for additional costs for the Policy limit of $25,000 relating to legal fees incurred in connection with COI obtaining a lease for temporary space and accounting fees related to reporting requirements stemming from the loss.

(j)    Failed to adjust and/or pay plaintiffs' claim expenses in the amount of $1,322,450 related to the investigation of their claim, determination of the amount of their loss, and the costs of preparing specific loss documents and supporting exhibits.

(k)    Failed to adjust and/or pay plaintiffs' expenses for a lock replacement in the amount of $2,153.00.

29

(l)    Failed to adjust and/or pay for plaintiffs' expenses for IT services in the amount of $32,073.22.

**ANSWER:**    **Selective denies the allegations contained in paragraph 108 (incorrectly numbered as paragraph 107 in Plaintiffs' Complaint), including subparagraphs (a) through (l).**

109.    Plaintiffs have been damaged by Selective's breach of the Policy in that its Covered Property has been damaged and Selective has failed and refuses to make the required payments under the Policy in an amount in excess of $7,800,000.

**ANSWER:**    **Selective denies the allegations contained in paragraph 109 (incorrectly numbered as paragraph 108 in Plaintiffs' Complaint).**

WHEREFORE, Defendant Selective Insurance Company of America denies that Plaintiffs are entitled to judgment against it in any amount whatsoever, and Defendant prays for the entry of judgment in its favor and against Plaintiffs, on the Complaint, together with its costs of this action.

## COUNT II
## VIOLATION OF ILLINOIS INSURANCE CODE
### (*Plaintiffs v. Selective*)

110.    Plaintiffs realleges and incorporates herein by reference Paragraphs 1 through 108 [*sic*] above as Paragraph 109 [*sic*] of this Count II as though fully set forth herein.

**ANSWER:**    **Selective restates and realleges by reference each and every response to paragraphs 1-109, inclusive, as though fully set forth herein for its response to paragraph 110 (incorrectly numbered as paragraph 109 in Plaintiffs' Complaint).**

111.    The Policy at Section E.4.g (Loss Payment) requires generally that Selective pay for a covered loss within 30 days after it receives the sworn proof of loss unless it has yet to reach agreement on the amount of loss or an appraisal award has been made. It reads in part:

> We will pay for covered loss or damage within 30 days after we receive the sworn proof of loss, if you have complied with all of the terms of this Coverage Part….

**ANSWER:**    **Selective admits that the language and information cited in paragraph 111 (incorrectly numbered as paragraph 110 in Plaintiffs' Complaint)**

**appears in the Policy. Selective denies that these abbreviated terms are an accurate or complete recitation of the Policy's relevant terms and conditions.**

112.     Similarly, Ill. Admin. Code tit. 50, § 919.50, requires payment to an insured within 30 days for claims not in dispute. It reads in part:

> The company shall affirm or deny liability on claims within a reasonable time and shall offer payment within 30 days after affirmation of liability, if the amount of the claim is determined and not in dispute. For those portions of the claim which are not in dispute and for which the payee is known, the company shall tender payment within said 30 days.

**ANSWER:     The statements contained in paragraph 112 (incorrectly numbered as paragraph 111 in Plaintiffs' Complaint) state a legal conclusion. To the extent that these statements are contrary to applicable law, or contain allegations of fact, Selective denies them.**

113.     The Illinois Insurance Code enumerates improper claims practices in Section 154.6, including, "[f]ailing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed." *See* 215 ILCS 5/154.6.

**ANSWER:     The statements contained in paragraph 113 (incorrectly numbered as paragraph 112 in Plaintiffs' Complaint) state a legal conclusion. To the extent that these statements are contrary to applicable law, or contain allegations of fact, Selective denies them.**

114.     Plaintiffs submitted their proof of loss statement on February 16, 2024. Twenty months later, Selective has failed to adjust and/or pay plaintiffs for its covered losses in excess of $7,800,000.

**ANSWER:     Selective admits that Plaintiffs submitted their Proof of Loss Statement on February 16, 2024. Selective denies all remaining allegations contained in paragraph 114 (incorrectly numbered as paragraph 113 in Plaintiffs' Complaint).**

115.     As detailed above, Selective has engaged in improper claim practices identified in Section 154.6, including, without limitation, by failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed, and as follows:

(a)    Knowingly misrepresenting relevant facts to plaintiffs or policy provisions relating to coverages at issue;

(b)    Failing to acknowledge with reasonable promptness pertinent communications with respect to claims arising under its policies;

(c)    Failing to adopt and implement reasonable standards for the prompt investigations and settlement of claims arising under its policies;

(d)    Not attempting in good faith to effectuate prompt, fair and equitable settlement of claims submitted in which liability has become reasonably clear;

***

(h)    Refusing to pay claims without conducting a reasonable investigation based on all available information;

(i)    Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed;

***

(m)    Delaying the investigation or payment of claims by requiring plaintiffs to submit a preliminary claim report and then requiring subsequent submission of formal proof of loss forms, resulting in the duplication of verification;

(n)    Failing in the case of the denial of a claim or the offer of a compromise settlement to promptly provide a reasonable and accurate explanation of the basis in the insurance policy or applicable law for such denial or compromise settlement.

**ANSWER:**    **Selective denies the statements contained in paragraph 115 (incorrectly numbered as paragraph 114 in Plaintiffs' Complaint), including sub-paragraphs (a)-(d), (h)-(i), and (m)-(n).**

116.    Section 155(1) of the Illinois Insurance Code provides as follows:

In any action by or against a company wherein there is in issue the liability of a company on a policy or policies of insurance or the amount of the loss payable thereunder, or for an unreasonable delay in settling a claim, and it appears to the court that such action or delay is vexatious and unreasonable, the court may allow as part of the taxable costs in the action reasonable attorney fees, other costs, plus an amount not to exceed any one of the following amounts:

(a)    60% of the amount which the court or jury finds such party is entitled to recover against the company, exclusive of all costs;

      (b)      $60,000;

      (c)      the excess of the amount which the court or jury finds such party is entitled to recover, exclusive of costs, over the amount, if any, which the company offered to pay in settlement of the claim prior to the action.

**ANSWER:**    **The statements contained in paragraph 116 (incorrectly numbered as paragraph 115 in Plaintiffs' Complaint) state a legal conclusion. To the extent that these statements are contrary to applicable law, or contain allegations of fact, Selective denies them.**

117.    Due to Selective's improper claims practices and its unreasonable and vexatious delay in settling plaintiffs' claim, plaintiffs have lost the use of their Covered Property and Business Personal Property and COI is unable to competitively bid projects as it lacks the necessary machinery and warehouse capacity.

**ANSWER:**    **The statements contained in paragraph 117 (incorrectly numbered as paragraph 116 in Plaintiffs' Complaint) state a legal conclusion. To the extent that these statements are contrary to applicable law, or contain allegations of fact, Selective denies them.**

118.    Due to Selective's improper claims practices and its unreasonable and vexatious delay in settling plaintiffs' claim, COI has suffered increased labor costs and diminished profitability due to the loss, failure and errors of its machinery, including the Peddinghaus Machine, the LS Blaster, and the Faro machine, that Selective has failed to properly adjust.

**ANSWER:**    **The statements contained in paragraph 118 (incorrectly numbered as paragraph 117 in Plaintiffs' Complaint) state a legal conclusion. To the extent that these statements are contrary to applicable law, or contain allegations of fact, Selective denies them.**

119.    Selective's improper claims practices and its unreasonable and vexatious delays have caused significant damage to plaintiffs beyond the damage to the Covered Property, including, but not limited to, COI's lost profits to date in excess of $8,600,000 and COI's continued lease payments in the approximate monthly amount of $27,000 for temporary space.

**ANSWER:** **The statements contained in paragraph 119 (incorrectly numbered as paragraph 118 in Plaintiffs' Complaint) state a legal conclusion. To the extent that these statements are contrary to applicable law, or contain allegations of fact, Selective denies them.**

120.    The date of plaintiffs' loss was July 2, 2023, and plaintiffs submitted their Sworn Statement of Loss on February 16, 2024. Selective has failed and refused to adjust the claim and pay for the required coverages.

**ANSWER:** **Selective admits that the date of Plaintiffs' loss was July 2, 2023, and that their Sworn Statement of Loss was submitted on February 16, 2024. Selective denies all remaining allegations contained in paragraph 120 (incorrectly numbered as paragraph 119 in Plaintiffs' Complaint).**

121.    There is no justifiable basis for Selective to have failed to fully adjust plaintiffs' claim and fully pay for plaintiffs' covered losses.

**ANSWER:** **Selective denies the allegations contained in paragraph 121 (incorrectly numbered in Plaintiffs' Complaint as paragraph 120).**

122.    Not only has Selective failed to adjust and/or pay for plaintiffs' clearly covered losses, including completely failing to address the damage to the Building's concrete slab and failing to pay Claim Expenses and Additional Costs that it agreed to pay, it has advanced untenable positions.

**ANSWER:** **Selective denies the allegations contained in paragraph 122 (incorrectly numbered in Plaintiffs' Complaint as paragraph 121).**

123.    Selective has advanced a coinsurance argument for repairs to the Building which its own valuation, which it had withheld from plaintiffs, showed to be false.

**ANSWER:** **Selective denies the allegations contained in paragraph 123 (incorrectly numbered in Plaintiffs' Complaint as paragraph 122).**

124.    Further, Selective has contended and maintains that plaintiffs' claim in excess of $628,000 for the repairs to their sewer and plumbing systems pursuant to the Policy's Ordinance and Law coverage provisions is not covered because it believes plaintiffs are not required to

comply with Chicago's current building code. Selective's position is at direct odds with Title 18 of the Municipal Code of Chicago, which provides:

> 18-29-102.4 Additions, alterations or repairs.
>
> Additions, alterations, renovations or **_repairs to any plumbing system shall conform to that required for a new plumbing system_** without requiring the entire existing plumbing system to comply with all the requirements of this chapter. Additions, alterations or repairs shall not cause an existing system to become unsafe, insanitary or overloaded.

**ANSWER:** **Selective denies the allegations contained in paragraph 124 (incorrectly numbered in Plaintiffs' Complaint as paragraph 123).**

125. Further, Selective has contended that plaintiffs should repair their plumbing system without regard to meeting the requirements for a new plumbing system until such time as the City of Chicago stops them or cites them for a violation.

**ANSWER:** **Selective denies the allegations contained in paragraph 125 (incorrectly numbered in Plaintiffs' Complaint as paragraph 124).**

126. The unpaid portion of plaintiffs' covered losses stemming from the loss on July 2, 2023, currently exceeds $7,800,000.

**ANSWER:** **Selective denies that COI's claim regarding outstanding damages represents "covered losses." With regard to the remaining allegations, specifically the amount of the alleged damages, Selective has insufficient knowledge as to the truth or falsity of those allegations contained in paragraph 126 (incorrectly numbered as paragraph 125 in Plaintiffs' Complaint) and therefore neither admits nor denies said allegations and demands strict proof thereof.**

127. Selective's actions are wrongful, vexatious, unreasonable, and unjustifiable.

**ANSWER:** **The statements contained in paragraph 127 (incorrectly numbered as paragraph 126 in Plaintiffs' Complaint) state a legal conclusion. To the extent that these statements are contrary to applicable law, or contain allegations of fact, Selective denies them.**

128. Pursuant to Section 155 of the Illinois Insurance Code, Selective is liable to plaintiffs for their attorneys' fees, costs, and additional damages pursuant to statute.

**ANSWER:** **The statements contained in paragraph 128 (incorrectly numbered as paragraph 127 in Plaintiffs' Complaint) state a legal conclusion. To the extent**

that these statements are contrary to applicable law, or contain allegations of fact, Selective denies them.

WHEREFORE, Defendant Selective Insurance Company of America denies that Plaintiffs are entitled to judgment against it in any amount whatsoever, and Defendant prays for the entry of judgment in its favor and against Plaintiffs, on the Complaint, together with its costs of this action.

## COUNT III
## VIOLATION OF THE ILLINOIS CONSUMER FRAUD ACT
### *(Plaintiffs v. Selective)*

129.    Plaintiffs realleges and incorporates herein by reference Paragraphs 1 through 125 [*sic*] above as Paragraph 126 [*sic*] of this Count III as though fully set forth herein.

**ANSWER:** **Selective restates and realleges by reference each and every response to paragraphs 1-128, inclusive, as though fully set forth herein for its response to paragraph 129 (incorrectly numbered as paragraph 128 in Plaintiffs' Complaint).**

130.    On July 2, 2023, the date of plaintiffs' loss, the value of their Covered Property was severely diminished and remains diminished through the date of the filing of this Complaint.

**ANSWER:** **Selective has insufficient knowledge as to the nature or extent of the damage alleged in paragraph 130 (incorrectly numbered in Plaintiffs' Complaint as paragraph 129) and therefore denies the allegations.**

131.    Notwithstanding the severe diminishment of the value of plaintiffs' Covered Property, Selective continued to unfairly charge plaintiffs premiums as if the Covered Property had retained its full value for the period of July 2, 2023, through December 15, 2024.

**ANSWER:** **Selective admits that it continued to charge Plaintiffs premiums for the period of July 2, 2023, through December 15, 2024. Selective denies all remaining allegations and characterizations of its actions contained in paragraph 131 (incorrectly numbered as paragraph 130 in Plaintiffs' Complaint).**

132.    Charge [sic] plaintiffs premiums as if the Covered Property had retained its full value for the period of July 2, 2023, through December 15, 2024 was deceptive and/or unfair.

**ANSWER:** **The statements contained in paragraph 132 (incorrectly numbered as paragraph 131 in Plaintiffs' Complaint) state a legal conclusion. To the extent**

36

**that these statements are contrary to applicable law, or contain allegations of fact, Selective denies them.**

133.     Selective intended that plaintiffs rely on its deceptive and/or unfair conduct and that they would pay premiums at an artificially elevated rate for insurance coverage for the diminished property as if the Covered Property had retained its full value.

**ANSWER:     Selective denies the allegations contained in paragraph 133 (incorrectly numbered as paragraph 132 in Plaintiffs' Complaint).**

134.     By way of example, although COI's Peddinghaus Machine was significantly diminished to the point that it needs to be replaced and has a replacement value in excess of $1.8 million, Selective continued to charge and receive from plaintiffs premiums for coverage of the Peddinghaus Machine. Similarly, Selective continued to charge and receive from plaintiffs premiums for coverage for the Building commensurate with its prior value as if there was no loss.

**ANSWER:     Selective admits that it continued to charge and receive from Plaintiffs premiums for coverage for the Building. Selective denies all remaining allegations in paragraph 134 (incorrectly numbered in Plaintiffs' Complaint as paragraph 133).**

135.     Charging an insured premiums for coverage of property with no or diminished value on the same basis as property with full value offends public policy, causes substantial injury to consumers, and is immoral, unethical, oppressive, or unscrupulous.

**ANSWER:     To the extent that the statements contained in paragraph 135 (incorrectly numbered as paragraph 134 in Plaintiffs' Complaint) constitute legal conclusions, no response is required. To the extent that these statements are contrary to applicable law, or contain allegations of fact, Selective denies them.**

136.     Selective's deceptive and/or unfair conduct occurred in a course of conduct involving trade and commerce, specifically in providing insurance coverage to a business consumer.

**ANSWER:     The statements contained in paragraph 136 (incorrectly numbered as paragraph 135 in Plaintiffs' Complaint) state a legal conclusion. To the extent**

that these statements are contrary to applicable law, or contain allegations of fact, Selective denies them.

137.    As a proximate result of Selective's deceptive and/or unfair conduct, plaintiffs have been damaged by paying in excess of $90,000 in premiums for insurance coverage that far exceeded the value of the property Selective was insuring.

**ANSWER:**    **The statements contained in paragraph 137 (incorrectly numbered as paragraph 136 in Plaintiffs' Complaint) state a legal conclusion. To the extent that these statements are contrary to applicable law, or contain allegations of fact, Selective denies them.**

138.    Selective's deceptive and/or unfair conduct violated the Illinois Consumer Fraud Act, 815 ILCS 505/1, *et. seq.*

**ANSWER:**    **The statements contained in paragraph 138 (incorrectly numbered as paragraph 137 in Plaintiffs' Complaint) state a legal conclusion. To the extent that these statements are contrary to applicable law, or contain allegations of fact, Selective denies them.**

139.    Pursuant to Sections 10 (a) and (c) of the Illinois Consumer Fraud Act, 815 ILCS 505/10 (a) and (c), plaintiffs are entitled to recover from Selective their actual economic damages, punitive damages, and attorney's fees and costs.

**ANSWER:**    **The statements contained in paragraph 139 (incorrectly numbered as paragraph 138 in Plaintiffs' Complaint) state a legal conclusion. To the extent that these statements are contrary to applicable law, or contain allegations of fact, Selective denies them.**

WHEREFORE, Defendant Selective Insurance Company of America denies that Plaintiffs are entitled to judgment against it in any amount whatsoever, and Defendant prays for the entry of judgment in its favor and against Plaintiffs, on the Complaint, together with its costs of this action.

**COUNT IV** *(in the alternative)*
**PROFESSIONAL NEGLIGENCE**
*(Plaintiffs v. Assured)*

**Defendant Selective Insurance Company of America makes no response to the allegations in Count IV of Plaintiffs' Complaint, as they are directed solely at Defendant AssuredPartners of Illinois, LLC. To the extent a response is required, Defendant Selective denies the allegations asserted and demands strict proof thereof.**

38

## AFFIRMATIVE DEFENSES

Defendant, SELECTIVE INSURANCE COMPANY OF AMERICA, for its Affirmative Defenses to Plaintiffs' Complaint at Law, without prejudice to its answers and denials above, and pleading in the alternative, state as follows:

## AFFIRMATIVE AND OTHER DEFENSES

1.      Plaintiffs' Claims are barred, in whole or in part, because the Complaint does not state a claim upon which relief may be granted and should therefore be dismissed.

2.      The coverages set forth in the Policy are not applicable to the facts upon which Plaintiffs seek coverage.

3.      Plaintiffs' claims are barred, in whole or in part, by the parties' contract.

4.      Plaintiffs are barred to the extent Plaintiffs failed to mitigate their claimed damages, if any.

5.      Plaintiffs have not suffered any real or actual damages as a result of any alleged acts or omissions of Selective Insurance Company of America.

6.      Plaintiffs' claims are barred or limited, in whole or in part, to the extent that Plaintiffs failed to perform their obligations under the Policy.

7.      Plaintiffs' claims are barred or limited, in whole or in part, to the extent Plaintiffs did not seek relief for damages or losses covered by the Policy.

8.      Plaintiffs' claims are barred, in whole or in part, by the doctrine of waiver, estoppel, laches or unclean hands.

9.      Defendant affirmatively states that it has complied in all respects with all obligations under the insurance contract.

10. Plaintiffs' claims are barred, in whole or in part, because Defendant has at all times acted in good faith and without malice, and denies that it or its agents and employees acted in bad faith or with the intent to harm the insured.

In pleading the foregoing defenses, Selective does not concede that it has the burden of proof as to any such defense, and Selective reserves the right to assert additional defenses should they become necessary or appropriate.

WHEREFORE, for the foregoing reasons, Selective Insurance Company of America respectfully requests that Plaintiffs' Complaint be dismissed and that this Honorable Court declare that:

A. Selective Insurance Company of American has no obligation under the Policy to pay or reimburse Plaintiffs for any amounts claimed in their Complaint;

B. Selective Insurance Company of America is entitled to costs and attorney's fees; and

C. Selective Insurance Company of America is entitled to all such other and further relief that the Court deems just and proper.

Respectfully Submitted,

Selective Insurance Company of America

By: */s/ Michael P. Baniak*

Michael P. Baniak
Dennis M. Dolan
Zachary G. Stillman
LITCHFIELD, CAVO, LLP
303 West Madison, Suite 300
Chicago, IL 60606
(312) 781-6596 (Baniak)
(312) 781-6641 (Dolan)
(312) 781-6672 (Stillman)
Baniak@litchfieldcavo.com
Dolan@litchfieldcavo.com
Stillman@litchfieldcavo.com

**CERTIFICATE OF SERVICE**

I hereby certify that on May 22, 2025, I electronically filed the foregoing DEFENDANT SELECTIVE INSURANCE COMPANY OF AMERICA'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFFS' COMPLAINT with the Clerk of the Court using the CM/ECF system which will provide notice and service of same on all counsel of record.


By:     */s/  Michael P. Baniak*