# Exhibit B

CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE
INSURANCE CO. OF AMERICA, et al.
STUART CARLTON WALTON, JR.
February 19, 2026

Chimniak Court Reporting & Video, Inc.

Downtown: 312.781.9111
Suburban: 630.983.0030
ChimniakCourtReporting.com

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

CHICAGO ORNAMENTAL IRON, INC.,   )
et al.,                          )
                                 ) Case No.:
             Plaintiffs,         ) 1:25-cv-05131
                                 )
      vs.                        ) Hon. Mary M.
                                 ) Rowland
SELECTIVE INSURANCE CO. OF       )
AMERICA, et al.,                 ) Magistrate Judge:
                                 ) Young B. Kim
             Defendants.         )

          The deposition of STUART CARLTON WALTON, JR., via Zoom videoconference, taken before JANET L. ERICKSON, CSR License No. 084-003327, pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, commencing at 9:30 a.m. on February 19, 2026.

**CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.**
**STUART CARLTON WALTON, JR.** 2/19/2026

2 (Pages 2 to 5)

2

There were present during the taking of this deposition via Zoom videoconference the following counsel:

SCHOENBERG FINKEL BEEDERMAN BELL GLAZER, LLC
300 South Wacker Drive, Suite 1500
Chicago, Illinois 60606
(312) 648-2300
BY: MR. RICHARD M. GOLDWASSER
richard.goldwasser@sfbbg.com

MR. CHRISTOPHER N. NELSON
christopher.nelson@sfbbg.com
for the plaintiffs, Chicago Ornamental Iron, Inc., 4340 W. 47th St., LLC, and 4340 Holdings, LLC;

LITCHFIELD CAVO, LLP
303 West Madison Street, Suite 300
Chicago, Illinois 60606
(312) 781-6677
BY: MR. MICHAEL P. BANIAK
baniak@litchfieldcavo.com

MR. MICHAEL G. CEROTA
cerota@litchfieldcavo
for defendant Selective Insurance Co. of America;

LATHROP GPM, LLP
2345 Grand Boulevard, Suite 2200
Kansas City, Missouri 64108
(913) 451-5135
BY: MS. CARRIE E. JOSSERAND
carrie.josserand@lathropgpm.com

for defendant Assured Partners of Illinois.

ALSO PRESENT:
Mr. Jonathan Samek

3

I N D E X

Page

THE WITNESS:

STUART CARLTON WALTON, JR.

Direct Examination by Mr. Goldwasser          5

E X H I B I T S

Exhibit No. 1                          37
Exhibit No. 2                          68
Exhibit No. 3                          47
Exhibit No. 4                       48/84
Exhibit No. 5                       51/85
Exhibit No. 45                        110
Exhibit No. 52                     87/113
Exhibit No. 92                        103

4

THE COURT REPORTER: Before we proceed, pursuant to Federal Rule 30(b)(4) regarding depositions by oral examination, I will ask counsel to agree on the record that there is no objection to this deposition officer administering a binding oath to the witness by videoconference.

I will ask each of you to state your agreement on the record starting with counsel for the plaintiffs, and at the same time, please identify yourself and who you represent.

MR. GOLDWASSER: Richard Goldwasser. I'm here with my colleague, Chris Nelson, and we represent the plaintiffs in this matter, and we are in agreement.

Also with me today is Jon Samek, a representative of the plaintiffs.

THE COURT REPORTER: Mr. Baniak, can you please identify yourself and who you represent?

MR. BANIAK: Of course. Mike Baniak. I'm joined by Michael Cerota. We represent Selective Insurance Company, the defendant,

5

and we agree to the oath being administered via videoconference.

THE COURT REPORTER: Ms. Josserand?

MS. JOSSERAND: Carrie Josserand. I represent defendant Assured Partners of Illinois, and we are in agreement.

(Witness sworn.)

THE COURT REPORTER: Thank you.

Please proceed.

STUART CARLTON WALTON, JR., having been called as a witness and having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. GOLDWASSER:

Q. Mr. Walton, could you please state your full name for the record?

A. My first name is Stuart, S-t-u-a-r-t -- Carlton is my middle name -- Walton, and I'm a junior.

Q. Okay. And have you ever given your deposition before?

A. I'm sorry. You broke up a little bit.

Q. Have you ever given a deposition?

**CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.**
**STUART CARLTON WALTON, JR.** **2/19/2026**

3 (Pages 6 to 9)

---

**6**

A. Yes.

Q. On how many occasions?

A. I don't know the actual number. Somewhere 15 to 20 maybe.

Q. Okay. When was the last deposition you gave?

A. The last one?

Q. Yes.

A. It was sometime last year.

Q. Okay. I just want to go through a few basic ground rules. It seems like you understand or you've been through the deposition procedure before.

So I'm going to be asking you a series of questions, and the court reporter is going to be taking down my questions and your answers.

So the first thing I would ask is if -- before you begin your answer is if you can wait until I finish my question, and I will extend you the same courtesy. I'll allow you to fully answer my question before I ask the next question.

Do you understand that?

A. Yes, I do.

Q. And that way, the court reporter can

---

**7**

take down both my question and your answer fully.

If you don't understand a question I ask, please let me know, and I'll try to rephrase it in a way so you do understand it, okay?

A. Yes.

Q. If you need to take a break at any point, please let us know, and we'll certainly accommodate you. The only thing I would ask is that you answer any question that is pending before you take a break.

Fair enough?

A. Okay.

Q. One last point: All of your answers are going to need to be verbal. You know, sometimes witnesses will nod or shrug their shoulders. The court reporter can't take that down, so we need all of your answers to be verbal answers.

Understood?

A. Yes.

Q. Okay. In preparation for this deposition, can you tell me what you did?

A. I reviewed the log notes on the file.

Q. Okay. And when did you do that?

---

**8**

A. I did some yesterday, and I did some the prior week.

Q. Okay. Did you review any other documents?

A. No.

Q. Okay. I presume you met with counsel?

A. I met with counsel, yes.

Q. Okay. Do you understand that Mr. Rudow gave his deposition earlier this week?

A. Yes.

Q. Did you speak with Mr. Rudow?

A. After his deposition?

Q. After his deposition.

A. No, I did not.

Q. Did you speak with Mr. Rudow in preparation for his deposition?

A. No, I did not.

Q. Okay. Could you tell me the amount of time you spent preparing for today's deposition?

A. I probably spent three or four hours twice, so six to eight hours.

Q. Okay. What's your current position at Selective?

A. I'm a director of large loss property

---

**9**

claims.

Q. Okay. And what does that mean, "large loss property claims"?

A. I'm sorry. I didn't understand the question.

Q. What do mean when you say "large loss property claims"?

A. Losses that are in excess of $100,000.

Q. Okay. And how long have you been in your current position?

A. Since 2016, so about ten years.

Q. Okay. And what are your responsibilities?

A. It's a supervision job. I supervise five adjusters who are handling the large loss claims.

Q. Okay. And who are those adjusters?

A. Who are they? George -- by name, George Dickover. He's executive general adjuster. Bob Thompson and Frank Ortiz and Adam Searcy are general adjusters, and Eric Spahl is an associate general adjuster.

Q. Okay. And at one time, you supervised Ronald Rudow; is that correct?

---

4  (Pages 10 to 13)

10

A.    That is correct.

Q.    And when did you stop supervising Mr. Rudow?

A.    I'm not certain of the exact date.  But he was promoted to director sometime in the middle of this particular claim, and he stopped reporting to me after that.

Q.    Okay.  And this particular claim, you understand --

THE COURT REPORTER:  Excuse me.  Mr. Goldwasser, you are breaking up on my end.

BY MR. GOLDWASSER:

Q.    Okay.  Mr. Walton, you understand that this loss involved a loss resulting from a roof collapse, correct?

A.    That's correct.

Q.    And this was a loss dated July 2nd, 2023; is that correct?

A.    Yes.

Q.    Okay.  And you were assigned to oversee Mr. Rudow as the adjuster for this claim, correct?

A.    Correct.

Q.    Okay.  And are you still involved in

11

the adjustment of this claim?

A.    No.

Q.    Okay.  And when did your involvement stop?

A.    Again, I'm not sure of the exact date.  I know -- I think my last log note -- it would be shortly thereafter that last log note that I inputted.

Q.    Okay.  Once Mr. Rudow was promoted, was your involvement in adjusting this claim over at that time?

A.    It was limited.  I didn't direct him at all.  I may have sat in on some calls with counsel after he was promoted, but I wasn't supervising him anymore.

Q.    Okay.  Who do you report to?

A.    Matt Cadon.

Q.    And what's Mr. Cadon's position?

A.    He's the vice president of property claims.

Q.    Okay.  During your involvement in the adjustment of this claim, did you report to anyone besides Mr. Caton?

A.    No, I did not.

12

Q.    Okay.  Is there anybody above Mr. Caton that was involved in the adjustment of this claim?

A.    To the extent of approving reserves or payments, yes.

Q.    Okay.  And who was that?

A.    Paul Kush, with a "K," is the chief claims officer, and then there's the Large Loss Committee.  And I don't know exactly who makes up that committee, but they approve reserves over $5 million.

Q.    Do you have any input in the setting of reserves?

A.    Yes.

Q.    And did you have input in setting the reserve for this case?

A.    I'm sure I did.  We had a discussion with Mr. Rudow and Mr. Caton.

Q.    Okay.  And what factors go into a determination of setting a reserve?

A.    Well, it's what you know at the time of when you're setting the reserve.  So some things are more etched in stone as opposed to some things that are more subjective, and you're making an educated guess as to what the value of the claim

13

might be.

But you do your best to determine what your -- what you believe your ultimate exposure would be at that point.

Q.    Okay.  So if you can, tell me how a reserve is set.

A.    How?

Q.    Correct.

A.    I mean, the methodology to determine it or physically how you do it?

Q.    Well, physically.  Who's involved in the process?

A.    So the entire process starts with Mr. Rudow preparing what's called an SLR, a serious loss report.  He makes a recommendation as to what the reserve should be at that point, forwards that document to me.

If it's over my authority, then I have to forward it to Mr. Caton.  Mr. Caton has to forward it to Mr. Kush, and it has to go to the Large Loss Committee, all the way up if it's over the $5 million threshold.

Q.    Okay.  During your involvement in adjusting this claim, what was the limit of your

5 (Pages 14 to 17)

**14**

authority?

A. $1 million.

Q. Okay. So a reserve of anything over a million dollars, you would have to send it up the chain; is that correct?

A. That's correct.

Q. And how was this done?

Was this done by e-mail?

What was the correspondence that you --

A. Usually, it was done -- it was done by e-mail. And then if the person above had any questions or thoughts, concerns, they would call you and discuss.

Q. Okay. And because the reserve here for this claim we know was in excess of $5 million, we know that the Large Loss Committee had ultimate approval; is that correct?

A. Yes. It went to the Large Loss Committee.

Q. Okay. Do you know how many people are on that committee?

A. I don't know exactly. I think it's three or four, but I'm not -- I'm not certain. It's not a cloak-and-dagger type thing, but I just

**15**

don't get involved in it very often, and they don't communicate with me.

It's more -- it's the upper echelon of executives, probably the CEO, underwriting -- chief underwriting officer, actuarial, those types of individuals who give that approval.

Q. And how is that approval conveyed or communicated to you?

A. It comes back down the chain, usually from -- Mr. Caton would tell me that the committee approved it.

Q. Okay. Is there a document that says -- you know, like an approval document?

Is it just an e-mail?

A. It's just an e-mail.

Q. Okay.

A. If they -- I guess there could be changes to the document as it goes up and down the chain for some reason, if they don't like how it reads or whatever, so -- or they wanted more information, so they might adjust it and send back the document that's to be distributed.

Q. Okay. So once a reserve is set, does that mean there's been a fund or there's money

**16**

that's set aside to pay out on that claim?

A. Essentially.

Q. Okay.

A. Go ahead.

Q. And where is that money held?

Is it held in a bank account? A CD? Some investment?

A. I don't know how they divide the money or how they segregate it, but --

Q. Okay. Do you know if the money for a reserve -- is it earning income while the claim is being adjusted?

A. I don't know.

Q. What's the highest level of education that you have?

A. I graduated college.

Q. And when did you graduate?

A. When?

Q. Yes.

A. In 1983.

Q. And from where?

A. It was called Towson State College at that point.

Q. Could you spell that?

**17**

A. T-o-w-s-o-n.

Q. And where is that located?

A. In Towson, Maryland.

Q. Okay. And, I take it, it has a new name?

A. It's now Towson University.

Q. Okay. And what was your degree?

A. It was a B.S. in biology.

Q. Okay. At what point did you get into the insurance industry?

A. January of 1986.

Q. And what was your first job in the insurance industry?

A. I was a multi-line adjuster for commercial union insurance.

Q. Okay. And how long were you in that position?

A. I was in the inside position for about 18 months. After 18 months, I became an outside adjuster is what it was called then. I was still multi-line, but I was more focused on claims that needed outside investigation, so mostly general liability and property at that point. I still got some auto and some work comp.

6 (Pages 18 to 21)

**18**

So I stayed there until 1992, September of '92.

Q. Okay. And from 1992 until -- in 1992, where did you go?

A. I went to a company called Crum & Forster Insurance.

Q. Okay. And how long were you there?

A. I was there until, I think it was, July of 2000.

Q. Okay.

A. At that point, I only handled property claims.

Q. Okay. And what happened in July of 2000 that led you to leave?

A. They closed our office.

Q. Okay.

A. And I apologize, but I had several different roles while at Crum & Forster as well.

Q. Okay. And after Crum & Forster, where did you go?

A. I went to a local independent for a short time called Leizure Associates, L-e-i-z-u-r-e, as an independent adjuster, and then I started at Selective in November of 2000.

**19**

Q. Okay. So you've been with Selective for quite a while?

A. Yes.

Q. Okay. And you've been in your current position since 2016, correct?

A. Correct.

Q. Okay. Let me step back for a second. We're obviously over Zoom. Where are you physically located?

A. I'm at my home in Maryland.

Q. Okay. And you don't have any documents in front of you; is that correct?

A. No, I don't.

Q. Okay. Is anyone else in the room with you?

A. Just my dog.

Q. Nice. Okay. Do you have any professional licenses or certificates?

A. I am -- I've had several over time. They're probably not up to date at the moment. But when I was adjusting claims, I had licenses for different states. I'm what's called -- I have initials of AIC, Associate in Claims, which is a

**20**

designation you get for completing a few classes.

I think I have some -- I think I'm licensed in California because I took that test or whatever and maybe a couple of other states currently, but --

Q. Are you licensed in -- are you licensed in Illinois?

A. I don't think -- I'm not licensed in Illinois, no. I don't know if you need one or not.

Q. Okay. Were you ever licensed in Illinois?

A. No.

Q. Okay. Do you have any other -- have you undergone any other training during your time with Selective?

A. That's kind of a broad question. There's always training that goes on. More so now, I'm more of a trainer than I would be being trained given my position in the company, but I've taken a lot of classes over the years.

Q. Okay. When was the last class you took?

A. Oh, I was in a webinar last week about

**21**

AI stuff.

Q. Okay. Does Selective have any written materials regarding claim handling?

A. There's a document that we call the claims guidelines.

Q. Okay. And how long -- how many pages are those guidelines?

A. I don't have an idea of an exact number. It's electronic, and there's several sections to it.

Q. Okay. When was the last time you reviewed the guidelines?

A. I pop in and out every now and then depending upon what might happen. Probably within the last three months. But if you're talking about looking at them and reviewing them top to bottom, I haven't done that for a while.

Q. How about popping in and out?

A. Like I said, I've probably been in there within the last three months or so. I think I had a question about the timeliness of something or something like that. I just wanted to look and see what it said.

Q. And what do the guidelines say about

7 (Pages 22 to 25)

**22**

timeliness?

A. I was looking for something specific, and I couldn't find the answer in there as to what it was. They're not meant to be, you know, a roadmap for every claim specifically. It's more of a guide to help you through a claim.

Q. Okay. Is there anything in the guidelines relating to coinsurance?

A. There's probably references to it, but I don't -- I can't tell you what they are specifically right now.

Q. How about property valuation?

A. I'm sure there are references to that.

Q. Do you understand what a reservation of rights letter is?

A. I do.

Q. And could you tell me what your understanding is?

A. It's a letter that the company provides to the policyholder that gives them knowledge of a potential coverage issue.

Q. Okay. And what's the purpose of issuing a reservation of rights letter?

A. The purpose is to give them notice that

**23**

there is a potential coverage issue and that there's the potential that we might disclaim coverage or limit coverage or whatever the situation might be.

Q. Okay. One of the purposes, though, is for Selective to make sure that it reserves all of its defenses under a policy, correct?

A. Yes.

Q. Okay. And another purpose is to advise the insured of potential defenses that may be asserted by Selective, correct?

A. Yes.

Q. And to make sure that the insured knows going forward when they're making various decisions that Selective may, in fact, assert one of these policy defenses, correct?

A. Yes. I'll give you that.

Q. Okay. Are there any internal standards or guidelines at Selective that concern when to issue a reservation of rights letter?

A. I don't know if there's anything in the guidelines that specifically points to a "when."

Q. Okay. So let's talk about this current claim.

**24**

Do you recall your first involvement, when you were assigned to this claim?

A. It would have been -- it was either that same day or the next day, whenever it was reported. I would have gotten notice pretty quickly, I think.

Q. Okay. And what were your responsibilities in connection with adjusting this claim?

A. My responsibilities with adjusting the claim?

Q. Correct.

A. Well, that's Mr. Rudow's job to adjust it. I supervise it.

Q. Okay. So in connection with this claim, you don't consider your role as adjusting the claim; that's correct?

A. That's correct.

Q. You characterize your role as supervising someone who is adjusting the claim; is that correct?

A. That's correct.

Q. And so tell me, what did you do to supervise Mr. Rudow in his adjustment of this

**25**

claim?

A. I would -- I had lots of conversations with Mr. Rudow about the claim as it progressed, reviewed as much of the information as I can to make sure that the claim is moving forward properly.

Q. Okay. And how did you communicate with Mr. Rudow?

A. Either by phone or e-mail.

Q. Okay. So you would have e-mailed.

So when you would -- we should expect to see e-mails to and from Mr. Rudow regarding the adjustment of this claim, correct?

A. You could. I mean, it would be normal for me to either respond to his e-mail or --

Q. Okay. Did you text Mr. Rudow at any point regarding this claim?

A. Not to my knowledge. It could have happened but not to my knowledge.

Q. Okay. Has anyone asked you to review your e-mails or to send your e-mails on in response to our request to produce documents in this case?

A. Nobody has asked me, no.

8 (Pages 26 to 29)

### 26

Q. Okay. Has anyone asked you to look at your phone for text messages?

A. No.

Q. Okay. Were you involved at all in the collection of documents that were produced in this case?

A. No.

Q. Okay. Has anyone from Selective reached out to you in regards to producing documents in this case?

A. No.

Q. Okay. So you have no idea what documents may have been produced or may not have been produced; is that correct?

A. That's correct.

Q. Okay. Certain elements of the insured COI's claim were actually approved and paid on, correct?

A. Yes.

Q. Okay. Who made that -- who makes those decisions as to what's going to be covered and paid on?

A. The adjuster does.

Q. That would be Mr. Rudow?

### 27

A. Correct.

Q. Does he need your approval?

A. He needs -- depending upon where we are in the claim and the amount of the payment, yes.

Q. Okay. And without your approval, Mr. Rudow is unable to make a decision, is that right, a final decision on coverage?

A. He makes recommendations that we review and make sure they are in line. It would either be me or up the chain, so --

Q. Okay. Were there any recommendations made by Mr. Rudow that you rejected?

A. I don't recall right now.

Q. Okay. What would reflect that? When you say, "I don't recall right now," were there documents that would reflect whether or not you approved or rejected one of his recommendations?

A. I would have put a log note in.

Q. Okay. So if there's nothing in the log notes that reflect that you rejected any of his recommendations, is it fair to say that you didn't reject any of his recommendations?

A. That's likely, yes.

### 28

Q. Okay. And just generally, in your supervisory capacity, is it often that you reject the adjuster's recommendation?

A. I would say not often. It probably -- it does happen probably, yes.

Q. Okay. How often? Are you able to give me a percentage?

A. Not very often.

Q. Okay. Are we talking about your approval of 90 percent of the recommendations?

A. I don't know the percentage. It just doesn't happen very often.

Q. Okay. I'm just trying to figure out when you say that it doesn't happen very often what that means.

A. I mean, it would be much -- it would be much less than 10 percent.

Q. Much less than 10 percent. 99 percent approval rate?

A. I have no -- I mean, I don't know how many times I'm asked for approval to know how many times it would be -- I mean, I rarely make -- I rarely don't approve a payment --

Q. Okay.

### 29

A. -- unless there's something, you know, wrong about it, right?

Q. Okay. And when you are reviewing requests to approve a payment, what factors are you looking at?

A. Sometimes how it's paid or what it's being paid under might be incorrect. Sometimes they might have missed a deductible. Somebody might have missed whether it was supposed to be actual cash value versus replacement cost.

You know, sometimes people make mistakes or, you know, don't recommend the right number, and you have to make sure it's in line.

Q. And I think we covered this, but during your involvement with this claim, you reported to Mr. Caton?

A. That's correct.

Q. And you had approval up to a million dollars; is that right?

A. Up to a million is my authority level, yes.

Q. Okay. And there was payment in this case, you're aware, of over a million dollars, correct?

**CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.**
**STUART CARLTON WALTON, JR.** **2/19/2026**

9 (Pages 30 to 33)

---

30

A. That's correct.

Q. And did you have to get Mr. Caton's approval for that?

A. The way the process works is that once the approval comes down from the Large Loss Committee, we have the approval at that point to reserve and/or pay that amount that's approved.

So every time -- as it was then, every time we made a payment that would have been a single payment over my authority, Mr. Caton would have to approve. But, for instance, if we had paid out 1.5 million and we're making a $200,000 payment, the $200,000 payment would be within my authority, and I would not have to get his approval to do that.

Q. Okay. How about situations where Mr. Rudow recommended noncoverage or came to you and said, "Look, COI is making a claim for the Peddinghaus machine" -- or some other piece of equipment in the warehouse -- "and I don't think we should pay it"?

Does he have to get your approval at that point?

A. Yes.

---

31

Q. Okay.

A. Well, I guess if we're going to actually deny something, you know, and say we're not going to pay and tell the insured, then, yes. But you know, whether something is damaged or not, that his discretion.

Q. But the issue of denial of a component of the claim, you would have to be involved.

Is that what you're saying?

A. Yes.

Q. Okay. And do you recall ever seeing a recommendation from Mr. Rudow to deny coverage on any part of this claim?

A. No.

Q. Okay. So your understanding is Mr. Rudow never issued a denial of any part of the claim?

A. Not a denial letter while I was involved.

Q. Okay. And what's a denial letter?

A. It's a letter where we explain to the policyholder why we're not going to pay for something.

Q. Okay. And during your involvement, no

---

32

denial letter was issued?

A. Not to my knowledge, no.

Q. Okay. Do you know who else besides Mr. Rudow was involved in the adjustment of this claim?

A. I don't believe there were -- I mean, are you talking about experts or other vendors, or are you talking about Selective employees?

Q. Well, let's start with Selective employees.

A. Normally, we have an adjuster go out to the loss site, but I don't think we had, like, a -- the way our process works, the loss comes in. It gets assigned to a local adjuster and then gets referred to the large loss unit after the value is determined.

I'm not positive if somebody actually went there under that guise or not, but that would be our normal process. So if somebody did do that, that wouldn't surprise me, but I don't know if that happened.

Mr. Rudow is local. So given the loss description, it might have been assigned directly to him. But other than that, I don't believe any

---

33

other Selective employee other than the ones that we've talked about had any involvement in the claim.

Q. Okay. How about any vendors?

A. I know that the building consultant was JDH. We used Envista, another consultant, for the equipment. I believe we used RCF for salvage and/or inventory, and there's probably others that were used. I just don't recall them right now.

Q. Okay. You mentioned experts.

Were any experts retained or consulted?

A. Well, I would have called those people experts as well. There may have been engineers and people like that that we needed along the way.

Q. Okay. Tell me about the log note system.

Can you explain to me what that is and how information ends up in the claims system?

A. Embedded within our claims system is a repository for log notes. And basically, the process is you click on the button for log notes, and you have the ability to input one and then "publish it" is what it's called once you finish it, and then it's time-stamped as to when you do it.

---

10 (Pages 34 to 37)

34

Q. Okay. And what's the purpose of maintaining this system?

A. What's the purpose of maintaining it?

Q. Yes.

A. Okay. It's to make sure that we can understand what's going on in the claim and we have documentation to support what we're doing.

Q. Okay. So would you agree with me that it's vital that the adjuster or other people publishing notes to the system put in all of the relevant information, correct --

MR. BANIAK: Objection.

BY MR. GOLDWASSER:

Q. -- relating to the claim?

MR. BANIAK: Sorry, Rich.

Object to form. Characterization.

Go ahead.

THE WITNESS: I mean, it's not meant to put every single thing that happens in a claim, but you should have a summary of what occurs or whatever documentation that you need to support what you do.

BY MR. GOLDWASSER:

Q. Okay. And you understand that, you

35

know, sometimes your decisions get challenged, correct?

A. Sure.

Q. Sometimes those challenges end up in lawsuits like this one, correct?

A. Yes.

Q. And so you want to make sure that all of the necessary information that Selective has to defend itself ends up in a log note, correct?

A. I don't think we think that way from the handling of all of our claims or anything like that, but we need to document our claims.

Q. Okay. Is there something called --

THE COURT REPORTER: I'm sorry.

Could you repeat that, please?

MR. GOLDWASSER: Yes.

BY MR. GOLDWASSER:

Q. Is there something called a CCM system?

A. Yes.

Q. And what is that?

And tell me how, if at all, it differs from the log notes.

A. It's a -- CCM stands for "Claims Content Management," so it's a repository for

36

documents to be stored.

Q. Okay. So how does that work together with the log notes?

A. I don't think that it actually works together with log notes. But if a report comes in from a person or an engineer or whoever, that report document goes into CCM, and then the adjuster would -- should input a log note summarizing the report or whatever.

Q. Okay. So the CCM should contain all of the reports from vendors, correct?

A. Yes.

Q. Any other documents that Selective has received in relation to the claim, correct?

A. It should have everything that's been used on the claim, yes.

Q. Okay. And in a similar fashion, it should have all of the documents that have been produced or sent by Selective, correct?

A. I would assume so. I don't know so.

Q. The purpose of maintaining the CCM system is to have a repository for documents like that, correct?

A. Yes.

37

MR. GOLDWASSER: Okay. I'm going to share my screen to show -- put up an exhibit.

Mike, did you send the share file to Mr. Walton?

THE WITNESS: He did.

BY MR. GOLDWASSER:

Q. Okay. Perfect.

So I'd like you -- and I'm going to share my screen, but I want to make sure you have the document in front of you, if so needed. And this was previously marked at Mr. Rudow's deposition.

All right. Here we go. We marked it as Deposition Exhibit 1, and that's the Selective insurance policy for this case.

Have you seen this document before?

A. I pulled it up from the list. I don't see you sharing the screen, but --

Q. Oh, thanks for the reminder.

A. But the answer would be yes.

Q. Here, I'm going to now share my screen.

(Exhibit No. 1 displayed.)

Okay. I'm sharing my screen now, correct?

11 (Pages 38 to 41)

### 38

A.    Yes.

Q.    And you can see that.  Okay.

So you're familiar with this policy?

A.    Yes.

Q.    Is it fair to say that you referred to this policy and reviewed it in your supervisory authority over Mr. Rudow in the adjustment of this claim?

A.    Yes.

Q.    Okay.  So I'm going to show you or you can turn to it -- it may be easier on the screen -- a portion of the policy under "Loss Payment." This is for the "Building and Personal Property Coverage Form."

A.    Do you know what page you're on?

Q.    Yeah, well, I --

A.    Is it right before that?

Q.    Here, I'm pulling it up.  I'm getting there.

A.    Are you going to the CP 10?

Q.    Yes, and it would be page 11.  I'm trying to get there.

Okay.  Here we go.

Okay.  Do you see where it says "Loss

### 39

Payment"?

A.    I do.

Q.    Okay.  So the policy reads, "Loss Payment.  In the event of loss or damage covered by this coverage form, at our option, we will either" -- and the first -- there's four different options.  The first one is, "pay the value of lost or damaged property."

The second is, "pay the cost of repairing or replacing the lost or damaged property subject to (b) below."

Do you see that?

A.    I do.

Q.    Selective, in fact, chose and elected not to pay the value of the lost or damaged property, correct?

A.    That's not my understanding.

Q.    Okay.

A.    I'm not sure what you're talking about there.

Q.    Well, Selective had the option of either paying for the value of the lost or damaged property or paying the cost for repairing it, correct?

### 40

A.    Yeah, those are two of the options there, yes.

Q.    Okay.  And Selective chose to pay the cost of repairing or replacing the lost or damaged property, correct?

A.    What lost or damaged property are you actually referring to?

Q.    The property that was -- the property that is covered by the policy in this form.

A.    Well, I don't understand the question in terms -- it's too broad for me to answer.

Q.    Okay.  So this coverage form covers both the building, correct, and business personal property, correct?

A.    That's correct.

Q.    Okay.  So let's talk about the building for a second.

With regard to the building, Selective chose to pay for the cost of repairing or replacing the lost or damaged property, correct?

A.    That would be correct.

Q.    Okay.  Now, if you -- I'm going to scroll down to Section 7, "Valuation."

Do you see that?

### 41

A.    I do.

Q.    And it reads, "We will determine the value of covered property in the event of loss or damage as follows:"

And then it says, "(a), at cash value as of the time of loss or damage except as provided in (b), (c), (d) and (e) below," correct?

A.    That's correct.

Q.    Okay.  So am I right that Selective sets a value of the covered property for the purposes of this policy at an actual cash value except as provided below in (b), (c), (d) or (e), correct?

A.    That's the first part of the process in making payments, yes.

Q.    Okay.  Now, if we go to the following page, under Section F, "Additional Conditions" -- do you see that?

A.    I do.

Q.    Okay.  And then it says, under 1, "Coinsurance.  If a coinsurance percentage is shown in the declarations, the following condition applies:"

It says, "We will not pay the full

**CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.**
**STUART CARLTON WALTON, JR.**                                                    **2/19/2026**

12 (Pages 42 to 45)

42

amount of any loss if the value of covered property at the time of loss times the coinsurance percentage shown for it in the declarations is greater than the limit of insurance for the property," correct?

A.    Yes.

Q.    Okay.  So is it your understanding that for the purpose of this coinsurance provision, the value of the property here is determined as the actual cash value that we talked about in paragraph seven or Section 7?

A.    It's determined both ways, actual cash value and replacement cost.

Q.    Okay.  And where in the policy does it say that it's determined in both ways?

A.    Well, the valuation in the policy is replacement cost, not actual cash value.  So you determine the coinsurance based on replacement cost, based on that value, and then you also run an actual cash value coinsurance calculation and determine which is more favorable to the policyholder.

So if it's more favorable to pay the actual cash value -- because generally, more

43

policies are -- if there is a coinsurance problem, the actual cash value valuation is more favorable to the policyholder usually, so --

Q.    For purposes of coinsurance, correct?

A.    Correct.

Q.    Okay.  So for purposes of coinsurance, what you're saying is you run a valuation for replacement cost value and you run an analysis for actual cash value, and you apply the analysis that's most favorable to the policyholder; is that correct?

A.    Correct.

Q.    Okay.  Fair enough.

Are you aware of a reservation of rights letter ever being sent on this claim while you were involved?

A.    I am aware of when it was sent.  I'm not positive it was sent before -- when I was still involved or not.

Q.    Okay.  But you know one was sent, correct?

A.    Correct.

MR. GOLDWASSER:  Let's take about a five-minute break if we can.

44

Let's do ten.  Let's do ten minutes.

MR. BANIAK:  I need coffee anyway.  Good call, Rich.  Thanks.

MR. GOLDWASSER:  Terrific.  11:45 or 11:44.

MR. BANIAK:  Yeah, see you then.

(Brief recess.)

MR. GOLDWASSER:  So let's go back on the record.

BY MR. GOLDWASSER:

Q.    Mr. Walton, do you know whether or not an actual cash value analysis was ever performed with respect to the covered property for the -- and when I say "covered property," I mean specifically for the building.

A.    When I was involved in the claim, we were not positive about the actual values and whether or not there was a coinsurance penalty that could be assessed or not.  So, you know, doing a calculation means you have to have concrete numbers.  I don't think we had concrete numbers exactly to perform one.

So we may have, you know, done one to

45

see what the results were, but it was not like, when I was involved, a final one or anything like that.

Does that make sense?

Q.    Well, I understand the words you used, yes.

So after the loss on July 2nd, 2023, within, you know, several days, was an actual cash value analysis performed?

A.    I don't think so, no.

Q.    Okay.

A.    If you're referring to the ISO 360 --

Q.    No, I'm not.

A.    Okay.

Q.    I just want to know whether or not Selective performed an analysis of the actual cash value of the building.

A.    I don't believe we did.  I mean, it's possible that Ron ran the ISO 360 both ways.  Probably not likely.

Q.    Okay.  And why wouldn't it be likely to run it both ways?

A.    Because you don't -- if there's not a problem on a replacement cost basis, you don't

**CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.**
**STUART CARLTON WALTON, JR.**
**2/19/2026**

13 (Pages 46 to 49)

---

46

need to run it on an actual cash value basis.

Q. Okay. So you believe that Ron would have just run the valuation on a replacement cost basis, correct?

A. That's correct.

Q. Okay. And to your knowledge, within the first several days of the loss, no actual cash value analysis was performed; is that correct?

A. To my knowledge, one was not performed.

Q. Okay. And is that generally how claims are adjusted?

A. Generally, you would do the calculation on a replacement cost basis unless the actual value on the policy was only actual cash value.

Q. Okay. So you first do an RCV analysis. And if show that there's no coinsurance issue, you don't even move on to the ACV analysis; is that right?

A. That's correct.

Q. Okay. Are you aware of Selective -- strike that.

Are you aware of COI obtaining a replacement cost valuation prior to purchasing its policy?

---

47

A. Not right now I'm not, no.

Q. Okay. Have you seen any documents that would reflect that?

A. I don't recall if I have.

Q. Okay. I'd ask if you'd take a look at Exhibit 3. I'll put that up.

(Exhibit No. 3 displayed.)

Have you seen this e-mail before --

A. I don't recall.

Q. -- Exhibit 3?

A. I don't recall that I have.

Q. Okay. Well, attached to this e-mail, which we previously marked as Exhibit 3, there's a "Valuation Detailed Report."

Do you see that?

A. I do.

Q. And it shows a cost as of March 2022?

A. It looks like September of 2022.

Q. "Effective Date: September 23, 2022."

A. That's the date I see on the --

Q. Okay.

A. -- top of the evaluation.

Q. Okay. And it looks like it was a CoreLogic report, correct?

---

48

A. Yes.

Q. Are you familiar with CoreLogic?

A. I am not.

Q. Okay. Have you seen this document before?

A. I don't recall that I have.

Q. Okay. Well, would you agree with me that it shows a reconstruction cost of $8,888,743?

A. That's what the document says, yes.

Q. Yes.

Is it common for insureds to obtain an analysis of reconstruction cost ahead of purchasing an insurance policy?

A. I don't know the answer to that question.

Q. Okay. I'm showing you what we've previously marked as Deposition Exhibit 4.

(Exhibit No. 4 displayed.)

And do you see it's an e-mail from a Carlee Edrington?

Do you see that?

A. I see it, yes.

Q. Okay. Have you seen this e-mail before?

---

49

A. I don't recall it.

Q. Okay. Ms. Edrington is informing Mr. Rudow in the second paragraph, "As far as I could tell when issuing the renewal, the replacement cost was 143 percent ITV."

Do you see that?

A. I do.

Q. Do you understand what Ms. Edrington is speaking about there?

A. I'm making an assumption. It does -- Ron talks about building limits. But it's not clear from her e-mail what she's referring to, but it would seem to be the COI building that we insure.

Q. Okay. Ms. Edrington is an underwriter at Selective, correct?

A. That's what her letterhead says, yes.

Q. Okay. Are you familiar with Ms. Edrington?

A. I am not.

Q. Okay. And in the subject, it says, "Account S 2351080 with Name Chicago Ornamental Iron," correct?

A. That's correct.

---

14 (Pages 50 to 53)

50

Q. Okay. And when she writes the replacement cost was 143 percent ITV, what does "143 percent ITV" mean?

A. I believe it means that the policy amount is 143 percent of the value of the structure.

Q. Okay. So in this case, it would seem that the building was actually overinsured?

A. That's the way it reads here, yes.

Q. Okay. And that there was no coinsurance concern at this time, correct?

A. No.

Q. I'm correct that there is no coinsurance concern at this point?

A. That's correct.

Q. Okay. And then she says in the next paragraph, "I just ran the replacement cost right now, and it is saying we are still at 111 percent ITV with the current policy limit."

Do you see that?

A. I do.

Q. And your understanding is that the policy limit is more than sufficient to cover the value of the building?

51

A. That's based on her running her report. I don't know exactly what she input into her report, but that's where we stand at the moment.

Q. Okay. Now what I'm showing you is what we previously marked as Deposition Exhibit 5.

(Exhibit No. 5 displayed.)

Have you seen this document before?

A. I'm sure I've seen it, yes.

Q. Okay. And tell us what this document is.

A. It's the 360 replacement cost valuation that Mr. Rudow ran initially.

Q. Okay. And it looks like this was calculated on July 7th, 2023, correct?

A. Yes.

Q. And do you see where it says "Property Information" and then, to the right, "Building No. 1"? And below that, it says "ProMetrix ID."

A. Yes.

Q. What is ProMetrix?

A. I'm not sure, to be honest.

Q. Okay. And what was the purpose of running this report?

A. To see what the value of the building

52

was.

Q. To determine whether or not there was a coinsurance policy concern?

A. Yes.

Q. Okay. And at the end of the report, it appears that there's a calculated value of a little over $10 million, correct?

A. That's correct.

Q. Okay. And then applied to that is the 90 percent coinsurance percentage, correct?

A. That's correct.

Q. And it yields a result of about 9.1 million, correct?

A. The required insurance would have been 9.1 million, correct.

Q. Correct.

So as long as you're over $9.1 million, there's no coinsurance concern; is that right?

A. That's correct.

Q. Okay. Do you recall when you first saw this document?

A. It would have been in the initial handling of the claim.

Q. Okay. Now, it looks like that's --

53

that's a pretty thin margin, right?

I mean, the 90 percent coinsurance figure is $9.1 million, and the coverage amount is 9.2 million.

That's pretty close, correct?

A. It's a small percentage, yes.

Q. And I suppose if there was a coinsurance concern, Mr. Rudow would have notified COI at that time, correct?

A. That's correct.

Q. So he must have been pretty confident, I guess, of this report given the small difference between the coverage amount and the 90 percent coinsurance figure?

A. I don't know how confident he was, but he was satisfied that at this point there was not a coinsurance situation.

Q. Okay. And this is something that you would have reviewed also, correct?

A. I would have looked at it, yes.

Q. And if you believed that there was a coinsurance concern, you would have noted that in the log notes, correct?

A. That's correct.

CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.
STUART CARLTON WALTON, JR.                                          2/19/2026

15  (Pages 54 to 57)

54

Q.   Okay.  And -- or in addition, you would have communicated with Mr. Rudow about that concern, correct?

A.   That's correct.

Q.   Okay.  So given the fact that, you know, you only have about a $100,000 difference in these two figures between the coverage amount and the coinsurance figure, it seems like you were pretty confident that this valuation was accurate?

A.   Well, the valuation is not going to be a hundred percent accurate.  The values that they spit out are more average values as opposed to the specific building that you're looking at, so sometimes you do have to manipulate the document to account for additional -- whatever it might be in the document.

But in general, if you're close to the value, it's not a big deal.

Q.   Okay.  Was this manipulated in any fashion?

A.   I don't know.  You'd have to ask Ron to be certain of that.

Q.   Okay.  But it was certainly your understanding that this 90 percent coinsurance

55

figure at this point may not end up actually reflecting the -- or excuse me -- your understanding that the calculated value of $10.1 million may not accurately reflect the actual replacement cost value, correct?

A.   Correct.

Q.   And that, in fact, the replacement cost value could be higher than the $10.1 million, correct?

A.   It could be, and it could be lower.

Q.   Okay.  So I guess what I'm trying to figure out -- wouldn't it have been prudent at this point, given the small difference here, to advise COI that there would be a potential coinsurance issue?

MR. BANIAK:  Object to form.

THE WITNESS:  Yeah, that's just -- it's not something that I don't think anybody would have done.  We didn't think that there was a problem.

BY MR. GOLDWASSER:

Q.   Okay.  And you understand that COI, the insured here, is making decisions on how they're going to reconstruct their building at this time,

56

correct?

A.   On July 7th, maybe.  I'm not sure.

Q.   Okay.  Well, how about August 7th?

A.   Maybe.

Q.   Okay.  And you're aware at some time they actually started making decisions and started reconstructing the building, correct?

A.   Sure.

Q.   Okay.  Was this valuation provided to COI at any point?

A.   I don't know.  It's probably not normally provided.

Q.   Okay.  But, you know, I'm looking at it, and I see, you know, the small difference between the coverage amount and the coinsurance limit.

And it certainly raises a question in my mind that, well, what happens if -- if the actual replacement cost value is higher than what's on here, we're going to have an issue.

Isn't that something you want to advise the insured of?

A.   Well, the reality is that you're not ever going to know the exact answer until you get

57

into the details of what the actual loss is.

Q.   Okay.

A.   If you scroll back up here and look at a couple of the estimated cost breakdowns, we don't know those estimated cost breakdowns at the beginning of the loss.  But if they determine them -- if they determine that they're higher, that could change the value.

But we don't know that, so there's no reason to notify anybody of anything at this point.

Q.   Okay.  So what happens then is an insured like COI goes on and they make construction decisions.

And then eventually you find out that these numbers are higher without the insured ever having the opportunity to make different decisions, correct, based on a coinsurance penalty?

MR. BANIAK:  Object to form.

Can you restate that, Rich?  I'm not sure what you're getting at.

MR. GOLDWASSER:  Well, did the witness -- I think the witness was about to answer.

**CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.**
**STUART CARLTON WALTON, JR.**
**2/19/2026**

16 (Pages 58 to 61)

58

BY MR. GOLDWASSER:

Q. Does the witness understand?

A. Well, can you repeat it, please?

Q. Sure.

What you're saying is you certainly don't know whether or not this $10.1 million figure is accurate, and you're not going to find out until the insured actually starts making its reconstruction decisions, correct?

A. That's a possibility. That generally does not happen.

Q. Okay. Well, it happened in this case, correct?

A. It did happen in this case.

Q. Okay. Wouldn't COI have benefitted with the knowledge that its reconstruction decisions were running up to a very thin margin based on Selective's own reconstruction valuation estimate on July 7th?

A. I'm not sure of what -- can you repeat that again?

Q. Well, COI at this time certainly isn't worried or concerned about a coinsurance issue, correct?

59

A. I don't know.

Q. Well, Selective certainly hasn't advised them of that, correct?

A. That's correct, and we didn't have a problem at this point either.

Q. Okay. But Selective is a -- you know, they write policies and adjust claims all the time, true?

A. Yes.

Q. That's their business, true?

A. That's correct.

Q. Okay. So Selective has a base of knowledge to understand that when it runs a replacement cost valuation shortly after a loss, that the actual replacement cost could be higher, correct?

A. That's correct.

Q. Okay. And are you saying that it's not Selective's policy or procedure to advise an insured that, "Look, you're close to the coinsurance limit. We're going to reserve our rights because based on our experience, it could be higher than the numbers we ran"?

A. I mean, if you're suggesting that on

60

every claim where we get a value that's within a certain value of the replacement cost we should do that, no, that's not something that I would do.

Q. Okay. So what would happen if this calculated value was just a bit higher, right?

Say it was, you know -- I don't know -- $10.3 million and you added -- and you used the 90 percent coinsurance figure and the number became, you know, $9,244,292.

Is there a coinsurance concern at that point?

A. No.

Q. Because it's a dollar under the policy limit?

A. Based on the calculation that we would do, there would not be a coinsurance concern.

Q. Okay. What if the coinsurance figure was a dollar higher than the policy limit?

A. It wouldn't matter.

Q. It wouldn't matter. You wouldn't believe at that time that there's a coinsurance issue.

Is that what you're saying?

A. That's correct.

61

Q. Okay. So at what point do you advise an insured that there's a coinsurance issue?

A. It would be at the point where we feel that taking a penalty is necessary.

Q. Okay. And how do you decide at what point that is?

A. It's either done when we run the evaluation initially or when we come into information that makes us believe that.

Q. Okay. Even if that's ten months after a loss when an insured begins to reconstruct its building, correct?

A. It that's when we gain the information, yes.

Q. Okay. I know your position was a supervisory position, so I think I understand the -- I know what the answer is, but I just want to ask.

Have you had any conversations with John Samek, a principal at COI?

A. With John?

Q. Yes.

A. He was on calls where I was on calls. I don't -- you know, I don't know that I talked to

**CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.**
**STUART CARLTON WALTON, JR.**
**2/19/2026**

17 (Pages 62 to 65)

62

him specifically outside of that realm.

Q. Okay. Do you have any recollection of those calls?

A. We were just going through what the status was of the claim on most of the calls.

Q. Okay. Do you recall anything that Mr. Samek said during these calls?

A. Not specifically at this point.

Q. How about generally?

A. Not really, no.

Q. Okay. How about anyone else from COI? A Mr. Mehta or "Mehta," M-e-h-t-a, was he on any of those calls?

A. He may have been. I'm not sure.

Q. Okay. Let me ask you, at any point during your involvement in this claim, did you receive any direction from those people above you in the chain as to how to handle the claim?

A. I'm not sure exactly what you mean by "direction," but they would -- they would not give me specific direction.

Q. Okay. Did you ever receive any communications directing you to change the way you were handling the claim?

63

A. No.

Q. Okay. When you engage a vendor or a consultant, is there a document -- do you issue a -- is there, like, a purchase order to set up an account for that vendor, or is there an engagement letter?

A. We don't have any sort of template or anything like that. There may be a template supplied by the vendor or something that we might complete but nothing that we would provide generally for any vendor.

Q. Okay. So, for example, like JDH, they were a vendor in this case, correct?

A. Yes.

Q. And so to get their involvement in the case, tell me the procedure.

How did that happen?

Somebody picks up the phone or --

A. Ron would have either picked up the phone or done something electronically to notify them of the claim.

Q. Okay. And they charge for this, correct?

A. That's correct.

64

Q. And there would be bills reflecting time for their services?

A. Yes.

Q. So with regard to the RCV valuation or the ACV valuation if that's performed shortly after a loss, that's the basis for Selective making its initial decision as to whether or not there's a coinsurance issue?

A. Correct.

Q. And it could be sometime later, as far as, say, ten months, that Selective realizes that, "Hey, you know, our initial determination was wrong," correct?

A. It could happen that way, yes, not normally, but it could.

Q. I mean, it happened in this case, correct?

A. That's correct.

Q. Okay. And in the meantime, as we discussed, COI is making decisions on the reconstruction of its building, correct?

MR. BANIAK: Object to what the witness knows about what COI was doing.

MR. GOLDWASSER: Okay.

65

THE WITNESS: I mean, I'm sure they were.

BY MR. GOLDWASSER:

Q. Okay. And without knowledge of a coinsurance issue, they're making decisions that they may have made without knowledge of a coinsurance concern, correct?

MR. BANIAK: Same objection.

THE WITNESS: I don't know the answer to that.

BY MR. GOLDWASSER:

Q. Okay. And if they do make a decision on reconstruction which lands them into the coinsurance penalty area, that's just bad luck for them, correct?

A. I don't understand the question. I mean, that doesn't make sense to me.

Q. Well, COI here was making construction decisions -- reconstruction decisions without knowledge that there was a potential for a coinsurance penalty, correct?

A. Again, I don't know what they were making decisions on or when.

Q. Okay. But you know that Selective

Case: 1:25-cv-05131 Document #: 67-2 Filed: 04/09/26 Page 20 of 36 PageID #:989

CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.
STUART CARLTON WALTON, JR.                                                    2/19/2026

18 (Pages 66 to 69)

66

hadn't notified them of a coinsurance concern for ten months after the loss, correct?

A.   I'm not sure of the exact date but, yeah, sometime later on once we realized there was a problem.

Q.   Okay.  And so once Selective notified COI of this coinsurance issue, COI had already made certain decisions and had gone down the path toward a certain reconstruction, correct?

A.   Again, I guess.  I don't know.

Q.   Okay.  And as a result of that, they ran into a coinsurance penalty, correct?

A.   That doesn't -- I don't follow your logic on what you're saying here now.

Q.   Okay.  Well, there's a coinsurance penalty that Selective is invoking, correct?

A.   Say it again.  I'm sorry.

Q.   There is a coinsurance penalty that Selective is invoking?

A.   I don't know what decision was made.  I wasn't involved in that.

Q.   Okay.  Fair enough.

So I just want to go back to Exhibit 5 for a second.

67

Okay.  So I just want to make sure I understand.

The purpose of running this report was, in fact, to determine whether or not there was a coinsurance concern at that time, correct?

A.   Whether the building was insured to value.

Q.   Okay.  Is there any other reason to run this report?

A.   Well, if it's not insured to value, we notify underwriting of what we find, and then they do whatever they do with -- maybe we're charging too much for a premium; maybe we're charging too less.  They do their own analysis to determine what to do with it at that point.

Q.   Okay.  If you were in the place of an insured, would you want to know about this evaluation when it was performed?

A.   I don't know if I would be wanting to know or not.

Q.   Why would you want to know?

A.   I don't know.  It's not really that relevant to anything at this point.

Q.   Well, if it's not relevant, why is

68

Selective running it?

A.   It doesn't affect them at this point.

Q.   It doesn't affect who?

A.   The policyholder.

Q.   And why not?

A.   Because there's no penalty applied at this point.

Q.   Okay.  I want to turn to Exhibit 2, which we previously marked at Mr. Rudow's deposition.

(Exhibit No. 2 displayed.)

Okay.  Do you see this?

A.   I do.

Q.   Okay.  And it says at the top "Log Note Review"?

A.   Yes.

Q.   And these are, in fact, the log notes that are maintained by Selective, correct?

A.   Yes.

Q.   Okay.  And you had made notations on this report, correct, or entries?

A.   Yes.

Q.   Okay.  So if we start at the back page here -- and it's actually Bates-stamped Selective 132

69

-- that's the first entry on July 2nd -- do you see that -- 2023?

A.   I do.

Q.   Okay.

A.   How did you get there so fast, though?

Q.   I skipped -- I hit "60" in the page thing, and it skipped straight to 60.

Let me know when you're there, and we're going to --

A.   All right.  I got it.

Q.   And we'll work forward because the notes were produced in, I guess, reverse chronological order.

Let me know when you're there.

A.   I'm there.

Q.   Okay.  So now I want to direct your attention to Selective -- its Bates stamp Selective 117.

A.   Okay.

Q.   Let me get there.  Give me one second here.

Okay.  So it goes on to 118, and this is the middle of August of 2023.

And I see that it says -- at the bottom

**CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.**
**STUART CARLTON WALTON, JR.**                                                                  **2/19/2026**

19 (Pages 70 to 73)

---

70

of page 117, Selective 117, it says, "General note completed by Rudow, Ronald on August 19, 2023. CCM upload, approved and distributed SLR."

Q.    Do you see that?

A.    I do.

Q.    Okay.  And the "SLR" is, what, Significant Loss Report?

A.    Serious Loss Report.

Q.    Serious, Serious, yeah.  Thank you. Serious Loss Report.

And it says "approved and distributed."

Do you understand that entry, what "approved and distributed" means?

A.    It means that the -- well, when he puts "CCM upload" in, that means he uploaded the SLR or maybe the e-mail that he sent distributing the SLR.

Q.    Okay.  And when it says "approved and distributed," who approved it?

A.    That would have been the Large Loss Committee.

Q.    Okay.  And if we go on to the next page, 118, it says, "Large Loss Committee has approved setting reserves to" --  it looks like a little over ten and a half million dollars -- "and

---

71

paying to that amount"?

A.    That's correct.

Q.    Okay.  And so for this specific reserve, it would have been set or recommended by you and Mr. Rudow?

A.    Correct.

Q.    Okay.  And what would that have been based upon?

A.    Whatever information we had at the time that would enable us to determine how much the loss was.

Q.    Okay.  And that was approved by the Large Loss Committee, correct?

A.    Correct.

Q.    And at that point, you could have paid out ten and a half million dollars, correct?

A.    That's correct.

Q.    Okay.  Let's go up to Selective 108.

Let me know when you're there.

A.    I am there.

Q.    Okay.  It says -- I'm looking at the -- I'll highlight it on the screen so you can see the entry near the bottom.  These are notes from Mr. Rudow on October 6th, 2023.

---

72

It says, "Indemnity Payment, Building. Initial reconstruction estimate for the entire building has been received from building consultant."

Do you see that?

A.    I do.

Q.    Okay.  And the building consultant to your understanding is JDH, correct?

A.    Correct.

Q.    Okay.  Then it says near the middle of this entry, "Reconstruction Estimate Approved"?

A.    Yes.

Q.    What's the amount of "Reconstruction Estimate Approved" here?

Do you know how to read this note?

A.    It's kind of jumbled, the way it must have printed out or got downloaded or whatever.

The total is 3.8 million plus, but I don't know if that is inclusive of some of the mitigation or not.

Q.    Okay.  But the total RCV on this estimate, which was approved on October 6, 2023, was a little north of $3.8 million, correct?

A.    That is correct.

---

73

Q.    Okay.  Now, if we go to Selective 101 in the same exhibit -- again, I'll highlight on the screen the entry I'm talking about on January 4th, 2024.

A.    Okay.  I'm there.

Q.    The title says "Indemnity Payment, Building," and then there's a $4 million -- or let me -- it says "Total RCV Approved."

And am I correct that the total RCV for the building approved at this point was $4,030,810.50?

A.    Again, that looks to be the number that's there.  And I'm not positive, again, whether it's only restoration or some mitigation included or not, but that's what that says there now.

Q.    Okay.  And here it says the total SLR approved is 10.5 -- a little over ten and a half million dollars, and it says, "which building is $5,212,749."

Do you see that?

A.    I do.

Q.    Do you know how that was determined, the total SLR approval for the building of a

---

20  (Pages 74 to 77)

74

little over 5.2 million?

A.    Well, the 10 million 556 that we reserved initially was broken out between the building, the business personal property and the business income.

Q.    Okay.  So what I'm trying to figure out, though, is how this was determined -- the building amount of $5.2 million was determined.

A.    How was it determined?

Q.    Yes.

A.    That's the -- that would have been our initial reserve.

Q.    Okay.  And how was the initial reserve for the building, the $5.2 million, determined?

A.    That would have been based on what we had at that point in terms of what the damages were.  It's -- you know, it's a subjective thing.

Q.    Okay.  And what would you -- what I'm trying to find out is, what were you looking at?

What information did you have to set that figure?

A.    Well, we would have had -- and I don't know for sure when we had it.  We would have had an idea from our expert, JDH, as to what they

75

thought the loss was.

Normally, there's a document called a ROM -- "Range of Movement," I think it is -- that kind of gives their overall view, not necessarily backed by detail but a general idea of what the loss is.

Q.    Okay.

A.    Then you have to put the mitigation into it and what you think that's going to be.  Then you have demolition to worry about, if that's a problem.  You just have different areas to factor in.

Q.    Okay.  But the 5.2 for the building is the amount of loss under the building portion of the policy, correct?

A.    Under the building portion.  That would include the mitigation, the restoration, demolition and whatever else -- the shoring.  You know, everything that went into that --

Q.    Okay.  So let me --

A.    -- goes into the building feature.

Q.    Okay.  So let me pull you back to Selective 108.

Actually, let's go to 111.

76

A.    111?

Q.    111, and I'll share my screen.

And so what I'm looking at here -- and I'll highlight it again -- is a note completed by Ronald Rudow on September 18th, 2023, and that has an SLR approval for the building of that same $5.2 million figure.

Do you see that?

A.    I do.

Q.    So by September 18th, 2023, JDH had performed some sort of an analysis showing that the loss for the building would have been approximately $5.2 million?

A.    No.  They would have done the restoration piece only.

Q.    Okay.

A.    They could have opined on the mitigation piece.  They probably were not involved in the shoring piece.  You know, there's other facets to -- that go into the 5.2.

Q.    Okay.  But certainly, as of September 18th, 2023, JDH had performed some analysis as to the RCV, the reconstruction value -- the replacement cost value for the building, correct?

77

A.    For the damaged building.

Q.    For the damaged building, exactly.

And you understood the damaged building to be about, what, a third of the building?

A.    Somewhere in that range.

Q.    Okay.  And based on JDH's analysis, Selective set the RCV portion of the building at a little over $5.2 million, correct?

A.    Partially based on their analysis.

Q.    Correct.  Okay.

And is there a coinsurance issue in your mind at this point?

A.    I don't believe so.

Q.    Okay.  And why is that?

A.    Mr. Rudow doesn't mention it.

Q.    Okay.  Well, you were reviewing his notes, correct?

A.    Yes.

Q.    Okay.  And if you thought there was a coinsurance issue, you certainly would have notated it, correct?

A.    Correct.

Q.    Okay.  Would you take my word if there are no notations here from you about a coinsurance

21  (Pages 78 to 81)

78

concern at this point?

A.    Take your word for what?  That there's --

Q.    Feel free to look at the document and your entries and let me know if you made any notation as to whether or not there was a coinsurance issue at this point.

A.    Yeah, I had not.

Q.    You did not have a coinsurance concern at this point?

A.    I made no mention of it, no.

Q.    Okay.  Did you have any conversations with Mr. Rudow about a coinsurance concern at this point?

A.    I don't know whether we had a conversation at this point or not.  I can't recall exactly when we started getting that -- the information that COI was giving us that drove the value way higher.

Q.    Okay.  Well, you understand at this point that Selective has set the RCV for the building at about $5.2 million, correct, a little over?

A.    You're going to have to repeat that question again.  You were breaking up on me.

79

Q.    At this point, you're aware and you took part in that decision to set the RCV for the building portion of this loss at $5.2 million, a little over 5.2?

MR. BANIAK:  Object to form.

THE WITNESS:  Yeah, we set the reserve at 5.2 million.  It doesn't have anything to do with the value.

BY MR. GOLDWASSER:

Q.    Okay.  So explain to me the difference between the value and the reserve.

A.    The reserve contemplates, for instance, the shoring that was done.  The shoring doesn't have any value for the building.  The cleaning of the building doesn't really relate to the value of the building.  Demolition doesn't relate to the value of the building.

Q.    Okay.  So if you look above here, it shows -- do you know what this "Adjustment of Loss, 1425" is?

A.    I don't know off the top of my head right now, no.

Q.    Okay.  How about this "Undisputed BluSky Restoration"?

80

A.    BluSky did the mitigation, and they may have done some of the demolition and/or shoring or whatever that was done initially.

Q.    Okay.  And is that what this $598,000 figure represents?

A.    That's what our undisputed was of it.  I'm not sure what their actual bill was.

Q.    Okay.  And then what is this "T&M Mit Package" followed by "$51,740.79"?

A.    I think the "T&M Mit Package" refers to the BluSky Restoration.  Maybe the 1740 is for a change in the next item, the "Recon Offices."

Q.    Okay.

A.    The way it spit this out is confusing.

Q.    Yeah, that's why I'm asking for your help.

So are you able to tell me from reviewing this note what the actual value Selective has assigned to the loss for the building, which part of the $5.2 million applies just to the value of the building?

A.    It would have been only the recon estimate from JDH.

Q.    Okay.

81

A.    There could have been other miscellaneous things along the way.  But, you know, we start with that as the value of -- if you wanted to look at it that way, the value of the building that was damaged.

Q.    Okay.  And so what you're saying is the RCV for the purposes of your reserve includes items that don't relate to the value of the building?

A.    The reserve includes items that do not relate to the value of the building.  That is correct.

Q.    Okay.  Let's go to Selective 96.

Okay.  Toward the top of the page, there's a note which reads, "Supervisor overview note completed by Caton, Matthew on February 29, 2024."

Do you see that?

A.    I do.

Q.    And it reads, "The Large Loss Committee has approved increasing reserves to $13,849,879 and paying to that amount," right?

A.    That's correct.

Q.    Okay.  You were part of setting that

22 (Pages 82 to 85)

82

reserve, correct?

A.    Part of the process, yes.

Q.    And you recommended it, correct?

A.    Ron would have started recommending it, but I recommended it to Mr. Caton, yes.

Q.    Why was the reserve increased?

A.    I would have to look at the SLR to tell you for sure what the differences were.

Q.    Okay.  Without looking at it, do you have any recollection as to why it was increased or the basis for its increase?

A.    It was probably related to every feature.  I don't know.  But, again, I could look at it and tell you.

Q.    Okay.  Do you know what the reserve is today?

A.    I don't.  I actually don't even have access to the file.

Q.    Okay.  So you don't know whether or not it's been increased?

A.    I assume it would be reflected in the log notes if it was.

Q.    Okay.  Well, let me ask you -- the log notes end at 6-10, 2025.

83

Do you see that?

I just went to the first page.

A.    Yeah, I can see that.

Q.    Okay.  Is there a reason -- do you know why, you know, the notes ended on June 10th, 2025?

MR. BANIAK:  If I could interject, I'll respond to that.  We stopped producing them because at that point, everything was done in preparation for or with respect to litigation, so everything from then on out would have been work product.

Additionally, there is a note in here that will be subject to a clawback letter.  I didn't notice this until after Mr. Rudow's deposition, but a note that looks like it says "conversation with policyholder counsel" was actually a conversation with me.

MR. GOLDWASSER:  Okay.  I appreciate the heads-up on that.

MR. BANIAK:  Sure.

MR. GOLDWASSER:  Okay.  We're coming up almost to noon.  What I would suggest is we take, you know, 40 minutes for lunch.

Does that work for everyone?

84

THE WITNESS:  That's fine.

MS. JOSSERAND:  Fine with me.

MR. BANIAK:  Sure.

MR. GOLDWASSER:  Let's come back at 12:35.

MR. BANIAK:  Sounds good.

(Lunch recess.)

MR. GOLDWASSER:  We're back on the record here.

BY MR. GOLDWASSER:

Q.    Okay.  Mr. Walton, I want to direct your attention back to Exhibit 5.  This was the "Replacement Cost Valuation" performed by Mr. Rudow about five days after the loss.

And he comes up with an estimated replacement cost of $10.16 million approximately, and I want to -- do you see that?

I'm sharing -- is my screen shared?

MR. BANIAK:  No.

THE WITNESS:  I'm on that document on --

MR. GOLDWASSER:  Here, let me -- there we go.

(Exhibit No. 5 displayed.)

BY MR. GOLDWASSER:

85

Q.    Do you see that?

A.    Yes.

Q.    So this "Replacement Cost Estimate" on July 7th is 10.16 million approximately, correct?

A.    That's correct.

Q.    Okay.  Now, we don't have Ms. Edrington's report, but here's Exhibit 4 on the screen in which she states that she ran the analysis and has it at 111 percent of ITV.

(Exhibit No. 4 displayed.)

And when I run the 111 percent against the policy limit, I get a number that's $100,000 more than Mr. Rudow's estimate.

A.    Roughly, yes.

Q.    Yes.

So do you know how that is, how on July 6th, Ms. Edrington runs the replacement cost estimate, comes up with one number, and the following day, Mr. Rudow runs it and comes up with a number that's a little less?

A.    Without looking at the two together, I couldn't tell you why there's a difference.

Q.    Okay.  Are they using the same software?

23 (Pages 86 to 89)

86

A.   I'm not positive whether underwriting uses or used the ISO 360 at this point or not. They did use a different system.

Q.   They did?  At one point, they used a different system?

A.   Correct, yes.

Q.   And what system was that?

A.   I don't recall off the top of my head. We --

Q.   And -- I'm sorry.  I interrupted you.

A.   I was just going to say, we do -- we have started using the same system.  So it could have been the same system, or it may not have been.  It was probably right around that time frame that we started doing the same one.

Q.   At some point, there was two systems in use?

A.   Correct.

Q.   And why was that?

A.   I don't know.

Q.   And do you know why the decision was made to go to one system?

A.   Just so we could be consistent.

Q.   Okay.  Do you know who made that

87

decision?

A.   No.

Q.   Okay.  I want to -- I'm going to share my screen here.  I direct your attention to Exhibit 52.  I'll put it up in a second.

(Exhibit No. 52 displayed.)

Okay.  Exhibit 52 starts with an e-mail from Mr. Rudow sent on August 19th, 2024, to John Samek and Munish Mehta at COI.

Do you see that?

A.   I do.

Q.   Okay.  And he attaches a letter -- he attaches -- there are several attachments.  One of the attachments is a letter dated August 19, 2024, the same date.

Do you see this letter?

A.   I do see the letter, yes.

Q.   Okay.  Have you seen this letter before?

A.   I don't think that I was involved when this letter was sent.

Q.   Okay.  So at some point prior to August --

A.   It may have been -- it was sometime around the time, I think, that I left the supervision.

88

Q.   Got it.  Got it.

Okay.  So I want to direct your attention to -- well, let's start with the beginning of the letter.

And Mr. Rudow is addressing an issue with the windows, correct?

A.   Yes.

Q.   Okay.  And then he goes on -- I think it's the second page -- and says, "I sent a letter to you on April 15, 2024, outlining many adjustment issues, including in relation to the building, specifically including the window repairs.  That April 15, 2024 letter also identified a coinsurance issue based on COI's estimated cost of repairs.  We advised COI that it appears that the building was underinsured."

Are you aware of any point prior to April 15, 2024, where Selective notified COI that the building was underinsured?

A.   I would have to look through the file to see but not to my knowledge right now as we sit here.

Q.   Okay.  Mr. Rudow then states, "The window repair estimate submitted by COI highlights

89

this issue.  As stated in our prior correspondence" -- he references Attachment 3 -- "we calculated a $12,129,261 building value."

And then he says, "This was based on the following:"  And he lists (a) through (e) here, and it begins, "The approved building estimate for the east section of the building is" $4.5 million approximately.

Do you see that?

A.   I do.

Q.   He then references as (b), "Stephen Rankin's architectural proposal identified the reconstruction area as 22,800 square feet," correct?

A.   Yes.

Q.   And then Mr. Rudow divides the estimated -- the building estimate by the square footage and comes up with a square footage amount of a little more than $195 a square foot, correct?

A.   That's correct.

Q.   And then he notes that the total square footage of the building appears to be a little more than 62,000, correct?

A.   Yes.

CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.
STUART CARLTON WALTON, JR.                                           2/19/2026

24  (Pages 90 to 93)

90

Q.   And then he multiplies the square footage amount times the total square footage of the building and comes up with a figure of $12,129,261, correct?

A.   That's correct.

Q.   Okay. And is it your understanding that what Mr. Rudow did here was he basically tripled -- roughly tripled the amount of the estimate to get to a full reconstruction value for the entire building of about $12.1 million?

A.   Roughly tripled it, yes.

Q.   Okay. So is that, I guess, a formula routinely employed by Selective in trying to assign a value to covered property?

A.   Using a square foot value for reconstruction is somewhat of an industry standard in terms of different types of buildings.

Dating myself, that's what we used to use to actually value structures through the Marshall-Swift evaluation program that existed 35 years ago or whatever it was. So a steel building might be worth $60 a square foot, and a brick building might be $150 a square foot. And then you have to take each of the components within the

91

building, the HVAC, the electric and all of those and add them back in to come up with a square foot value, and then you'd multiply it by the square foot value.

So it's somewhat of a normal proposition, although the process has evolved a little bit, I guess, in terms of the programs that do it now.

Q.   Okay. And how has it evolved?

A.   Well, you -- that program, the way I understand it, you put an address in, and it tells you what the square footage is. Sometimes it's from the tax records; sometimes it's not. You've got to make sure you get that right.

But it has its own formula for coming with up with the value of those components, and it's based on the type of structure that you say it is, a manufacturing building, right, or what it's used for.

So it's just a -- it's a different methodology to reach the same conclusion.

Q.   Okay. But you're saying that the square footage methodology is no longer in use?

A.   That's because -- it still is in use,

92

but it's not like -- it's not a program that we use anymore. I mean, we use the square foot value for reserving purposes.

Q.   Okay. So I'm looking at Mr. Rudow's letter here, and he seems to be using that.

A.   Correct.

Q.   Is this a proper use of that methodology?

A.   I would say it is, yes.

Q.   Okay. Is he setting reserves here?

A.   No.

Q.   Okay.

A.   He's setting the value of the building.

Q.   Okay.

A.   He's making a determination that the value of the building is $195.27 per square foot based on the value of the damaged building -- damaged area.

Q.   Okay. And just --

THE COURT REPORTER: Excuse me. One moment, Mr. Goldwasser. You're breaking up there.

MR. GOLDWASSER: Okay. I'll get closer to the microphone.

93

BY MR. GOLDWASSER:

Q.   But you aren't necessarily building the same thing across the entire warehouse, correct?

A.   It could be different, yes.

Q.   Okay.

A.   The thought process -- like you said, the building was in thirds, right, and had an east and a west wing. And the east and the west wing were pretty similar to my knowledge, so that would be a very good comparison. And I'm not positive right now about the middle portion and how that compared to the other two.

Q.   Okay. You would have to know that in order to determine whether or not that is the proper methodology.

Is that what you're saying?

A.   You'll have to repeat that again.

Q.   You would have to know what the middle section consisted of in order for you to tell me whether or not you believe this was a proper methodology?

A.   I mean, I wasn't there. But Ron was there, and he felt that it was representative, so that's why he came to that conclusion.

CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.
STUART CARLTON WALTON, JR.
2/19/2026

25 (Pages 94 to 97)

94

Q. Okay. Are there economies of scale when you build a 62,000-square-foot building?

A. There can be, yes.

Q. Okay. Do you think that should be taken into consideration when applying the methodology used by Mr. Rudow?

A. I don't know how you take it into consideration.

Q. Okay. So Mr. Rudow then comes up with three scenarios for an RCV, correct, in his letter?

A. Yes, he does.

Q. Okay. So Scenario 1, he has an RCV of a little over 4.4 million, correct?

A. An RCV of a little over 4.4 million, yes.

Q. Okay. And then he basically goes through the coinsurance formula set forth in the insurance policy, correct?

A. That's correct.

Q. Okay. And then he does the same thing based on an RCV of a little more than 4.8 million, correct?

A. That's correct.

95

Q. Okay. And then he goes through an evaluation based on an RCV of almost 5.4 million, correct?

A. That's correct.

Q. Okay. And then he says -- Mr. Rudow says, "As you can see, it appears that there is a significant coinsurance issue based on the approved repair costs," right?

A. Correct.

Q. Okay. And then in the next paragraph, Mr. Rudow states, "Please note that Scenarios 1 through 3 can all be calculated at actual cash value as well. The April 15, 2024 letter identified a 20.26 percent rate of depreciation for the building."

Do you know where Mr. Rudow got a 20.26 percent depreciation rate?

A. I don't know here sitting right now. I'd have to look at the April 15th letter or maybe even an ITV calculation he ran on an ACV basis.

Q. Okay. Where would an adjuster get the depreciation rate from?

A. I'm sorry. Where would an adjuster --

Q. Obtain the depreciation rate.

96

A. Well, you can get it off of the ISO 360 system. You could do it manually.

Q. Okay. And where does the ISO 360 system get the depreciation rate?

A. Well, they -- you base the depreciation on the age and condition of the property, of the different components, and you tell the system how old it is or what condition it's in, and then the system spits out the number.

Q. Okay. So you're relying on the system at that point, correct?

A. Correct.

Q. How does Selective know that that's an appropriate number?

A. Well, we rely on what the system says. That's what it's supposed to do.

Q. Okay. But has anyone actually at Selective looked into the issue as to whether or not the depreciation rates being used by the software ISO 360, market depreciation, is an appropriate depreciation rate?

A. I don't know for certain.

Q. Okay. Have you ever looked into it?

A. No, I have not.

97

Q. Okay. Has anyone ever asked you a question as to why you're using certain depreciation rates pulled from ISO 360?

A. No.

Q. It's just sort of a given that you're using this system and you're going to rely on their depreciation rates, correct?

A. Correct. I mean, we're not the only company that uses it.

Q. Okay. So it then looks like Mr. Rudow calculates the three scenarios he referenced above but based on an actual cash value, correct?

A. That is correct.

Q. And this is consistent with what you testified to earlier, that Selective runs an RCV and an ACV and then gives the insured the benefit of the lower value, correct?

A. The benefit of the higher value.

Q. Or the benefit of the higher value. Thank you for the correction.

But for the purpose of applying the coinsurance provision, they look at the -- you give them the lower value?

A. The amount of the penalty doesn't

26 (Pages 98 to 101)

98

really matter. What matters is the amount of the recovery to the policyholder.

Q. Okay.

A. So if the ACV value is higher, then they can collect -- on a replacement cost basis, they would get the ACV.

Q. Okay. So here we go.

Scenario 1 has an RCV building value of about $12.1 million.

Do you see that?

A. Yeah, I'm just trying to make sure where you are.

You're on page 4276? Yeah, okay. I got you.

Q. Okay. So Scenario 1 envisions an RCV building value of about $12.1 million, correct?

A. That's correct.

Q. Okay. And what Mr. Rudow then does is he finds a depreciation amount based on the depreciation rate provided by ISO 360, correct?

A. That's my understanding.

Q. And that's 20.26 percent, correct?

A. Correct.

Q. And so the depreciation he calculates

99

is about $2.4 million, correct?

A. That's correct.

Q. Okay. So then Mr. Rudow subtracts the depreciation from the RCV building value in order to determine the actual cash value, correct?

A. That's correct.

Q. Okay. And there he says, based on these numbers, there is no coinsurance penalty, correct?

A. For Scenario No. 1, that's correct.

Q. Correct.

And then he says, "This would be COI making a claim at ACV only and forfeiting recoverable depreciation."

A. Correct.

Q. Okay. And then Scenario 2 is a higher RCV building value -- do you see that -- of about $13.2 million?

A. Correct.

Q. Okay. Let me go back to Scenario 1, though.

A. Okay.

Q. For purposes of determining a coinsurance penalty, don't you need to apply the

100

coinsurance percentage?

A. You do.

Q. Okay. And you're aware that in the policy issued to COI here, the coinsurance percentage was 90 percent, correct?

A. Correct. Yes.

Q. Okay. And Scenario 1 doesn't take into consideration the coinsurance percentage, correct?

A. I don't recall what the -- he didn't show that on the formula here, but -- and I don't remember what the exact building limit was, but you can take 10 percent of that and know that it's less than the policy limit.

Q. Okay. Well, the policy limit was $9.2 million.

A. Okay.

Q. Are you aware of that?

A. Okay. I'll take your word for it.

Q. Okay.

A. So in this situation, he's got the ACV at 9.6 million. You take the 10 percent off of that, which would be 960,000 roughly, and then that value would be less than the 9.2 million.

Q. Okay. Perfect.

101

So we go to Scenario 2.

And Scenario 2 starts with, as I said earlier, an RCV of $13.2 million, correct?

A. Correct.

Q. And the depreciation rate of 20.26 percent yields depreciation of about 2.6 -- almost $2.7 million, correct?

A. That's correct.

Q. So the actual cash value determined by Mr. Rudow is $10,528,203, correct?

A. That's correct.

Q. Okay. Again, this scenario -- let me go back.

In Scenario 2, nowhere does Mr. Rudow show any 90 percent coinsurance.

A. I don't see that in the formula, no.

Q. Okay. In order to determine whether or not there's a coinsurance penalty, you would actually have to do that calculation, correct?

A. That's correct.

Q. You would have to multiply $10.5 million figure by 90 percent, correct?

A. Correct.

Q. And then you would compare that to the

**CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.**
**STUART CARLTON WALTON, JR.**
**2/19/2026**

102

policy limit, correct?

A.    Correct.

Q.    Okay.  Scenario 3 has a $14.7 million RCV, correct?

A.    That's correct.

Q.    And based on Mr. Rudow's calculation of the depreciation, he arrives at an $11.7 million ACV, actual cash value, correct?

A.    That's correct.

Q.    Okay.  And again here, there's nothing to show that he applied the 90 percent coinsurance figure to the actual cash value, correct?

A.    That is correct.

Q.    Okay.

A.    I'm just doing the -- checking the math, too.

Q.    Yeah, yeah, I'm going to give you another opportunity to check some math.

A.    That's okay.  You're correct.  He didn't -- he did not use the coinsurance percentage for --

Q.    And he should have, correct?

A.    That's correct.

Q.    Okay.  I'm going to show you what we're

103

marking -- this is a new exhibit -- as Exhibit 92.  I've titled it "Coinsurance Demonstrative Exhibit."

Do you see that?

MR. BANIAK:  I think you have to share your screen.

MR. GOLDWASSER:  I'm glad somebody is paying attention.

THE WITNESS:  There's a little bit of a delay.  I was waiting for it to pop up.

MR. GOLDWASSER:  It's only six years after COVID.

(Exhibit No. 92 displayed.)

BY MR. GOLDWASSER:

Q.    Okay.  You may want to keep Exhibit 52 in front of you.

A.    52?

Q.    Yeah, that was the --

A.    Okay.

Q.    -- exhibit that we just went through with the various scenarios.

A.    Got you.

Q.    And so what I've done is I've basically taken -- well, I have taken Mr. Rudow's scenarios

104

and I've applied the 90 percent to it, okay?

A.    Okay.

Q.    So I want to walk you through it to make sure I have this right.

Scenario 1 -- okay.  The value of the property in Scenario 1 would be 9.6 -- give me a second here.

Yeah, so I've taken the actual cash value which was calculated in Scenario 1 by Mr. Rudow at $9,671,873.

Do you see that?

A.    I do.

Q.    Okay.  And the way we arrive at that or the way Mr. Rudow arrived at that is he took the RCV, and he subtracted the depreciation, and he came up with this figure, correct?

A.    That's correct.

Q.    Okay.  So then the coinsurance percentage is 90 percent, correct?

A.    Correct.

Q.    The limit of insurance is 9.2 million, actually $9,244,293, correct?

A.    Correct.

Q.    And there's a deductible that you have

105

to take into consideration, correct, when you're doing a coinsurance evaluation?

A.    The deductible comes after --

Q.    It comes after.  Okay.

A.    -- the calculation.

Q.    Okay.  So based on the amount of loss at $4.4 million or a little north of that, I've done the calculation set forth in the insurance policy.

Are you familiar with that formula?

A.    Yes.

Q.    Okay.  So step one is you take the value of the property, the actual cash value, correct?

A.    Yes.

Q.    And then you multiply it by the coinsurance percentage of 90 percent, right?

A.    Correct.

Q.    And I came up with $8.7 million, a little more.

Do you see that?

A.    I do.

Q.    And based on the insurance policy, that's the minimum amount of insurance that COI

28 (Pages 106 to 109)

106

would have needed to meet the coinsurance requirements, correct?

A. That's correct.

Q. Okay. So under Scenario 1, right, there's no coinsurance penalty for COI --

A. That's correct.

Q. -- right?

Because the minimum amount required was 8.7 million, and the limits of insurance they purchased was 9.2 million, correct?

A. That's correct.

Q. Okay. So I've done the same thing for Scenario 2, and I've increased the value of the property based on Mr. Rudow's calculation.

So we have now the ACV is a little more than 10.5 million.

Do you see that?

A. I do.

Q. Okay. And the other numbers for the coinsurance remains constant. The limit of insurance is constant. The deductible is constant.

But the amount of loss is higher because that's calculated based on a higher RCV,

107

correct?

A. Yes.

Q. Okay. So I've then taken 90 percent of the value of the property, and I've come up with the minimum amount of insurance to meet the coinsurance requirement of about 9.4 million.

Do you see that?

A. I do.

Q. Okay. So that's, according to Mr. Rudow's -- although he didn't apply the 90 percent, according to his actual cash value and repair value, the building was underinsured at this point?

A. Correct.

Q. Okay. So then we go through the steps in the formula to see how much Selective is going to pay, correct?

A. Yes.

Q. Okay. And this first step is you take the ACV -- oh, excuse me. We've done that.

So you go to the second step, and you divide the policy limit, okay, of 9.2 million by the minimum amount of insurance that would have been required to meet the coinsurance requirement,

108

and you come up with a figure of about 97 and a half percent, correct?

A. That's correct.

Q. And then you use that number, and you multiply that number against the amount of the loss, right?

A. That's correct.

Q. Okay. And that yields a figure of $4,745,000 and change, correct?

A. Yes.

Q. And then you deduct the $5,000 deductible, right?

A. Correct.

Q. And it yields a number of about $4.7 million, correct?

A. That's correct.

Q. Okay. So under the policy --

A. I didn't check your math, but I'm trusting you.

Q. Okay. Well, if the math is wrong, I'll own it.

A. The methodology is correct.

Q. The methodology is correct. That's the most important thing here.

109

So we go to step four. So step four is, right, the most -- let me take out the language from the policy.

So that figure -- that final figure, according to the policy, is that Selective will pay that amount or the limits of insurance, whichever is less, correct?

A. Correct.

Q. Okay. So under Mr. Rudow's analysis, if you actually correct it to apply the 90 percent coinsurance figure, his position would be or Selective's position is that we at least owe $4.7 million for the loss on the building, correct?

A. Under this scenario, yes.

Q. Okay. To your knowledge, has that amount been paid?

A. I don't know.

Q. Okay. And then we go to Scenario 3, which, again, using the value of the property, the ACV determined by Mr. Rudow at $11.7 million and an amount of loss of almost $5.4 million -- we go through the same exercise, and the number in Scenario 3 is $4.7 million or $4,723,156.06, right?

**CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.**
**STUART CARLTON WALTON, JR.**
2/19/2026

29 (Pages 110 to 113)

110

A.    That's correct.

Q.    So under Mr. Rudow's -- or under this coinsurance provision using Mr. Rudow's RCV and ACV and amount of loss, Selective would have to pay at least $4.7 million, correct?

A.    Correct.

Q.    Okay.  And you don't know whether or not Selective has paid that amount?

A.    I do not know how much we paid on the loss.

Q.    Okay.  So we referenced the April 15th, 2024 letter, which was previously marked as Exhibit 45 at Mr. Rudow's deposition, and I'm going to share the screen in a second.

(Exhibit No. 45 displayed.)

Okay.  Are you at Exhibit 45?

A.    I can see it, yes.

Q.    Okay.  So it's an e-mail from Mr. Rudow on April 16, 2024, to Mr. Samek, Mr. Mehta and some other people.  And attached to it is the April 15th, 2024 letter that was referenced in his August letter, and here it is.

Have you seen this letter before?

A.    I probably have.  I don't recall it off

111

the top of my head, but I probably should have been involved in the claim at that point.

Q.    Okay.  So on the first page of this letter near the bottom, Mr. Rudow writes, "Chicago Ornamental Iron, Inc., (COI)" in parentheses, "presented Selective with an initial outline of building damages, including some supporting estimates/proposals, totaling" approximately $4.5 million "on September 29, 2023."

Do you see that?

A.    I do.

Q.    And you would have been provided with that estimate, correct?

A.    It would have been something that came through either that portal or through an e-mail from COI or through their counsel.

Q.    Okay.  But you would have seen that, correct, and reviewed it at or about the time it was uploaded or --

A.    Yes.

Q.    Correct?

A.    Yes.

Q.    Okay.  And this is September 29th, 2023, correct?

112

A.    Yep.

Q.    Okay.  So you understood at that time that the repair cost that COI was seeking to have paid for the third of the building that needed reconstruction was a little more than $4.5 million, correct?

A.    That's correct.

Q.    So using Mr. Rudow's methodology of essentially tripling the RCV, this would be -- this would lend itself to a replacement cost value for the entire building at over $13.5 million, correct?

A.    That would be the same methodology used.  I don't really know what was included in the 4.5 million, whether there were items that don't add to the value, but we didn't agree with that value either because we thought the value was much lower.

Q.    Okay.  Now, if you remember back to the August letter, the number that Mr. Rudow was using in the August letter is approximately $4.5 million, correct?

A.    I would have to look at it again.

Q.    Let me pull it up.

113

A.    Which letter is it?

Q.    It was Exhibit 52, but I'd like to -- I'm more than happy to pull it up.

(Exhibit No. 52 displayed.)

A.    Yeah, so that number is 4.452 million.

Q.    Okay.  4.52?

A.    4.452.

Q.    Okay.  Close enough, correct?

So if you do the math, you're still north of $13 million, correct?

A.    Right.  But at this point, we're, what, nine -- we're almost a year later from the -- well, six months or later from the April 15th letter -- four months later.

Q.    Okay.

A.    There's been additional adjustment in the loss since then.

Q.    Okay.  Understood.

So my point is that the figure, whether it's the 4.4 million or 4.5, if you triple it, okay, it still puts you north of $13 million, correct --

A.    That's correct.

Q.    -- which puts you in coinsurance -- in

**CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.**
**STUART CARLTON WALTON, JR.**                                     **2/19/2026**

114

the coinsurance penalty, correct?

A. If that were the value that we thought the loss was at the time.

Q. Okay. Now, COI was telling you on September --

A. You broke up again on us.

Q. Sure. Sure.

This was the letter from Mr. Rudow. I was saying, COI presented Selective with an initial outline of building damages totaling $4,552,010, right?

A. Correct.

Q. Okay. And you didn't think those numbers were correct at the time.

Is that what you're telling me?

A. That's correct, yes.

Q. Okay. So despite COI telling you in September -- on September 29th, 2023, that the repair cost would be about $4.5 million, you didn't you accept that until April of 2014 (sic) when you, I suppose, conceded that it should have been $4.4 million, correct?

A. As far as the dates go, that looks to be correct, yeah.

115

Q. Okay. So if you would have known on -- if you would have believed COI's number or accepted COI's number on September 29th, 2023, Selective would have issued a reservation of rights letter at that time, correct?

A. We probably would have notified the insured that there was a potential coinsurance problem.

Q. Okay. But for whatever reason, Selective did not accept COI's number at that time, correct?

A. Correct.

Q. And so it did not issue a reservation of rights letter at that time?

A. We did not notify anyone of a potential coinsurance problem, no.

Q. Okay.

A. I wouldn't call it a reservation of rights letter.

Q. I'm sorry?

A. I wouldn't call it a reservation of rights letter.

Q. Okay. You would have notified them of a coinsurance concern?

116

A. Correct, yes.

Q. Okay. And you acknowledge that you did not do that?

A. Correct.

Q. Okay. So -- but there's even more reason -- I mean, the number is even higher in this letter -- or excuse me.

The number that COI provided you on September 29th, 2023, is even higher than the number that triggered the April 15th letter, correct?

A. Slightly higher, yeah. But eventually, COI's building number went a lot higher, too, so both of our initial estimates turned out to be low from each of our perspectives.

Q. But COI is facing --

A. You broke up again. I'm sorry.

Q. You said both estimates were low. I think that's what you --

A. From each our perspectives, correct.

Q. Yes. And what I said is, that may be true, although only COI is now facing a coinsurance penalty, right?

MR. BANIAK: Objection. Argumentative.

117

MR. GOLDWASSER: That's true. It probably is.

BY MR. GOLDWASSER:

Q. Okay. So if you would have just used the same methodology that Mr. Rudow eventually used in that August letter or actually in this April letter by multiplying by three, it would have shown a coinsurance penalty, correct?

A. Yes, it would.

Q. Okay. So -- okay. I want to go down now -- so Mr. Rudow then has a table with various values and costs and --

A. Are you on the April 15th letter?

Q. I am. Here, let me share my screen.

A. I went back to it. I just wasn't sure what you were talking about.

Q. Okay. So he shows a replacement cost value of a total of $4.5 million, correct?

A. Right there in the middle?

Q. Yes.

A. Yes.

Q. And it shows about 51,000 for offices, bathrooms, kitchen space --

A. Correct.

31 (Pages 118 to 121)

---

118

Q. -- right?

A. Yep.

Q. And then 4,452,000 and change for all other areas, correct?

A. Correct.

Q. Okay. Mr. Rudow then says, "The approved RCV for all building damage as outlined above is $5,355,700.42."

Do you see that?

A. I do.

Q. Okay. So as of April 15th, 2024, the building portion -- the RCV for the loss under the building portion of the policy was approved at over $5.3 million, correct?

A. That's correct.

Q. Okay. And the RCV for the eastern section of the building approved was $4,452,000 and change, correct?

A. That's what the letter says, yes.

Q. Okay. Near the end of the letter -- I guess it's really the second to last page of the document but pretty much the last page of the letter -- Mr. Rudow says, "Selective also wants to advise you of a potential coverage issue under the

---

119

policy. The policy contains the following condition:"

And it looks like it excerpts the coinsurance provision from the policy, correct?

A. Correct.

Q. And then he says, "Our initial evaluations did not indicate there was a coinsurance concern," correct?

A. Yes.

Q. Then he says, "However, as we have obtained additional estimates and further evaluated the repair costs, it appears that there might be a coinsurance issue."

Do you see this?

A. I do.

Q. Okay. He concludes that paragraph with, "In the interim, Selective reserves all rights concerning the coinsurance condition. Selective also continues to reserve all rights and defenses under the policy and applicable law."

Do you see that?

A. I do.

Q. Is this a reservation of rights letter?

A. In some respects it is, yes.

---

120

Q. Okay. Tell me what in what respects it is.

A. Well, you're quoting the policy and advising the insured that they might not get a full recovery --

Q. Okay.

A. -- or that their loss might not be covered.

Q. Okay. Is there some -- I mean, when I asked you the question of whether or not this is a reservation of rights letter, you qualified it.

In what respect is it not a reservation of rights letter?

A. Well, it goes over a lot of information, not just about coverage.

Q. Okay. So if I'm understanding you correctly, you're saying this letter includes a reservation of rights?

A. That would be my answer, yes. It's not a letter that only deals with coverage.

Q. Gotcha. Okay.

Earlier you testified that, you know, there would be some occasion in which you might notify an insured that there could be a

---

121

coinsurance issue that you felt would not qualify as a reservation of rights.

Am I being correct? Is that correct?

A. Correct.

Q. And could you give me an example of -- would that be a written letter? Would that be a phone call? An e-mail?

What form would that take?

A. You could do that upon initially getting the claim. You could do it verbally. You could send them a letter.

There's lots of ways to do it. It just depends on how the information comes to you or when it comes to you.

Q. Okay. But you don't consider that, I guess, invoking a reservation of rights?

A. That's just not a formal one.

But, for instance, if you go out to a building and it's insured for $200,000 and it's 200,000 square feet and you multiply that and it's -- I don't know what the math is -- but it's way more than -- it's underinsured by a bunch, you're going to talk about it right then and there, right, as opposed to having to come back and do an

---

32 (Pages 122 to 125)

**122**

ITV and figure out the value, etcetera, etcetera, or you might go back and talk to them again and tell them, "We have an issue," and then you might present it in a letter.

MR. GOLDWASSER: Okay. Give me about ten minutes here, and I think I'm almost done.

MR. BANIAK: Sounds good.

MR. GOLDWASSER: Thanks.

(Brief recess.)

MR. GOLDWASSER: Okay. We're back on the record.

BY MR. GOLDWASSER:

Q. Just a couple of remaining questions, Mr. Walton.

Is there a standard operating procedure to determine either the replacement cost or the actual cash value of a building that Selective employs?

A. Is there a standard operating procedure?

Q. Yeah.

A. I mean, generally, you would complete an ITV, make that determination from that initially, and then depending on the loss -- you

**123**

know, you're not going to ever know anything different if the loss is for a small amount, right?

If the loss is a total loss or the loss is almost a total loss or can be apportioned like this, you can, you know, reevaluate it as you go along, but there's not a -- I mean, there's no one set way.

Q. Okay. Because it seems like there's different ways to arrive at the RCV and ACV, and one of them is to use the ISO 360 program, correct?

A. That's the program that we currently use. We used a different one a few years back, too, and there are several that you can use. There's one in the Xactimate program that some people use. They're all different, but they're --

Q. Okay.

A. But they all come to the same conclusion.

Q. Okay. And it seems like there's an alternate way where you take estimates, and you get a square footage figure, and you apply it to the total square footage of the building, correct?

**124**

A. That's one alternative way if you have that ability.

Q. Okay. And I guess there's another way where you could use this system, I guess, you referred to "back in the day," that you could put in an address and get a per-square-foot figure, correct?

A. Well, that's what they do now. That's what you do now. You put the address in, and it comes out.

But like I said, the value of a structure is what it's going to actually cost to replace it, what you actually spend to do it if you do it exactly the way it was before the loss, right?

So on a true total loss claim, you get that value because you replace everything. That makes it easier to understand.

Q. Who decides which of these various methods are used to determine an RCV, an ACV or the application of a coinsurance provision?

A. I think it's a decision that's made by the company, obviously, but it depends on the information we have.

**125**

Q. So are you saying it's on a case-by-case basis?

A. I'm saying that general protocol would be that we use the ITV. But then depending on the claim, if there's an alternative method that we seem to -- that we feel is more correct, then we would use that.

Q. And who makes -- when you say "we feel is more correct," who is the person that makes that decision?

A. That would be the company.

Q. Who at the company?

A. The adjuster.

Q. Okay. So in this case, that was Mr. Rudow?

A. Yes.

Q. Okay. So he had different ways to come up with the values, and he was able to make the determination of which one he wanted to use, correct?

A. Which one he felt was more accurate.

Q. Okay. And does he run that decision by anyone?

A. I'm sure it was discussed amongst me and Mr. Caton and probably with counsel, too.

CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.
STUART CARLTON WALTON, JR.                                                    2/19/2026

33 (Pages 126 to 129)

126

Q.   Okay.  Well, I don't want to know anything about counsel.

But the conversations where you were involved or Mr. Caton was involved, do you have any recollection of those?

A.   Not specifically.  Not specifically.

Q.   Do you generally?

A.   I mean, I know what we generally would have discussed.

Q.   I'm not looking for what you would have.  I just want to know if you have a recollection of what you actually did discuss.

A.   I don't have an accurate recollection now.

Q.   Okay.  And would there be written communications that reflect those conversations?

A.   I doubt it.  It probably would have been verbal.

Q.   Okay.  And is it a standard practice of Selective to kind of pull from one methodology some -- you know, some valuation and then pull from a different source another figure?

For example, "We're going to go based upon a trebling of the square foot rate, and we're

127

going to use a 20 percent depreciation rate from ISO 360"?

A.   I'm not sure what you're asking me there, but --

Q.   Well, let me try to clarify.

A.   Okay.  Go ahead.

Q.   So in Mr. Rudow's letter of April 15th, 2024, and August 19th, 2024, he used a methodology of taking a square foot based upon the reconstruction estimate and applied it to the whole building, okay, which is different than the way ISO valued the reconstruction cost.

But at the same time, it appears he used a depreciation rate from ISO 360, so it seems like he's kind of -- he's got one methodology here, and he's got another methodology here, and he's taking from one and applying it to the other.

Is that something that's commonly done?

A.   The depreciation rate wouldn't change, I don't believe, from whether you do it one way or the other.  That would be the same.  And in reality, it's not that much -- it's not really different.  It's just the system generates a number based on averages.

128

And when you get actuals, you can input those numbers back into the system, if you will, or plug the differences in, and that becomes a more accurate representation than the averages do.

So does that make sense?

Q.   I think I understand what you're saying.

Now, was that done in this case?

Were the actual estimated numbers used to plug into the ISO 360 system?

A.   I'm not positive if that's the way that Mr. Rudow did it or not, but that's certainly one way to do it.

Q.   Okay.  Are there logs that are kept that would reflect when and who used the ISO 360 system in connection with this claim?

A.   I think you asked me if there's a record of when somebody uses the 360 system?

Q.   Yeah, sure.  That's my question.

A.   Yeah, you broke up a little bit in the beginning.

Well, there may be one in ISO 360, yeah.

MR. GOLDWASSER:  Okay.  I think that's all we have.

129

I'll turn it over to Ms. Josserand.

MS. JOSSERAND:  I don't have any questions today.

MR. GOLDWASSER:  Okay.  Mr. Walton, thank for your time.

THE WITNESS:  Thank you.

THE COURT REPORTER:  Before we go, could I please ask about signature?

MR. BANIAK:  Oh, right.  He'll waive.

THE COURT REPORTER:  Mr. Goldwasser, are you ordering at this time?

MR. GOLDWASSER:  Yes.

THE COURT REPORTER:  Mr. Baniak, would you like to order a copy?

MR. BANIAK:  Yes, please.

THE COURT REPORTER:  Ms. Josserand, would you like to order a copy?

MS. JOSSERAND:  Yes, please.

THE COURT REPORTER:  Thank you.

(The deposition ended at 2:00 p.m.)

**CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.**
**STUART CARLTON WALTON, JR.**                                    **2/19/2026**

34  (Pages 130 to 131)

130

REPORTER'S CERTIFICATE

The foregoing deposition of STUART CARLTON WALTON, JR., via Zoom videoconference, was taken before Janet L. Erickson, CSR, commencing at 9:30 a.m. on February 19, 2026.

Said witness was first duly sworn by me and then examined upon oral interrogatories. The questions and answers were taken via machine shorthand by the undersigned and reduced to computerized transcription. The foregoing is an accurate and complete record of said deposition.

The certificate annexed hereto applies only to the original transcript and copies signed and certified by me. I assume no responsibility for copies which have been reproduced beyond my direction or control.

The signature of the witness was waived by agreement of the parties herein.

The undersigned is not interested in this case nor is of kin or counsel to any of the parties herein.

131

IN WITNESS WHEREOF, I hereunto affix my hand as Certified Shorthand Reporter in the State of Illinois on March 3, 2026.

Janet L. Erickson, CSR
License No. 084-003327