# Exhibit C

CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE
INSURANCE CO. OF AMERICA, et al.
RONALD RUDOW
February 17, 2026

Chimniak
Court Reporting & Video, Inc.

Downtown: 312.781.9111
Suburban: 630.983.0030
ChimniakCourtReporting.com

CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.
RONALD RUDOW                                                                    2/17/2026

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CHICAGO ORNAMENTAL IRON, )
INC., et al.,            )
                         )
          Plaintiffs,    )
                         )
  vs.                    )   Case No. 1:25-cv-05131
                         )
SELECTIVE INSURANCE CO.  )
OF AMERICA, et al.,      )
                         )
          Defendants.    )

            DEPOSITION OF RONALD RUDOW taken
pursuant to the Federal Rules of Civil Procedure
for the United States District Courts pertaining
to the taking of depositions, taken before
Sheryl A. Nommensen, a C.S.R. and a notary public
within and for the County of Will and State of
Illinois, taken at 300 South Wacker Drive,
Suite 1500, Chicago, Illinois, on the 17th day
of February, 2026, at the hour of 9:42 a.m.

STENOGRAPHICALLY REPORTED BY:
SHERYL A. NOMMENSEN, CSR
State of Illinois CSR License No. 084-003471

**CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.**
**RONALD RUDOW**                                                                                    **2/17/2026**

2 (Pages 2 to 5)

2

PRESENT:
    SCHOENBERG FINKEL BEEDERMAN BELL
    GLAZER, LLC, by
    RICHARD M. GOLDWASSER, ESQ. and
    CHRISTOPHER A. NELSON
    300 South Wacker Drive, Suite 1500
    Chicago, Illinois  60606
    312-775-3631
    richard.goldwasser@sfbbg.com
    christopher.nelson@sfbbg.com,
        Appeared on behalf of the
        Plaintiffs;

    LITCHFIELD CAVO, LLP, by
    MICHAEL P. BANIAK, ESQ.
    303 West Madison Street, Suite 300
    Chicago, Illinois  60606
    312-781-6677
    baniak@litchfieldcavo.com,
        Appeared on behalf of the
        Defendant Selective Insurance
        Company of America;

    LATHROP GPM by
    CARRIE E. JOSSERAND, ESQ.
    2345 Grand Boulevard, Suite 2200
    Kansas City, Missouri  64108
    913-451-5135
    carrie.josserand@lathropgpm.com,
        Appeared on behalf of the
        Defendant Assured Partners of
        Illinois.

    also present:
    Jonathan Samek

                * * * *

3

                RONALD RUDOW
                 Deposition
              February 17, 2026

EXAMINATION BY:                              PAGE

Mr. Goldwasser. . . . . . . . . . . . . . . . 7

Ms. Josserand . . . . . . . . . . . . . . . 257

Mr. Baniak. . . . . . . . . . . . . . . . . 275

                * * * *

4

                RONALD RUDOW EXHIBITS
Deposition Exhibit 1. . . . . . . . . . .Page  48
Deposition Exhibit 2. . . . . . . . . . .Page  60
Deposition Exhibit 3. . . . . . . . . . .Page  63
Deposition Exhibit 4. . . . . . . . . . .Page  72
Deposition Exhibit 5. . . . . . . . . . .Page  90
Deposition Exhibit 6. . . . . . . . . . .Page  93
Deposition Exhibit 7. . . . . . . .not identified
Deposition Exhibit 8. . . . . . . . . . .Page  99
Deposition Exhibit 9. . . . . . . . . . .Page 100
Deposition Exhibit 10 . . . . . . . . . .Page 109
Deposition Exhibit 11 . . . . . . . . . .Page 113
Deposition Exhibit 12 . . . . . . . . . .Page 119
Deposition Exhibit 13 . . . . . . . . . .Page 120
Deposition Exhibit 14 . . . . . . . . . .Page 121
Deposition Exhibit 15 . . . . . . . . . .Page 122
Deposition Exhibit 16 . . . . . . . . . .Page 128
Deposition Exhibit 17 . . . . . . . . . .Page 130
Deposition Exhibit 18 . . . . . . . . . .Page 131
Deposition Exhibit 19 . . . . . . . . . .Page 138
Deposition Exhibit 20 . . . . . . .not identified
Deposition Exhibit 21 . . . . . . . . . .Page 143
Deposition Exhibit 22 . . . . . . .not identified
Deposition Exhibit 23 . . . . . . . . . .Page 152
Deposition Exhibit 24 . . . . . . .not identified
Deposition Exhibit 25 . . . . . . . . . .Page 166
Deposition Exhibit 26 . . . . . . . . . .Page 159
Deposition Exhibit 27 . . . . . . .not identified
Deposition Exhibit 28 . . . . . . . . . .Page 162
Deposition Exhibit 29 . . . . . . . . . .Page 163
Deposition Exhibit 30 . . . . . . .not identified
Deposition Exhibit 31 . . . . . . .not identified
Deposition Exhibit 32 . . . . . . .not identified
Deposition Exhibit 33 . . . . . . .not identified
Deposition Exhibit 34 . . . . . . .not identified
Deposition Exhibit 35 . . . . . . .not identified
Deposition Exhibit 36 . . . . . . .not identified
Deposition Exhibit 37 . . . . . . .not identified
Deposition Exhibit 38 . . . . . . .not identified
Deposition Exhibit 39 . . . . . . .not identified
Deposition Exhibit 40 . . . . . . .not identified

5

                RONALD RUDOW EXHIBITS
                    (continued)
Deposition Exhibit 41 . . . . . . .not identified
Deposition Exhibit 42 . . . . . . .not identified
Deposition Exhibit 43 . . . . . . .not identified
Deposition Exhibit 44 . . . . . . .not identified
Deposition Exhibit 45 . . . . . . . . . .Page 192
Deposition Exhibit 46 . . . . . . .not identified
Deposition Exhibit 47 . . . . . . .not identified
Deposition Exhibit 48 . . . . . . .not identified
Deposition Exhibit 49 . . . . . . .not identified
Deposition Exhibit 50 . . . . . . .not identified
Deposition Exhibit 51 . . . . . . .not identified
Deposition Exhibit 52 . . . . . . . . . .Page 207
Deposition Exhibit 53 . . . . . . .not identified
Deposition Exhibit 54 . . . . . . .not identified
Deposition Exhibit 55 . . . . . . .not identified
Deposition Exhibit 56 . . . . . . .not identified
Deposition Exhibit 57 . . . . . . .not identified
Deposition Exhibit 58 . . . . . . .not identified
Deposition Exhibit 59 . . . . . . .not identified
Deposition Exhibit 60 . . . . . . .not identified
Deposition Exhibit 61 . . . . . . . . . .Page 230
Deposition Exhibit 62 . . . . . . . . . .Page 215
Deposition Exhibit 63 . . . . . . .not identified
Deposition Exhibit 64 . . . . . . .not identified
Deposition Exhibit 65 . . . . . . .not identified
Deposition Exhibit 66 . . . . . . .not identified
Deposition Exhibit 67 . . . . . . .not identified
Deposition Exhibit 68 . . . . . . .not identified
Deposition Exhibit 69 . . . . . . .not identified
Deposition Exhibit 70 . . . . . . .not identified
Deposition Exhibit 71 . . . . . . .not identified
Deposition Exhibit 72 . . . . . . .not identified
Deposition Exhibit 73 . . . . . . .not identified
Deposition Exhibit 74 . . . . . . .not identified
Deposition Exhibit 75 . . . . . . .not identified
Deposition Exhibit 76 . . . . . . . . . .Page 184
Deposition Exhibit 77 . . . . . . .not identified
Deposition Exhibit 78 . . . . . . .not identified
Deposition Exhibit 79 . . . . . . .not identified
Deposition Exhibit 80 . . . . . . .not identified

3 (Pages 6 to 9)

6

RONALD RUDOW EXHIBITS
(continued)

Deposition Exhibit 81 . . . . . . .not identified
Deposition Exhibit 82 . . . . . . .not identified
Deposition Exhibit 83 . . . . . . .not identified
Deposition Exhibit 84 . . . . . . .not identified
Deposition Exhibit 85 . . . . . . .not identified
Deposition Exhibit 86 . . . . . . .not identified
Deposition Exhibit 87 . . . . . . . . .Page 189
Deposition Exhibit 88 . . . . . . .not identified
Deposition Exhibit 89 . . . . . . .not identified
Deposition Exhibit 90 . . . . . . . . .Page 233
Deposition Exhibit 91 . . . . . . . . .Page 257

- - - -

7

(WHEREUPON, the following proceedings commenced at 10:04 a.m.)

MR. GOLDWASSER: You can swear in the witness.

(WHEREUPON, the witness was duly sworn.)

RONALD RUDOW, called as a witness herein, having been first duly sworn, was examined upon oral interrogatories and testified as follows:

DIRECT EXAMINATION
BY MR. GOLDWASSER:

Q. This is the discovery deposition of Ron Rudow, taken pursuant to notice and set today by agreement of the parties.

Mr. Rudow, I just want to lay out some ground rules before we begin.

I imagine you've given your deposition before. Correct?

A. Correct.

Q. So just as a refresher, if you have any -- if you don't understand the question I'm asking at any time, please ask me to repeat it or

8

rephrase it, and I'll try to put it in a way that you can understand. Okay?

A. Okay.

Q. We're going to need all of your answers to be verbal as opposed to head nods or shoulder shrugs. Okay?

A. Got it.

Q. Likewise, for the sake of the court reporter and the record that we're making here today, I'm going to need you to allow me to finish my question before you answer, and I will likewise extend you the same courtesy and allow you to answer the question before I ask my next question. Okay?

A. Understood.

Q. The reason obviously is the court reporter has a difficult time taking down when two people are speaking at once.

A. Makes sense.

Q. Okay. If you need to take a break at any time, just let us know, and we'll accommodate you. I would just ask that you finish answering any pending question before we break.

A. Understood.

9

Q. Okay. Mr. Rudow, is your full name -- is your formal name Ronald Rudow or Ron?

A. Formal is Ronald Rudow.

Q. Okay. I represent Chicago Ornamental Iron, Inc. During today's deposition, I will most likely be referring to it as COI, and you'll understand what I mean?

A. I will.

Q. And you're familiar with Jon Samek; correct?

A. Correct.

Q. He's the individual sitting to my right?

A. Correct.

Q. And you know him to be one of the principals of COI; correct?

A. Correct.

Q. At certain times I may be referring to Mr. Samek just -- because I think a lot of us have gotten to know each other over time, but just as Jon. And you'll understand if I say Jon, I'm referring to Mr. Samek; correct?

A. Correct.

Q. Okay. How many times have you sat for a deposition before?

**CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.**
RONALD RUDOW
2/17/2026

4 (Pages 10 to 13)

10

A. Dozen or more.

Q. Okay. And has that all been in connection with your work as an adjuster?

A. Correct.

Q. And has that all been in connection with your employment for Selective?

A. Yes.

Q. Okay. When was the last time you gave a deposition?

A. I'd say Quarter 4 of 2025.

Q. Okay. And that was in a pending litigation; correct?

A. No. I believe that was for a subrogation investigation.

Q. An investigation. Okay. How about for active litigation?

A. That would have been earlier in 2025.

Q. Okay. And where was that case pending?

A. I don't recall.

Q. Okay. Do you remember the name of the case?

A. No.

Q. Selective was a defendant in the case?

A. Yes.

11

Q. Was that a local case here in either Cook County or the Northern District of Illinois?

A. Most likely not.

Q. Okay. What's your current position with Selective?

A. My current role is a director of large loss property.

Q. And could you tell me what -- generally what that entails?

A. Sure. I oversee a group of five individuals that receive and handle first-party property claims. That can be homeowners, they can be commercial, they can be builder's risk, all types of first-party property claims within Selective's footprint.

So we write business in 37 states, and we have an excess and surplus lines business that operates in all 50.

Q. Okay. And how long have you been in that position?

A. Just shy of two years.

Q. Okay. What's -- how do you characterize large loss? What constitutes a large loss?

A. There's multiple factors that go into

12

it. It can be dollar values. It can be complexity of the damages that are involved, whether that be a multifaceted building, business personal property, equipment, income losses. So there's varying factors.

Q. Okay. Is there a limit then -- when you say it could be dollar figure, is it over a certain amount?

A. Typically, but not always.

Q. How does a claim get assigned to you?

A. To me, I don't -- to clarify, I don't handle the claims directly anymore except for the ones that I currently had before. So I don't receive claims directly anymore.

But the referrals come in from our field staff that we have positioned throughout the country, and a director will review those referrals to determine what the issues are with the loss, you know, what damages are involved, is it homeowners, is it commercial, and then determine approximate values based on facts that are known potentially very early in the claim to determine if we should move it to a different adjuster.

13

Q. Who are the five individuals that you oversee?

A. Their names?

Q. Yes.

A. One is Alan Kidd.

Q. Could you spell his last name.

A. K-I-D-D.

Q. And is it A-L-A-N?

A. That's correct.

Q. Okay.

A. Another one is Abigail Richardson. Another one is Michael Teegarden.

Q. Could you spell his last name.

A. T-E-E-G-A-R-D-E-N.

Another one is David Clark.

Q. C-L-A-R-K?

A. Yes.

Q. Okay.

A. And last one is Steven Claudio.

Q. Could you spell Claudio.

A. C-L-A-U-D, as in David, I-O.

Q. Okay. What was the date that you became a director of large loss?

A. I don't remember the exact date. It was

**CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.**
RONALD RUDOW
2/17/2026

5 (Pages 14 to 17)

14

in 2024.

Q.   Okay.  The loss that we're -- that this lawsuit concerns is a loss in 2023.  You're aware of that; correct?

A.   Correct.

Q.   It was in July of 2023; right?

A.   Right.

Q.   What was your position in July of 2023?

A.   My title at that time was an executive general adjuster.

Q.   And what are the job responsibilities of the executive general adjuster?

A.   At that time, in that role, you handle pretty much any claim, homeowners, commercial, all the types of risks that I previously mentioned, typically of the highest dollar values that the company has.

Q.   And what constitutes the highest dollar values?

A.   There is no like formality or definition of that.

Q.   Okay.  Well, you used the term highest dollar values.  How does -- you know, what lands you on that characterization that you were dealing

15

with the highest dollar values?

A.   The exposures involved.  Typically, it involves reviewing the policy to determine what limits might be involved on a building or business personal property, the initial facts that we might know in reference to the claim as to the extent of the damages, so that way we can utilize some sort of past knowledge and experience to determine what we think an exposure might be potentially early on in the claim.

Q.   Okay.  When you say you were adjusting claims of the highest dollar value for the company, what makes you think that you were adjusting claims of the highest dollar value?

A.   I don't know if I have an answer to that question.

Q.   Okay.  In July of 2023, how many claims were you handling?

A.   Probably safe bet is 25.

Q.   Is that -- would that be a typical amount of claims to handle while you were the executive general adjuster?

A.   It's pretty reasonable.

Q.   Okay.  What is your role currently in

16

connection with this claim?

A.   I still am the handling adjuster on this claim.

Q.   So you're still serving in the role with respect to this claim as an executive general adjuster; is that correct?

A.   Correct.

Q.   Okay.  And as part of that role, from the time the claim was made through today, are you overseeing anyone else handling this claim?

A.   No.  There is nobody else handling this claim.

Q.   Okay.  And who do you report to?

A.   I report to a Matthew Caton.

Q.   Can you spell Mr. Caton's last name.

A.   C, as in Charlie, A-T-O-N.

Q.   And that's in connection with this claim?

A.   He is my supervisor.

Q.   Okay.  But, just to be clear, in connection with this claim; correct?

A.   Correct.

Q.   Okay.  Has Mr. Caton been your supervisor since the claim was filed?

17

A.   No.

Q.   Okay.  When did he become your supervisor?

A.   In 2024, when I was promoted.

Q.   Okay.  And prior to 2024, who did you report to?

A.   Carl Walton.

Q.   Okay.  What's the highest level of education you finished?

A.   College.

Q.   Where did you go to school?

A.   Western Illinois University.

Q.   When did you graduate?

A.   2003.

Q.   And what was your degree?

A.   Marketing management.

Q.   Do you have any professional licenses or certifications?

A.   I do have licenses, yes.

Q.   Okay.  What licenses do you have?

A.   I have licenses in about 22 states that require them for employees of insurance carriers.

Q.   Okay.  And what type of license is that?

A.   It's to handle first-party property

18

claims.

Q. Does the license have a name?

A. Not that I'm aware of.

Q. Okay. Do you have any license in connection with construction or the trades?

A. No.

Q. Okay. After you graduated college in 2003, what was your first job?

A. First job was at a local golf store.

Q. Okay. When did you begin working in the insurance industry?

A. 2004.

Q. Okay. And that was with whom?

A. Travelers Insurance.

Q. What was your position with travelers?

A. My first role there was an auto claim rep. We handled clear liability auto accident cases.

Q. Okay. And how long were you with Travelers?

A. Until 2016, so about twelve, thirteen years.

Q. Okay. When you left Travelers, what was your position?

19

A. I was a technical specialist there.

Q. And what is a technical specialist?

A. It's just their title for the role of somebody who handles first-party property claims.

Q. Okay. And was that the role that you started with at Travelers?

A. No.

Q. Okay. And what was the -- what would you call that role?

A. Well, my first role at Travelers was the auto claim rep.

Q. Auto claim rep, okay.

A. Correct.

Q. Okay. And you left Travelers in 2016?

A. Correct.

Q. And why did you leave Travelers?

A. Just felt it was the time to move on.

Q. Okay. Did you have a job waiting for you when you left?

A. Yes. I had a job at Selective.

Q. Okay. And what was your initial position with Selective?

A. I was associate general adjuster.

Q. And for how long was that?

20

A. Approximately two years.

Q. And you were promoted?

A. Correct.

Q. To what position?

A. After that, I was a general adjuster.

Q. For how long?

A. Approximately two years.

Q. And then you became an executive general adjuster; is that right?

A. That's correct.

Q. Okay. Aside from the current claim, have you ever been involved in adjusting a claim for a roof collapse?

A. Yes.

Q. How many?

A. I don't keep track of those.

Q. Okay. Do you know when?

A. Probably within the last few years, maybe every so often.

Q. Okay. Are we talking more or less than five?

A. That's fair.

Q. Around five?

A. That's fair.

21

Q. How about claims involving damage due to water or flooding?

A. Can you clarify your question?

Q. How many claims have you handled?

A. I can't count that many.

Q. Okay.

A. We see a lot of them.

Q. Dozens?

A. More than that.

Q. Hundreds?

A. Closer, correct.

Q. Okay. How about warehouse losses?

A. We handle those frequently.

Q. Okay. Are you involved as a witness or an adjuster in any active litigation?

A. In any capacity?

Q. Yes.

A. I would have to say yes.

Q. Okay. How many in addition to the current one?

A. Maybe a handful.

Q. Okay. Is a handful five or six?

A. That's a handful, yeah.

Q. Okay. And do you know where those cases

**CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.**
**RONALD RUDOW**
**2/17/2026**

7 (Pages 22 to 25)

22

are pending?

A. Exactly, no.

Q. Okay. How about inexactly?

A. I mean, it could be anywhere in our footprint, to be honest.

Q. Okay. What's your footprint?

A. Well, Selective handles 37 states where we write business, and our E & S business is in all 50, so --

Q. Okay. Are you able to characterize the loss in any of those five for me?

A. I mean, they're going to be anywhere from fire losses to water losses. I mean, we see a little bit of everything.

Q. Okay. Have you undergone any training at Selective?

A. Can you clarify training as respect to what?

Q. In any capacity.

A. Yes.

Q. Okay. What kind of training?

A. I mean, we do like typical training like for the company that we have to have for like security purposes.

23

We have training for some -- it's not really a license but for some unfair claim practices for the State of California.

We have training for -- you know, it could be small sets where we're individualized, a specific topic that we want to educate folks on or at least make them more aware of some things and trends that are happening. It's more informal than something that's company-wide.

Q. Is there any formal training for claims handling?

A. No.

Q. Are there any written policies that relate to the handling of claims?

A. We do have a -- excuse me, we do have a guideline.

Q. Okay. Is the guideline called anything?

A. It's called a guideline.

Q. Okay. And has that guideline been produced in this litigation?

A. I'm -- I would have to defer to my counsel for that.

Q. Okay. When was the last time you reviewed the guideline?

24

A. In its totality?

Q. In any part.

A. In any capacity, within the last month.

Q. What was the purpose?

A. To review some internal protocols for when certain notifications need to be sent.

Q. Okay. Could you tell me generally what's included in this -- in these guidelines?

A. We have some topics surrounding like what we -- what should be in a file, like communications, documentation.

We talk -- there is some other things in reference to some internal procedures that we have that we let our various internal business partners know about when certain things arise. It can be inclusion of payments, how those are structured, what to be aware of when you are issuing payments, a wide variety of things.

Q. Is timeliness covered in the guidelines?

A. Specifically to -- no, not from a per-state perspective, because those do vary.

Q. I'm sorry, not in respect to a what?

A. Not with respect to individual states.

Q. Individual states. Okay. How about

25

generally?

A. I think generally it's if you receive something, be responsive.

Q. Okay. Is that actually in the guidelines?

A. I'd have to review it to know for sure.

Q. Okay. Are there different guidelines for each state?

A. No.

Q. Okay. There's just one general guideline or guidelines that are applicable to everywhere Selective does business; correct?

A. That's correct.

Q. Okay. Is there anything in the guidelines that relate to issuing a reservation of rights letter?

A. I believe so.

Q. Okay. And what can you tell me about that? What does it say in regards to reservation of rights?

A. If you're looking for particulars, I'd have to review the guideline.

Q. Okay. Can you tell me what a reservation of rights letter is?

**CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.**
RONALD RUDOW                                                    2/17/2026

8 (Pages 26 to 29)

---

26

A.    Reservation of rights letter is when you -- when an adjuster observes potential concerns in reference to how the policy affords coverage and whether it may or may not afford coverage, and that would be a written notification to the policyholder.

Q.    Okay.  And what's the purpose of a reservation of rights letter?

A.    Purpose would be to let our policyholder know of any applicable policy language that may or may not be applicable to the loss and the facts being presented.

Q.    Okay.  Is it fair to say that one of the purposes of the reservation of rights letter is to properly inform an insured as to potential coverage issues; correct?

A.    Correct.

Q.    And that, in turn, would allow the insured to, you know, make certain decisions with that knowledge in mind; correct?

A.    Correct.

Q.    Another purpose of the reservation of rights letter is to make sure that Selective itself reserves its defenses under a policy;

---

27

correct?

A.    Correct.

Q.    A reservation of rights letter is a significant communication; correct?

MR. BANIAK:  Object to form.

THE WITNESS:  I think you should define significant.

MR. GOLDWASSER:  Okay.  Important.

THE WITNESS:  I would agree with important.

MR. GOLDWASSER:  Okay.

BY MR. GOLDWASSER:

Q.    As an executive general adjuster, what's your standard process for updating the policyholder regarding coverage determination?

A.    That could be done -- I do it in multiple fashions, in person, through site inspections.  It could be on the phone or via e-mail.

Q.    Okay.  And when you do that, do you make any written notification of it?  Do you log that, that communication anywhere?

A.    I typically would log that in the claim notes.

---

28

Q.    Will Selective pay undisputed amounts of a claim while it continues to investigate disputed elements of a claim?

A.    Yes.

Q.    And in what circumstances will Selective pay undisputed amounts?

A.    If I understand your question correctly, we would pay undisputed amounts when they're undisputed.

Q.    Okay.  Without regard to whether or not there are other elements that are in dispute; correct?

A.    Correct.

Q.    Okay.  And is there a process for escalating issues or disputes that you have with coverage issues with a policyholder internally?

A.    Can you clarify escalating issues, to like what --

Q.    Well, you have a supervisor; correct?

A.    Uh-huh.

Q.    Mr. Walton, Carl Walton during the claim period here; correct?

A.    Correct.

Q.    At least when it started.  What's the

---

29

process of advising Mr. Walton that, you know, there may be some issues with the adjustment of the claim?

A.    That would simply just be me having a phone conversation with him and just letting him know the facts that I've determined or at least been given and presenting him with those coverage issues and making him aware of that.

Q.    Okay.  For this claim, who made -- who makes -- who at Selective makes the ultimate decision on coverage issues?

A.    The claim adjuster.

Q.    That would be you?

A.    That's correct.

Q.    Okay.  And is that made with input from Mr. Walton or without input from Mr. Walton?

A.    It can be made with input, yes.

Q.    Okay.  But the ultimate decision lies with you?

A.    Yes.

Q.    So if coverage for a certain part of the claim was approved, that's because you approved it; correct?

A.    Correct.

---

CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.
RONALD RUDOW
2/17/2026

9 (Pages 30 to 33)

Page 30

Q. And if coverage was denied for a certain part of the claim, that's because it was your determination that it should be denied; correct?

A. Correct.

Q. Okay. For the -- for this claim, do you recall when you were first assigned the claim?

A. It was within a day or two of the loss, I believe.

Q. Okay. And maybe you touched on this before, but how was it that the assignment came to you?

A. I received an e-mail letting me know that I would be assigned to this claim.

Q. Okay. And who did that e-mail come from?

A. I don't recall.

Q. Do you know generally who was responsible for assigning claims?

A. Yes.

Q. And who is that?

A. It would have been one of the directors at the time.

Q. Okay. Mr. Walton was a director?

A. Correct.

Page 31

Q. Who else was a director at that time?

A. James Pebbles and Mark Vandegraft.

Q. Can you spell Mark's last name.

A. V, as in Victor, A-N-D-E-G-R-A-F-T.

Q. Okay. And as the executive general adjuster, what were your responsibilities in connection with this claim?

A. My responsibilities were to investigate the facts and determine applicable coverages and then evaluate damages.

Q. Okay. And I know you visited the property here. When was the first time?

A. I believe it was July 7th of 2023.

Q. Okay. And was anyone else from Selective with you?

A. I don't believe so.

Q. Okay. Did you -- was anyone from COI with you?

A. Yes.

Q. And who was that?

A. Jonathan.

Q. Okay. Anyone else?

A. There were other employees there at the time.

Page 32

Q. Okay. And did you take any notes with respect to that visit?

A. Yes.

Q. Okay. Did you take notes while you were walking through?

A. Yes.

Q. Okay. Handwritten notes?

A. Yes.

Q. Okay. And did you preserve those handwritten notes?

A. Should be.

Q. Okay. And where do you keep those handwritten notes?

A. In my office.

Q. Okay. Did you provide those handwritten notes to the attorneys for Selective here?

A. I don't recall if I sent those directly to counsel or if they would have already been included in the claim file.

Q. Okay. Can you explain to me what the claim file consists of?

A. It consists of anything that would be paper, that would have been documented, handwritten from site inspections.

Page 33

And it would also include the log notes and anything stored electronically within the claim file.

Q. Okay. But sitting here today, you can't recall whether or not you provided those handwritten notes?

A. I do not recall.

Q. As executive general adjuster, you also have the ability to approve the payments; correct?

A. Correct.

Q. Are you required to get any approval from anyone at Selective?

A. Yes. There are approval requirements.

Q. Okay. So tell me what those requirements are.

A. As an executive general adjuster, you're given a specified authority level, and anything once you exceed that authority level needs approvals from either your supervisor and -- or depending on value, beyond that.

Q. Okay. What's the level for which you don't need approval from anyone else?

A. As an executive general adjuster, I believe my authority was around 900,000.

**CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.**
**RONALD RUDOW**
**2/17/2026**

10 (Pages 34 to 37)

---

34

Q. Anything over that you needed approval from a director?

A. A director or somebody above a director.

Q. Okay. And who is above a director?

A. Matthew Caton, who I mentioned earlier, he is above a director. And then after him would be our executive vice president of claims.

Q. And who is that?

A. His name is Paul Kush.

Q. C-U-S-H?

A. K-U-S-H.

Q. And was he the executive vice president at the time of this loss when it first occurred?

A. Yes.

Q. Okay. I want to ask you some questions about the document production in this case. Were you the individual at Selective responsible for gathering the documents?

A. In order -- let me clarify. In order to provide to counsel?

Q. Yes.

A. I don't believe so.

Q. Okay. Who was that?

A. I believe it would have been somebody in

---

35

our legal department.

Q. Okay. You don't know who?

A. No.

Q. Okay. For me to find out that information, you know, who would know that?

A. I believe a Christopher Losquadro should know that.

Q. Could you spell that name.

A. Just the last name?

Q. Yeah.

A. L-O-S-Q-U-A-D-R-O, I believe.

Q. Okay. And I take it he's in the legal department?

A. That's correct.

Q. Is he the general counsel?

A. His exact title I don't know.

Q. Okay. You were not involved in any way in gathering the documents to produce in this case?

A. No.

Q. Okay. In adjusting this claim, you used certain vendors; correct?

A. That's correct.

Q. Okay. Which vendors did you use in

---

36

order to adjust this claim?

A. One vendor would have been a company called JDH, Incorporated.

Q. Okay. And what do they do?

A. They assist with evaluations concerning structures.

Q. Okay.

A. Another vendor would have been Envista Forensics.

Q. Okay. And what does Envista do?

A. I retained them to review the equipment at the facility.

Q. Okay.

A. Another vendor is Morgan Johnson Carpenter.

Q. Okay. And what do they do?

A. And they are an accounting firm that assisted us with the evaluation of financials.

Q. Okay. Who else?

A. And also hired J.S. Held, who assisted with review of applicable codes for the City of Chicago.

Q. Building codes, municipal codes, that sort of thing?

---

37

A. Correct.

Q. Okay. And have you -- anyone else?

A. I don't believe so.

Q. Okay. Have you used these vendors on other claims?

A. Yes.

Q. In fact, you use these vendors on a regular basis to adjust other claims; correct?

MR. BANIAK: Object to form.

THE WITNESS: Can you elaborate on regular basis?

BY MR. GOLDWASSER:

Q. Let me ask you this. I'll just ask you, how often do you use JDH, Incorporated?

A. Maybe twice a year.

Q. Okay. How about Envista?

A. Maybe a handful of times a year.

Q. Okay. Morgan Johnson?

A. Probably a couple, handful.

Q. J.S. Held?

A. Couple times a year.

Q. Okay. Who is your contact or who do you work with at JDH, Incorporated?

A. On this particular claim involving COI,

---

CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.
RONALD RUDOW                                                                    2/17/2026

11  (Pages 38 to 41)

38

it was a Margaret --

Q.   Stanfield?

A.   Yes.  Thank you.

Q.   Okay.  Anyone else?

A.   At the initial inspection, there was another gentleman there as well that was assisting with note-taking, measuring, things of that nature.  But after the initial inspection, Margaret was the lead person that I spoke to.

Q.   Okay.  And do you remember that person's name who did the measuring?

A.   I don't recall.  I know I know it, but I just don't recall.

Q.   Okay.  Who was your contact or who did you work with at Envista Forensics?

A.   I had called and worked with a gentleman named Mark Ewing.

Q.   E-W-I-N-G; is that correct?

A.   I believe so.

Q.   Okay.  Anyone else?

A.   I also believe he had somebody assisting him at an initial inspection or two.  That person, I do not recall their name at all.

Q.   Okay.  Morgan Johnson?

39

A.   That was a Gary Johnson.

Q.   Okay.  And how about J.S. Held?

A.   I am -- there were two individuals at J.S. Held.  I am not recalling their names at the moment.

Q.   Okay.  Did JDH prepare any reports?

A.   They prepared an estimate --

Q.   Okay.

A.   -- if that's what you're referencing as a report.

Q.   Okay.  Estimates, reports, okay.

A.   They prepared us an estimate.

Q.   Okay.  How many?

A.   It would have been an estimate more than likely after each additional piece of information came forward that needed a review.

Q.   Okay.  How about Envista, did they prepare any reports or documentation in connection with your investigation of this claim?

A.   I think their reports mostly entailed like itemizing the inventory and like the equipment, so at least listing out what the equipment was and also working through some of the itemized lists that I believe were provided by

40

COI.

Q.   Okay.  Was Envista Forensics involved at all in the inspection of any of the equipment to see if it was functional?

A.   Yes.

Q.   Okay.  And did they prepare any reports in connection with their inspections?

A.   I do not recall any formal reports from Envista.

Q.   Okay.  Were there any informal reports?

A.   No.  I mean, there would have only been exchanges of phone conversations or potentially some e-mails.

Q.   Okay.  So the way they communicated whatever findings they had were either through e-mails or telephone calls?

A.   Correct.

Q.   Okay.  And that would have been between you and Mark Ewing, the phone calls?

A.   Correct.

Q.   Okay.  Sitting here today, do you recall any of the phone calls between you and Mr. Ewing?

A.   The material discussed?

Q.   Yes.

41

A.   Not exactly, no.

Q.   Okay.  How many phone calls do you believe you had with Mr. Ewing in connection with the adjustment of this claim?

A.   At least a dozen.  It's just a speculatory guess.

Q.   Okay.  And you're unable to tell me what you said to Mr. Ewing or what he said to you during any of these calls; is that correct?

A.   That's correct.  There's a lot of equipment involved.

Q.   Okay.  How about Morgan Johnson, did they prepare any sort of report in connection with the adjustment of this claim?

A.   I don't -- their report would have been in the sense of like schedules in reference to financials that were received from COI.

I also believe there may have been some just informal like analysis, you know, just so that way I could comprehend and understand the financials of it better in piecing out some of the information rather than looking through mounds of profit and loss statements and tax returns.

Q.   Okay.  So there were some reports that

**CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.**
RONALD RUDOW                                                      2/17/2026

12 (Pages 42 to 45)

42

they prepared?

A. There may have been some, yeah.

Q. Okay. And I take it you probably had some telephone conversations with Mr. Johnson; correct?

A. Correct.

Q. Do you recall what you said to Mr. Johnson or what he said to you during any of these calls?

A. We would have been basically discussing topics as contracts in place before the loss, contracts in place after the loss, how the business was doing after the loss based on the provided financials from COI. It would have been topics of that nature.

Q. Okay. Aside from the topics, do you recall any of the specifics?

A. No.

Q. Okay. How about -- how many times did you speak with Margaret Stanfield over the phone or in person?

A. It would have been many.

Q. Dozens?

A. Correct.

43

Q. More than dozens?

A. Few dozens.

Q. Okay. And do you recall the substance of any of those conversations, either by phone or in person?

A. Substance, no, but again topics involving damages to the building, additional information that was being provided that was either new information or needed a continued evaluation.

Q. Okay. How about J.S. Held? Who did you deal with at J.S. Held? I don't think I asked you that.

A. You did ask, but I don't recall their names.

Q. There was more than one person?

A. I believe so.

Q. And did J.S. Held prepare any reports in connection with the adjustment of this claim?

A. No formal reports that I'm aware of.

Q. Okay. Was there something that you would consider informal reports?

A. It would have just been e-mails.

Q. Okay. And what do you recall those

44

e-mails to have covered?

A. Those -- the e-mails would have covered topics surrounding, you know, code reviews and different things that were applicable for the City of Chicago.

Q. Okay. Do you recall any telephone conversations or in-person conversations with people at J.S. Held?

A. I can be certain there were no in-person conversations. The substance again of other phone calls would have just been about the topics that we retained them for.

Q. Okay. So aside from yourself, these four vendors and the individuals at those vendors, and Mr. Walton and I guess now Mr. Caton, is anyone else at Selective involved in the adjustment of this claim?

A. I don't believe so.

Q. Okay. You log your notes on -- and you consider them claim notes; is that right? You make notes and you log them on to some database?

A. That's correct.

Q. Like a claim management system?

A. Yeah. I mean, it's just another system

45

that we have our notes in.

Q. Does that system have a name?

A. If it does, I don't know what it is.

Q. Okay. And how is it that you log in whatever information that you need to put in?

A. I just hit the add note button within our claim system.

Q. Okay. And it allows you to provide a narrative of what you want to include; correct?

A. That's correct.

Q. And you're able to upload documents to the system; correct?

A. That is correct.

Q. Okay. And is it important to include or is it your intention to include all important information relating to the claim?

A. That is my intention, yes.

Q. Okay. You want to make sure you have a full and complete record; correct?

A. That is correct.

Q. Of all the material information; correct?

A. Correct.

Q. You wouldn't leave anything out of it at

**CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.**
RONALD RUDOW                                                      2/17/2026

13 (Pages 46 to 49)

46

least knowingly; correct?

A. Correct.

Q. Okay. And when you receive documents from an insured, what do you do with those documents?

A. I would -- if they were received via e-mail, I would add that particular e-mail to our electronic system that stores all of that information and then conduct a review to determine if it's sufficient information for me to evaluate or if there's a need for additional requests, whatever that might be.

Q. Okay. But I'm -- for the present purposes, I'm just focused on how you store that information. You upload it to the same system with your claim notes or that's a different system?

A. It's a different system.

Q. Okay. And does that system have a name?

A. It is our -- it's called -- we abbreviate it and call it CCM.

Q. Okay.

A. I believe it stands for Claim Content Management.

47

Q. Okay.

A. I believe.

Q. Okay. So if you get an e-mail from COI with attachments, you're able to move that entire e-mail and the attachments into the CCM; correct?

A. That's correct.

Q. Okay. Now you were also provided access, I believe, to a data room at BDO. Are you familiar with that?

A. Yes.

Q. Okay. In addition to accessing those -- the information in the data room, did you actually copy or remove or place that data in the CCM?

A. I believe so. There was a lot of data in there, I believe.

I believe so. I don't recall if all of it made it there because there were -- if I'm remembering correctly, there were additions being made frequently, and then trying to know what was new and what was old.

Q. Okay. And when was the first time you accessed the data room at BDO?

A. I don't recall that date.

Q. Would you note in your claim notes the

48

occasions in which you accessed the data room?

A. I probably would not specifically say accessed BDO data room. I would just be referencing documents.

Q. Okay. Is there a record other than the claim log that would show when and what documents you reviewed?

A. I don't believe so.

Q. Okay. Who else at Selective had access to the claim log?

A. The claim log is -- anybody can access that has access to our claim system.

Q. Okay. Let's take a look at this binder here. It's what I'm going to call Rudow Exhibit 1.

(WHEREUPON, Exhibit 1 was marked for identification.)

BY MR. GOLDWASSER:

Q. What's in front of you is what we marked as Rudow Deposition Exhibit Number 1. It refers -- the cover page reads Selective Insurance Policy Document, Insured's Copy. Do you see that?

A. Yes.

Q. Are you familiar with this document?

49

A. Yes.

Q. Okay. Feel free to page through it. Is it your understanding that this is the applicable insurance policy that was issued to COI and on which the claim was made?

A. Without reviewing every page, I would have to say it probably is.

Q. Okay. If you turn to the -- it's actually the last page of the exhibit. The page reads Commercial Property Coverage Declaration. Do you see that?

A. I do.

Q. Okay. And this declaration page lists certain policy limits; correct?

A. Correct.

Q. So, for example, the Building, the insurance limit here is a little over 9.2 million dollars; that's correct?

A. Correct.

Q. BPP, business personal property, including stock, the limit of insurance is 6.3 million, a little over; correct?

A. Correct.

Q. For Personal Property of Others, you

**CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.**
RONALD RUDOW
2/17/2026

14 (Pages 50 to 53)

---

50

have a limit of insurance of 1.2 million dollars; correct?

A. Correct.

Q. And for Business Income, there's a limit of insurance of 4 million; correct?

A. Correct.

Q. It shows for each of the limits for Building, BPP, and Personal Property of Others a valuation, and it says RC. Can you tell us what RC means?

A. RC means replacement cost.

Q. Okay. And if you turn back to the page before, it says Policy Changes. Do you see that?

A. Yes.

Q. Okay. And it lists the Named Insured and Address. Do you see that?

A. Uh-huh, yes.

Q. And it shows Chicago Ornamental Iron, Inc., as an insured; correct?

A. Correct.

Q. And it shows 4340 West 47th Holdings LLC as insured; correct?

A. Correct.

Q. Okay. And the policy period here is

---

51

December 15th, 2022 through December 15th, 2023; correct?

A. Correct.

Q. Okay. And the endorsement effective date was June 14th, 2023; correct?

A. Correct.

Q. So this was the policy and the declarations with the limits of insurance effective as of the date of loss; correct?

A. Correct.

Q. Okay. If you turn back toward the beginning of the document -- I apologize, we don't have a Bates-stamped copy. I think I took this from the complaint.

If you take a look at the section ElitePac Schedule - Manufacturers. I think you just passed it. Okay.

So you're looking at the ElitePac Schedule; correct?

A. Correct.

Q. Okay. And these are all insurance coverages that COI purchased, correct, that the insureds purchased; correct?

A. Correct.

---

52

Q. Okay. Now if you would go into the policy itself, if you move over to the coverage form. Do you see that's the next page, two pages over, Building and Personal Property Coverage Form?

A. Okay, I'm there.

Q. Okay. So if you take a look at Page 11 of the form, 11 of 16, I'm looking at Number 4, Loss Payment. Are you following me?

A. Yep.

Q. Okay. It says, "In the event of loss or damage covered by this Coverage Form, at our option, we will either (1) Pay the value of lost or damaged property; (2) Pay the cost of repairing or replacing the lost or damaged property, subject to B below; (3) Take all or any part of the property at an agreed or appraised value; or (4) Repair, rebuild and replace the property with other property of like kind and quality, subject to B below." Do you see that?

A. I do.

Q. And it says, "We will determine the value of lost or damaged property, or the cost of its repair or replacement, in accordance with the

---

53

applicable terms of the Valuation Condition in this Coverage Form or any applicable provision which amends or supersedes the Valuation Condition." Do you see that?

A. I do.

Q. Okay. So under this provision of the policy, Selective had the option that they could have paid the value of the lost or damaged value -- or damaged property, excuse me. That was one option. A second option would have been to pay the cost of repairing or replacing the lost or damaged property; correct?

A. Correct.

Q. Okay. And there were two other options, but Selective chose at its option to pay the cost of repairing or replacing the lost or damaged property; correct?

A. Correct.

Q. Okay. But it could have just paid the value of the lost damage -- the lost or the damaged property; right?

A. Could have, yeah.

Q. Okay. Now if you look at the page 12 of the form, just the next page there, under

---

**CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.**
RONALD RUDOW
2/17/2026

---

54

Valuation, it says, We will determine the value of Covered Property in the event of loss or damage as follows, at actual cash value as of the time of the loss or damage or -- let me read that again. At actual cash value as of the time of the loss or damage, except as provided in B, C, D and E below. Correct?

A.    Correct.

Q.    Okay.  I want you to take a look at B, C, D, and E below -- I don't need to read it -- and tell me if you believe B, C, D, or E apply to COI's claim.

A.    I would say yes.

Q.    Okay.  Which one applies?

A.    I would say B.

Q.    Okay.

A.    And I would say that we worked through E to get it resolved.

Q.    Okay.  So E is Tenants' Improvements and Betterments; correct?

A.    Correct.

Q.    Okay.  And when you say you worked to get it resolved, what tenants' improvements are you speaking of?

---

55

A.    During initial site visit and conversations, Jonathan had mentioned that there had been -- he had done improvements to the building.  So we needed to rectify who -- when he said he did improvements, was that him, was that COI, who was it that was doing those things.  So we needed to work through that.

Q.    Okay.  How was that resolved?  How was that worked through?

A.    I mean, based on his -- I believe he had recently done an office renovation, and, you know, the information that he gave to us and the questions that were asked during that time were, in my opinion, sufficient to the fact that one of the policyholders incurred that damage and not a tenant.

Q.    Okay.  Let me call your attention back to A, Valuation.  It says at actual -- we will determine the value of covered property in the event of loss or damage as follows:  at actual cash value as of the time of loss or damage.  Okay.

I'm just trying to understand. Does that -- the value that Selective places on

---

56

the covered property is an actual cash value at the time of loss; correct?

MR. BANIAK:  Object to form.

THE WITNESS:  The policy indicates that will determine the value of that at actual cash.

BY MR. GOLDWASSER:

Q.    Covered property for the purpose of the value is valued on an actual cash value basis; correct?

A.    In this particular section that you have directed us to, yes.

Q.    Okay.  So let's look back at 4, the Loss Payment, okay, where it says we will determine the value of lost or damaged property, or the cost of its repair or replacement, right, and condition and -- strike that.

Let me turn to the next page.  Let me turn to the next page.  Section F, Additional Conditions, okay.

MS. JOSSERAND:  Just to be clear, you're on Page 13 now?

MR. GOLDWASSER:  13 of the form, correct.

MS. JOSSERAND:  Okay.

---

57

BY MR. GOLDWASSER:

Q.    It says, "The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.  1, Coinsurance.  If a coinsurance percentage is shown in the Declarations, the following condition applies."

And it says A, "We will not pay the full amount of any loss if the value of Covered Property at the time of loss times the Coinsurance percentage shown for it in the Declarations is greater than the Limit of Insurance for the property."  Do you see that?

A.    I do.

Q.    Okay.  The value of the covered property here is determined on an actual cash value basis; correct?

MR. BANIAK:  Object to form.

THE WITNESS:  In the section that you previously pointed out to us, yes, but that is contrary to what you pointed to before on the declarations page.

MR. GOLDWASSER:  Okay.

BY MR. GOLDWASSER:

---

16 (Pages 58 to 61)

**58**

Q. Here it says -- let me get this straight. On the declaration page, that shows that the insured bought additional coverage to cover replacement cost; correct?

A. Correct.

Q. Okay. And it's true that the insured had the option of recovering under an actual value, actual cash value or replacement cash value; correct?

A. That is language within the policy --

Q. Okay.

A. -- correct, that we have not discussed.

Q. Okay. But I'm just focused right now on the coinsurance provision, okay.

So I'm trying to figure out -- when Selective says in its policy that "we will not pay the full amount of any loss if the value of Covered Property at the time of loss times the Coinsurance percentage shown for it in the Declarations is greater than the Limit of Insurance for the property," so I'm trying to figure out -- the first element, right, here is the value of covered property; correct?

A. Correct.

**59**

Q. Okay. And you would agree with me, would you not, that the value of the covered property is set forth on the previous page, Page 12 in Section 7, that we will determine the value of covered property at actual cash value; correct?

A. That is what the form says.

Q. Okay. Without looking at any notes or correspondence, other exhibits that we'll get to, do you know what the value of the covered property here was at the time of loss?

A. Without looking at the numbers, I don't recall.

Q. Okay. And that would be an actual cash value as we just stated; correct?

A. Again, without looking at the numbers, I don't recall.

Q. Okay. You've reviewed this policy before obviously; correct?

A. Yes.

Q. And, in fact, during the adjustment process you referred to it, correct, and the language?

A. Correct.

**60**

Q. You're familiar -- you're very well familiar with the language in this policy?

A. That's fair.

Q. And you've used it to communicate with the insureds; correct?

A. Correct.

Q. You've taken some of the policy provisions and you've put them in your written correspondence to explain your positions; correct?

A. Correct.

Q. Okay. Let's go to Exhibit -- we're going to call this Rudow Deposition Exhibit 2. It's the spiral-bound exhibit right here.

(WHEREUPON, Exhibit 2 was marked for identification.)

BY MR. GOLDWASSER:

Q. Mr. Rudow, do you recognize what we've marked as Rudow Deposition Exhibit 2?

A. Yes, I do recognize this.

Q. Okay. And is this a -- well, tell us what it is.

A. It's the log notes.

Q. Okay. And what are log notes?

A. Previously mentioned as our claim notes.

**61**

Q. Okay. So this is where you maintain your notes and upload documents; is that correct?

A. This is where we maintain our notes, correct, yes.

Q. Okay. And the documents that are referenced here are uploaded. That goes on the CCM system?

A. Correct.

Q. Okay. And are these notes maintained and kept in the ordinary course of business?

A. Yes.

Q. And the entries made in this document are made at or about the time reflected by the various dates; correct?

A. Correct.

Q. So these are contemporaneous notes made as you're logging the information into the system?

A. Correct.

Q. Okay. And do you make these -- do you input the notes here yourself personally?

A. Yes.

Q. Okay. Does anyone else log any notes into this?

A. Yes.

**CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.**
**RONALD RUDOW**                                                                                    **2/17/2026**

17 (Pages 62 to 65)

---

Page 62

Q.   Okay.  And who else does that?

A.   Anybody who has affiliation to the file.

Q.   Okay.  And so their name would be associated with whatever log or entry we see; correct?

A.   That's correct.

Q.   Okay.  Significant events and information related to the claim are all logged into this -- into these notes; correct?

MR. BANIAK:  Object to form.

THE WITNESS:  Correct.

MR. GOLDWASSER:  Okay.

BY MR. GOLDWASSER:

Q.   Sitting here today, do you think there's anything missing that you didn't log into these claim notes?

A.   I will say that there is nothing that I'm aware of that is missing, but if you would like me to read all of these, I could.

Q.   No, no need.  Just sitting here today, you believe this is a full and complete entry of your notes; correct?

A.   I believe so.

Q.   And you certainly didn't intentionally

---

Page 63

leave anything out of your notes?

A.   No.

Q.   Okay.  Now let's turn to the big binder.  Feel free to put that on the floor.

(WHEREUPON, Exhibit 3 was presented to the witness.)

BY MR. GOLDWASSER:

Q.   So Exhibit 3 is an e-mail from Matthew Wadley at Assured Partners, sent on September 23rd, 2022, to Mr. Samek.  Do you see that?

A.   Yes.

Q.   Okay.  Have you ever seen this e-mail before?

A.   It looks familiar.

Q.   Okay.  Mr. Wadley tells Jon, "I ran your property through the building valuation estimator to check on the insurable value with the updated construction costs.  The current valuation is showing $8,888,743."  Do you see that?

A.   Yes.

Q.   Okay.  We currently have the property insured for 6.7 million roughly.  Do you see that?

A.   Yes.

---

Page 64

Q.   Okay.  The cost to increase the building limit effective 9-23-2022 is $322.  Do you see that?

A.   Yes.

Q.   Okay.  Do you know what a valuation estimator is?

A.   No.  I do not know what Matthew Wadley is referencing here.

Q.   Okay.  Does Selective use building valuation estimators?

A.   If I understand what you're asking, yes.

Q.   Okay.  And what do you understand that value -- building value estimator to be?

A.   A software system that allows input of building data in order to generate a value.

Q.   Okay.  And there are different softwares that do that; correct?

A.   Correct.

Q.   What software does Selective use?

A.   Selective uses a software called ISO 360.

Q.   Okay.  What does ISO stand for, do you know?

A.   I do not know.

---

Page 65

Q.   Okay.  And Selective used ISO 360 during the period during -- as of the date of loss that COI has filed here; correct?

A.   Correct.

Q.   Do you know -- and so if you turn the page, there's a Valuation Detailed Report.  Do you see that?

A.   I do.

Q.   Have you seen this report previously?

A.   Yes.

Q.   Do you know when?

A.   Exact date, no.

Q.   Okay.  Did you receive it, I imagine, sometime after the loss?

A.   Correct.

Q.   And was it early on after the loss?

A.   I don't recall.

Q.   Do you know who sent you the report?

A.   I do not recall who would have provided this, no.

Q.   Okay.  Let's go back to Exhibit 2, which is your claim notes.  Okay.

Can you turn the page to Bates stamp page 131.  It's almost towards the end.

---

18 (Pages 66 to 69)

66

It's the second to last page. Okay.

At the bottom, it says diary note completed by Widick, Matthew on 7-3-2023. Do you see that?

A. Yes.

Q. Who is Mr. Widick?

A. Mr. Widick would have been the initial individual assigned to the claim for COI.

Q. Okay. What was his position at the time?

A. My best assumption is that he was a property claim specialist.

Q. Okay. If you go up a couple entries, it says supervisor overview note completed by Spencer Andrew or Spencer, Andrew on 7-3-2023. Do you see that?

A. Yes.

Q. It says set building reserve at $99, EI alerted. Can you tell me what that means to you?

A. The log note or who entered it?

Q. The log note.

A. The building reserve at $99 is an internal protocol done in our property claims department. And EI refers to early intervention.

67

Q. Okay. And who is Andrew Spencer?

A. Andrew Spencer, again best assumption is that would be Matthew Widick's supervisor.

Q. Okay. How about Ryan Wittrien? Do you know who Ryan Wittrien is, W-I-T-T-R-I-E-N?

A. I do know him.

Q. I'm sorry?

A. I do know him.

Q. You do know him. And what was his role at the time with Selective?

A. He is responsible for the early intervention assignment.

Q. Okay. Are you familiar with Eric Nielsen?

A. Yes.

Q. Okay. What was his role at the time?

A. He was the counsel retained by our subrogation partners.

Q. Okay. And who were the subrogation partners?

A. Ryan Wittrien.

Q. Okay. Anyone else?

A. If it changed hands from Ryan, it would be documented in the log notes.

68

Q. Okay. So he was counsel for Ryan Wittrien?

A. Correct.

Q. And when you say -- was there an entity for which Mr. Nielsen was counsel for?

A. I'm not sure I understand your question.

Q. He was counsel for Mr. Wittrien?

A. He is counsel for Selective.

Q. Okay. But you're saying that Mr. Wittrien was your -- maybe I -- was your subrogation partner?

A. Correct.

Q. Okay. And what do you mean by that? Can you explain that?

A. Our -- any subrogation opportunities are not handled by the claim adjuster.

Q. Okay.

A. There is a separate internal department.

Q. For subrogation?

A. For subrogation.

Q. Okay. If you look at page Selective 130, which is the page before that -- and this is in reverse chronological order; correct?

A. It appears that way.

69

Q. Okay. So if you look at the bottom of 130, Selective 130, it says Plan of Action note completed by Ronald Rudow or Rudow, Ronald; correct?

A. Correct.

Q. It says LLU referral. What is LLU?

A. LLU stands for large loss unit.

Q. Okay. In the entry above, there's a reference to Todd Jones. Who is Todd Jones?

A. Todd Jones represented himself as someone from the agency that COI retained their insurance from --

Q. Okay.

A. -- or through I should say.

Q. Got it. The note above that was also made by you. It references a referral to MJC. Is that the accounting firm?

A. Correct.

Q. Okay. And a referral above that to RCF. Who is RCF?

A. That is correct. RCF would have been another vendor, to update your initial question, earlier. RCF stands for Ruddy Cassidy & Foster.

Q. Okay. And what do they do?

**CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.**
RONALD RUDOW                                                                                2/17/2026

19 (Pages 70 to 73)

---

**70**

A. They assist with gathering and itemizing inventory as far as what is damaged and help work through that itemized list with our policyholder, as well as through pricing of those damages.

Q. Okay. And who is your contact there?

A. His name was Jeff Cassidy.

Q. Okay. And did RCF prepare any reports or documentation in connection with the adjustment of this claim?

A. Yes.

Q. Okay. What did they prepare?

A. They would have prepared a spreadsheet of different classifications of inventory that were worked with with COI.

In reference to inventory items, I believe there was separate lists for the equipment and for welders, I believe, office equipment, just different categories that we felt needed to be separated out.

Q. Okay. Above that, there's a referral to Envista; correct?

A. Correct.

Q. We discussed who Envista is; right?

A. We have.

---

**71**

Q. And similarly JDH; correct?

A. Correct.

Q. Okay. You were first out at the property on July 6th, 2023; correct?

A. I believe I stated earlier I thought it was July 7th, but it could be July 6th.

Q. Okay. And what information did you collect then?

A. During the site visit?

Q. Yes.

A. I would have collected observations and notes in reference to the severity of the damages to the building, various pieces of equipment and inventory, would have had discussions with Jon about the day it occurred, things that had happened between that time and my site visit, things of that nature.

Q. Okay. Just generally, what did you observe when you came out to the property?

A. I observed the east section of the building was damaged. There was some work going on to the debris field that was left there as well.

Q. When you say damaged, how was it

---

**72**

damaged?

A. The roof was no longer there.

Q. The roof had collapsed?

A. The roof had fallen into the building, yeah.

Q. Okay. And was there water on the floor?

A. There was still some saturation on the floor, yeah.

Q. Did you take any pictures at the time?

A. Yes.

Q. Okay. And you uploaded those pictures; correct?

A. Correct.

Q. Okay. To the CCM?

A. Correct.

Q. Okay. Let's look at the exhibit what we've marked as Rudow Deposition Exhibit Number 4.

(WHEREUPON, Exhibit 4 was presented to the witness.)

BY MR. GOLDWASSER:

Q. It looks like it's an e-mail from Carlee, C-A-R-L-E-E, Edrington, E-D-R-I-N-G-T-O-N, to you, correct, Mr. Rudow?

A. Correct.

---

**73**

Q. And it looks like it was sent on July 6th, 2023. Did you actually receive this e-mail?

A. It appears that way.

Q. Okay. Miss Edrington tells you -- well, let's start from the back. That's the last date of the -- well, this is a chain of e-mails; correct?

A. It appears that way.

Q. Okay. And the first e-mail is actually from you to Priscilla Flavin; correct?

A. Correct.

Q. And Brad Washburn; correct?

A. Correct.

Q. And this is July 6th, 2023; correct?

A. Correct.

Q. You actually sent this e-mail?

A. It appears that way.

Q. Okay. And you say, "Good morning everyone. The Property Department has received a claim for this account for a loss that occurred a few days ago. I have been reviewing the policy and some other data and see this account has been making numerous changes to limits on Building,

---

20 (Pages 74 to 77)

74

BPP, adding PPO, BI/EE, et cetera."  Right?

A.  Correct.

Q.  Okay.  And you say, "During my review, I came across Attachment 1 from the term 12-15-21 through 12-15-2022 which increased the Building limit to $8,888,743."  Correct?

A.  Correct.

Q.  It says, "Page 3 of this endorsement states Increase Building Limit to Match Estimator and this is the first time I have come across this language."  Do you see that?

A.  I do.

Q.  And then you ask, "Can someone explain what this means?  Can someone provide the Estimator report for which this was based from?  Can someone advise what steps and communications took place to arrive at this endorsement change?"  Do you see that?

A.  I do.

Q.  At that point, Miss Flavin loops in Carlee Edrington; correct?

A.  Correct.

Q.  Okay.  And then Miss Edrington responds also on July 6th to several people, including

75

yourself, and she says, "I found the attached correspondence in file.  When the agent requested the change, he said they wanted to increase the building limit per a recent ITV estimator that we ran.  So the UTA just wrote increased building limit to match estimator as a description of the change."  Do you see that?

A.  Yes.

Q.  What is ITV estimator, do you know?

A.  ITV stands for insurance to value.

Q.  Okay.  And what does UTA stand for?

A.  My best assumption is that is a reference to underwriting department.  I'm not sure exactly what that means.

Q.  Okay.  And insurance to value, when you have an insurance -- it's a ratio; correct?

A.  Correct.

Q.  Insurance, is that the limits, the policy limits when you talk about insurance?

A.  Correct, the limit, the building limit of insurance, yes.

Q.  Okay.  And it says ITV, to value; correct?

A.  That's what ITV stands for, yes.

76

Q.  Yes.  What's value?  What do you understand value to mean there?

A.  So the value -- the insurance to value is whether or not your insurance is up to the value of the property.

Q.  Okay.  And are we talking about an actual cash value of the property?

A.  Not to my knowledge, no.

Q.  Okay.  What are you talking about there or what is -- what did you understand Miss Edrington to be talking about there?

A.  Based on this e-mail alone is that COI's agency performed an ITV estimator to create a value.

Q.  Okay.  And what sort of value are we talking about?  An actual cash value, a replacement value, a market value, some other value?

A.  It would be, to the best of my knowledge, a replacement value.

Q.  Okay.  And then she says, "No report was provided and we were okay with the limit since ISO 360 was saying it was 143 percent ITV."  Do you see that?

77

A.  Yes.

Q.  Okay.  So as of July 6th -- and ISO 360 is the estimator that Selective uses; correct?

A.  Correct.

Q.  So Miss Edrington is saying that the policy limits were 143 percent of the replacement value cost; correct?

MR. BANIAK:  Object to form, mischaracterizes his testimony.

THE WITNESS:  Her language in that e-mail was that underwriting was okay with the limit that was presented, as their review of ISO 360 was that it was over by 143 percent -- or let me rephrase.  That the ISO 360 value was at 143 percent as compared to the limit of insurance.

BY MR. GOLDWASSER:

Q.  So just -- so the policy limit was greater than the value of the property; correct?

A.  Correct.

Q.  By 143 percent?

A.  That was the ratio, not by 143 percent.

Q.  That was the ratio?

A.  That was the ratio.

Q.  Okay.  And you actually received that

**CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.**
RONALD RUDOW
2/17/2026

21 (Pages 78 to 81)

78

e-mail; correct?

A. Correct.

Q. Okay. You then respond to Miss Edrington including when you say, "Based on that attachment, it appears Corkill Insurance Agency ran the ITV estimator and requested the increase. Makes sense." Correct?

A. Correct.

Q. And then you write, "I obtained the November 2022 survey this morning from Safety Management and they completed an ITV for $11,731,498.18 creating a 32 percent variance." Correct?

A. Correct.

Q. What -- tell me what this November '22 survey is.

A. Based on this e-mail, in short reference is our safety management department conducted a survey of COI's property in November of 2022. In that survey, they completed their own insurance to value, ITV, which generated the value that you read off.

Q. Okay. It says creating a 32 percent variance. What's the 32 percent variance

79

referencing? What's the other number that it's being compared to?

A. It would be in comparison to the limit of insurance.

Q. Okay. So what you're saying there is that the value was greater than the limits of insurance pursuant to this November 2022 survey; correct?

A. Correct.

Q. Okay. And at this time -- at this time, did you know what the policy limit was that was in effect on the date of loss?

A. Yes.

Q. Okay. And it was a little over 9.2 million dollars?

A. Sounds accurate.

Q. Okay. And the value, the replacement value that was performed in November '22 showed that it was greater than -- that the replacement cost was greater than the value of the policy limit; correct?

A. Yes.

Q. Did this raise any coinsurance concerns for you?

80

A. It initiates the thought process, correct.

Q. Okay. And so what did you do next as far as documenting your thoughts about coinsurance?

A. I would have to review the log notes or you'd have to point to a log note.

Q. Okay. Did you communicate anything with the insured regarding your thought process about coinsurance at this point?

A. I did communicate coinsurance topic during the initial site inspection.

Q. Okay. And what did you say during the initial site inspection conversation?

A. I would have explained the limit on -- limit of coverages on the policy.

I would have explained the topic of coinsurance and that, you know, evaluation is still ongoing in reference to that since we were so early in the claims process, but making him aware that coinsurance is a part of the policy.

Q. Okay. You said I would have. Do you have any recollection that you did?

A. Yes.

81

Q. Okay. And where were you when you had this conversation? When you say -- I imagine you're speaking about a conversation with Jon Samek; correct?

A. Correct.

Q. Okay. Where were you when you had this conversation?

A. Inside his building.

Q. Okay. Where inside his building?

A. In the warehouse.

Q. Okay. Where in the warehouse?

A. Somewhere in the warehouse.

Q. Okay. You can't recall with any specificity?

A. I believe it was out of the damaged zone.

Q. Okay. And what did Mr. Samek say in response?

A. I don't recall, but I do -- the exact specifics of that conversation, but I do recall that we discussed just how it works, how we need to assess the values.

At that point in time, we had just very preliminary information in reference to all

**82**

the different coverages that may be applicable on the claim.

Q. Did you tell Mr. Samek that Selective had run an estimator that showed an ITV for $11,731,000?

A. I don't recall if I conveyed that specific, no.

Q. Okay. Did you convey any replacement cost value that Selective had run at that point?

A. To my knowledge, that would have been the only one at that particular time.

Q. Okay. And you don't recall whether or not you discussed that with Mr. Samek?

A. Not in terms of that specified value, no.

Q. Okay. Did you speak in some other generalized terms? Did you say 11 million? Did you say 10? Did you say 9?

A. I don't recall.

Q. Okay. Did you offer a figure that Selective had actually run?

A. I don't recall.

Q. Is there anything that would refresh your recollection?

**83**

A. If you can point to a log note.

Q. Okay. Having a coinsurance issue raised in your own mind is a significant event; correct?

MR. BANIAK: Object to form.

THE WITNESS: Yes.

MR. GOLDWASSER: Okay.

BY MR. GOLDWASSER:

Q. And so we could expect a log note reflecting that, correct, if there was a coinsurance issue that you were thinking about; correct?

A. There would possibly be a log note in reference to that discussion, yes.

Q. Okay. And if that discussion happened, it should be in the log notes; correct?

A. It should be.

Q. Okay. And if it's not in the log notes, can we assume that it didn't occur?

A. No.

Q. Okay. Is there any reason you would not have logged the conversation with an insured about a coinsurance concern?

A. There would be no reason no.

Q. Okay. Miss Edrington responds -- and

**84**

this is Selective 1078, still part of Exhibit 4.

Miss Edrington responds on July 6th to you, "Not to my knowledge. CLAS only requires us to run the ITV every three years and I probably began working on the renewal prior to the safety management report being completed." Do you see that?

A. Yes.

Q. CLAS is spelled C-L-A-S, and they're all capitalized. What is CLAS?

A. CLAS is the software system that underwriting utilizes.

Q. Okay. She says, "It appears that the valuation that safety management ran has some differing info than what Prometrix is pulling through in CLAS." Do you see that?

A. Yes.

Q. What's Prometrix?

A. It's another software system that I believe pulls public available data.

Q. Okay. And what data is that?

A. Just general information about the building. I'm not a hundred percent sure, as that is an underwriting tool.

**85**

Q. Okay. What is safety management or what group is that? Can you explain that to me?

A. Safety management is an internal department that assists our underwriters in assessing a risk.

Q. Okay. Miss Edrington says, "But as far as I could tell when issuing the renewal, the replacement cost was at 143 percent ITV." Correct?

A. Correct.

Q. She then says, "I just ran the replacement cost right now and it is saying that we are still at 111 percent ITV with the current policy limit." Do you see that?

A. Yes.

Q. Okay. Was it your understanding at this time that Miss Edrington ran another report and came up with a different figure for ITV?

A. That would have been what I believe she did.

Q. Okay. And this one was 111 percent; correct?

A. Yes.

Q. Okay. And it looks like there was an

23 (Pages 86 to 89)

86

attachment, a valuation report. Do you see that? It says valuation report.pdf.

A. Yes.

Q. Have you seen that valuation report?

A. Probably.

Q. Okay. Do you believe it exists?

A. Based on this, yes.

Q. Okay. Eventually -- and we'll get to the exact document, but eventually, in April 2024, you notified Mr. Samek that there was a potential coinsurance issue. Do you recall that?

A. I do.

Q. Okay. In that letter, you don't mention either of these valuation reports, either the 143 -- the report that yielded 143 percent ITV or the report that generated 111 percent ITV. Why was that?

A. The letter that I would have referenced and provided in April of 2024 would have been reference to the reports and the valuations that I completed versus somebody else.

Q. Okay. So these reports here you didn't believe were worthy of referencing in your reservation of rights letter in April of 2024;

87

correct?

MR. BANIAK: Object to form, characterization.

THE WITNESS: I did not believe that they were pertinent to be included.

MR. GOLDWASSER: Okay.

BY MR. GOLDWASSER:

Q. And you certainly were not relying on those; correct?

A. I was not.

Q. Okay. Because both of these reports would have given certainly a basis to assert a coinsurance penalty; correct?

A. Can you restate that question?

Q. So there were two valuations, two reports here that are referenced in this e-mail chain with Miss Edrington. And my question was I'm correct that both of these reports would provide a basis to make an argument for the application of a coinsurance penalty; correct?

A. Correct.

Q. Okay. Because these reports -- according to these reports, the property was underinsured?

88

A. I don't believe I follow your -- your path here.

Q. Okay. Maybe I'm missing it. Okay. So let me get this straight. I think I probably flipped it.

So this 143 percent figure -- maybe I got it wrong. What's the -- what's the insurance limit that is being used for this 143 percent figure?

A. My -- without running any numbers, my best guess would be the 143 percent was calculated off of the previously mentioned 8 million 888 figure.

Q. Okay. Or whatever the policy limit was. What was the value?

A. I don't believe it ever says what the value was.

Q. But I'm trying to understand the 143 percent figure. Is the value greater than the policy limits or less than the policy limits?

A. In a reference of this manner, if the -- if the number -- if the ratio is more than a hundred percent, then the limit of insurance is more than the value.

89

Q. Okay, okay. Understood. But in her prior e-mail or I guess in your prior e-mail, you have an ITV of 11,700,000 approximately; correct?

A. Correct.

Q. And you're showing that based on that survey, the property was underinsured by 32 percent?

A. Again without running the numbers, I am referencing that I believe that there was a 32 percent variance, meaning that this value that you read was higher than the limit of insurance on the policy.

Q. Okay. Thank you. So when you received the e-mail on July 6th, did that put your coinsurance concern to rest?

A. No.

Q. Okay. And why is that?

A. Because everything was still very preliminary three days after the loss.

Q. Okay. But here Miss -- based on what Miss Edrington is telling you, that these two reports are -- yield policy limits greater than the replacement cost value; correct?

A. Correct, that is what she says.

**CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.**
RONALD RUDOW                                                              2/17/2026

24 (Pages 90 to 93)

90

Q. Okay. Let's turn to Exhibit 5, Rudow Deposition Exhibit 5.

(WHEREUPON, Exhibit 5 was presented to the witness.)

BY MR. GOLDWASSER:

Q. Do you recognize this document?

A. Yes.

Q. Okay. And what do you recognize it to be?

A. This is the initial ISO 360 that I prepared.

Q. Okay. And you prepared it on July 7th, 2023; correct?

A. Correct.

Q. Okay. And this report yielded an estimated replacement cost of a little over 10.1 million dollars; correct?

A. Correct.

Q. And then you did a 90 percent coinsurance calculation and came up with a little over 9.1 million; correct?

A. Correct.

Q. And then you showed the policy amount of about 9.2 million; correct?

91

A. Correct.

Q. So based on this report, there was no coinsurance penalty; correct?

A. Based on this initial evaluation, I had less concerns.

Q. Okay. Did you communicate this report to the insured?

A. I don't recall if I communicated this valuation or not.

Q. Okay. Well, it seems like you had a conversation with Mr. Samek the day before at the facility in which you raised the coinsurance issue.

Did you not feel it was important to let him know that you ran an estimator and came up with a 10.1 million dollar figure?

A. Again I don't recall. There possibly could have been a conversation.

Q. Okay. And is that a conversation that you would expect to be seen or to be logged in the claim notes?

A. Yes.

Q. Okay. Would there be any reason not to include it?

92

A. No.

Q. The may be obvious, but what was the purpose of running this report?

A. To determine the value, approximate value of the building.

Q. Okay. Did you send this report to anyone else at Selective?

A. Possibly. I don't recall.

Q. Okay. Do you recall whether or not you sent it to Mr. Walton?

A. I don't recall.

Q. Okay. Was this report uploaded in your claim notes or in the CCM system?

A. It should have been.

Q. Okay. Would there have been any reason not to have uploaded it?

A. No.

Q. Okay. At any point, did you provide a copy of this estimate to Mr. Samek or anyone else at COI?

A. I don't believe so.

Q. Okay. And why was that?

A. This is an internal procedure that we follow. It's a work product.

93

Q. Okay. So it's internal. It's not a relevant document showing the value of the replacement cost?

MR. BANIAK: Object to form, argumentative.

THE WITNESS: That's not how I characterized it.

MR. GOLDWASSER: Okay.

BY MR. GOLDWASSER:

Q. When you say work product, what do you mean when you say work product?

A. We -- we as adjusters need to have the ability to reference and develop these valuations, and this is a system that we do to help assist us in our jobs.

Q. Okay. Was this report -- did an attorney instruct you to run this report?

MR. BANIAK: Object to form, calls for privileged communication. Don't answer that.

MR. GOLDWASSER: Okay. Let's look at Deposition Exhibit 6.

(WHEREUPON, Exhibit 6 was presented to the witness.)

BY MR. GOLDWASSER:

CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.
RONALD RUDOW                                                                    2/17/2026

25 (Pages 94 to 97)

94

Q.   It's an e-mail chain that covers and begins on July 14th and goes through July 17th, 2023.  Do you see that?

A.   Yes.

Q.   Did you actually receive these e-mails or send the e-mail?

A.   I would say yes.

Q.   Okay.  And this is an e-mail chain in which you're advised and provided a link for the BDO data room; is that fair?

MR. BANIAK:  I'm sorry, the BDO what?

MR. GOLDWASSER:  Data room.

MR. BANIAK:  Oh.  Sorry, I just didn't hear you.

THE WITNESS:  Yes, it appears that way.

MR. GOLDWASSER:  Okay.

BY MR. GOLDWASSER:

Q.   And was this the primary means by which you received the information that you had requested for your investigation?

A.   I would say primary is -- sure.

Q.   Okay.  How often did you -- did you access the data room?

A.   I don't recall how many times.

95

Q.   Okay.  Was it on a regular basis?  Did you look weekly, monthly?

A.   I -- honestly, I don't recall how often it was.  Whether it was contingent on being notified there was more stuff uploaded, I don't recall.

Q.   Okay.  Let's go back to Exhibit 2, which is your claim note.  There's an entry by you on July 21st, 2023 with a title Indemnity (Advance).  Do you see that?

A.   What was the date again?

Q.   7-21-2023, Selective 121.  I apologize.

A.   And the note which you are referencing again?

Q.   It's the third from the bottom.  It says, "After review of the anticipated exposure on this loss with Director across all covered features, from Building to BPP to BI/EE to ElitePac, the loss of exposure here is significant and warrants sizable advanced payment."  Do you see that?

A.   Yes.

Q.   Okay.  BPP, which I think we've discussed before, is business personal property;

96

correct?

A.   Correct.

Q.   BI is business interruption?

A.   Correct.

Q.   And EE is extra expense; is that correct?

A.   Yes.

Q.   Okay.  And here at the bottom you note that, therefore, the easiest feature to provide advance payment on is the BI/EE, $1,000,000 advance was reviewed with director and approved.  Do you see that?

A.   Yes.

Q.   Okay.  And that indicates that's consistent with what you previously stated, that you had authority up to 900,000 and needed the director's approval for payments above that; correct?

A.   Correct.

Q.   Okay.  If you turn to the prior page, Selective 120, there's another notation here July 21st.  It's the second from the top.  Okay.  You received an e-mail this morning from the PH with several questions.  Do you see that?

97

A.   Yes.

Q.   And PH is policyholder; correct?

A.   Correct.

Q.   Okay.  So the e-mail was from Jon Samek; right?

A.   I would assume so.

Q.   Okay.  And you list or -- I'll just read it here.  It looks like you've copied his e-mail.  It says, Ron, I wanted to follow up with you on a number of pressing items.  There's 1, there's a 2, and then there's a 3, and the 3 says coinsurance.

"Is coinsurance going to be a problem on the BPP and BPP of others based on your consultant's initial estimates?"  Do you see that?

A.   I do.

Q.   Okay.  Do you recall Mr. Samek ever asking you whether or not the coinsurance was going to be a problem on the building?

A.   I don't recall if that was a specific question in any e-mail from Jon.

Q.   Okay.  Down a little in that entry, you pick up and you say, "Responded back to the PH this afternoon with the following."  Do you see where I'm at?

**CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.**
RONALD RUDOW                                                                        2/17/2026

26 (Pages 98 to 101)

98

A.   I do.

Q.   Okay.  And then you provide your response, and as part of that response you pick up on item number 3, coinsurance.  Do you see that?

A.   Yes.

Q.   Okay.  And there you say "BPP, I received information from Mark E. at Envista and Mark D. at RCF Salvage with respect to your BPP figures.  The equipment levels they have reported thus far do not raise concerns for a coinsurance issue."  Do you see that?

A.   Yes.

Q.   You actually sent an e-mail to Mr. Samek with that information; correct?

A.   Yes.

Q.   Okay.  Who is Mark D. at RCF?

A.   That is Mark Dillon.

Q.   Could you spell Dillon.

A.   D, like David, I-L-L-O-N.

Q.   Okay.  What was the status of your coinsurance review regarding the building at this time?

A.   I'd have to reference a log note to be specific, to answer your question.

99

Q.   Okay.  And if there are no log notes, does that indicate that you weren't reviewing the coinsurance issue at that point for the building?

A.   No.

Q.   Okay.  Let's look at what I've marked as Rudow Exhibit 8.

MR. BANIAK:  Would you mind before we get into this maybe taking a five-minute break or something?

MR. GOLDWASSER:  Yeah.  That's fine.

(WHEREUPON, a discussion was held off the record.)

(WHEREUPON, a break was taken.)

MR. GOLDWASSER:  Okay.  We're back on the record.

(WHEREUPON, Exhibit 8 was presented to the witness.)

BY MR. GOLDWASSER:

Q.   Mr. Rudow, if you take a look at Exhibit -- what we've marked as Rudow Deposition Exhibit 8, and it appears to be an e-mail from you to Mr. Samek, do you see that, dated July 21st, 2023?

A.   Yes.

100

Q.   Okay.  And you actually sent this e-mail to Mr. Samek; correct?

A.   Yes.

Q.   Okay.  And this is the e-mail that was referenced in your claim notes from the same date, correct, that we had just gone over when we talked about the coinsurance for the BPP?

A.   I believe so.

Q.   Okay.  And this chain includes the e-mail that Mr. Samek had sent to you on that same day; correct?

A.   Yes, it appears so.

Q.   And you actually received that e-mail?

A.   Yes.

Q.   Okay.

(WHEREUPON, Exhibit 9 was presented to the witness.)

BY MR. GOLDWASSER:

Q.   So if you take a look at the next exhibit, 9, it appears to be an e-mail from you to Mr. Samek on July 27th, 2023.  Did you actually send that e-mail to Mr. Samek?

A.   Are you asking about all e-mails on that date?

101

Q.   Yeah.  So let's -- there's a chain here; correct?

A.   It appears that way.

Q.   Okay.  And the e-mail chain dates cover July 21st through the 27th; correct?

A.   Correct.

Q.   Did you either receive or send the e-mails referenced or contained in Deposition Exhibit 9?

A.   Yes.

Q.   Okay.  On the first page of that exhibit is the e-mail from you to Mr. Samek on July 27th, 2023, and you say, "Jon, the ACV is payable to you whether you do the work or not."  Do you see that?

A.   Yes.

Q.   What do you mean when you say the ACV is payable whether you do the work or not?

A.   The structure of the policy would pay for those ACV damages whether or not Jon decided to do any repair work --

Q.   Okay.

A.   -- to the building.

Q.   And ACV is the actual cash value; correct?

CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.
RONALD RUDOW
2/17/2026

27 (Pages 102 to 105)

102

A. Correct.

Q. So in order to collect actual cash value, you don't actually have to repair the loss, correct, or replace the loss?

A. Correct.

Q. Okay. Let's go back to Exhibit 2, which are the claim notes, Selective 117.

At the bottom of the page, in an entry dated August 19th, 2023, it looks like you noted Approved & Distributed SLR. Do you see that?

A. Yes.

Q. And then it goes on, I guess underneath that, onto 118, "Large Loss Committee has approved setting reserves to $10,556,749 and paying that amount. SLR may now be distributed." Do you see that?

A. Yes.

MR. BANIAK: Sorry to interrupt. Just a quick note, that's a different note.

MR. GOLDWASSER: Okay. Fair enough.

BY MR. GOLDWASSER:

Q. So the note was actually completed by Matthew Caton on August 18th, 2023; correct?

103

A. That's correct.

Q. Okay. So what is the Large Loss Committee?

A. The Large Loss Committee is comprised of specific executives at Selective that review claims and damages when they're in excess of authority levels for claims department personnel.

Q. Okay. And what was the -- what was the level here that was exceeded?

A. I believe our Large Loss Committee becomes involved when anticipated exposure exceeds 5 million.

Q. Okay. And who -- at the time that this note was logged, who sat on the Large Loss Committee?

A. I don't know the exact individuals, but I do know that it is somebody from our actuarial department, it is I believe our CFO, and it's a grouping of I believe five to seven individuals.

Q. Okay. Do you know their names?

A. Again, as I stated, I don't remember -- I don't know exactly who was comprised of that committee at any specific time.

Q. Okay. And how does the Large Loss

104

Committee document or convey their approval?

A. They convey their approval back to -- back through our claims department.

Q. Okay. Is there a document that shows we've approved this amount?

A. I -- I do not know. I do not present it to them, nor do I receive the response.

Q. Okay. So when you see this entry that says Large Loss Committee has approved setting reserves to 10.5 million dollars, you don't know how that was conveyed or communicated to Mr. Caton; is that correct?

A. That is correct.

Q. Okay. And is your reading of this note that the Large Loss Committee has agreed to pay to that amount? That's what it says, right, and they've agreed to pay to that amount? Do you see that?

A. I do see that.

Q. Okay. What's your understanding of that, that they agree to pay that amount or up to that amount? What's your reading?

A. My interpretation of that is that they have given approval to set the reserves for the

105

10.5 million listed in the log note --

Q. Yeah.

A. -- and paying up to that amount.

Q. Okay. And so the Large Loss Committee here has approved a 10.5 million dollar reserve and payment to that amount. Who determines at that point whether that amount is paid?

A. The claim adjuster.

Q. Which would be you?

A. That's correct.

Q. Okay. What does SLR mean here, when it says SLR may now be distributed?

A. SLR stands for serious loss report.

Q. Serious loss report?

A. Correct.

Q. Okay. And can you explain what that report is?

A. It's an internal document that we as claim adjusters provide to our other internal business partners.

Q. Okay. And who are those internal business partners?

A. It can range from folks from underwriting, to actuaries, to our agency relation

**CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.**
RONALD RUDOW                                                                         2/17/2026

28 (Pages 106 to 109)

106

folks, so that way they're aware of an anticipated exposure in case the agency calls in to ask certain questions.

Q. And what information is contained on this report?

A. It's an overview of policy coverages. It's a snapshot at the time of potential damages identified at whatever point in time that the report is written and then discusses, you know, some subrogation, just so that way we can let our internal partners know as many aspects of the claim as possible.

Q. Okay. If there was a coinsurance concern, would we expect to find that included in this report?

A. There is a coinsurance section of the report, yes.

Q. Okay. And do you know whether or not there was a coinsurance section in this particular report?

A. There's a coinsurance section in the report.

Q. Generally?

A. Generally.

107

Q. Okay. And then who authors the report?

A. The claim adjuster.

Q. You?

A. Correct.

Q. Okay. So do you recall preparing this, this loss report?

A. I would have prepared it, yes.

Q. Okay. But do you actually -- what I'm saying is do you have independent recollection sitting here today of whether or not -- of actually preparing it?

A. Yes.

Q. Okay. And do you recall completing the coinsurance section of the report?

A. I would have completed it, yes.

Q. Okay. And do you know what you stated in that section?

A. I do not have that memorized, no.

Q. Okay. Do you have a general recollection of what you stated?

A. No, not without reviewing the document.

Q. Okay. And it says CCM upload. This is I guess your entry. This is on Selective 117. Do you see that?

108

A. Yes.

Q. Okay. And so the report was uploaded to the CCM system; is that correct?

A. That's correct.

Q. Okay. So -- and that CCM system would today, I imagine, contain that report; correct?

A. Correct.

Q. Okay. Do you know whether or not the Large Loss Committee documents their meetings and makes notes of their meetings in any way?

A. I do not know.

Q. Okay. And who would know that? If we wanted to get that answer, who would be able to tell us at Selective?

A. I could only reference you to my direct supervisor, who would potentially know more than me.

Q. Okay. And at that time, was that Mr. Caton or Mr. Carlton?

A. At that time, it would have been Mr. Carl Walton.

Q. Carl Walton. Yeah, thank you. Okay. Let's go to what we've marked as Rudow Deposition Exhibit 10.

109

(WHEREUPON, Exhibit 10 was presented to the witness.)

BY MR. GOLDWASSER:

Q. Let me back up. So you have a reserve set at 10.5 million dollars as of August 18th, correct, 2023?

A. That appears correct.

Q. Where are those funds held at that time?

A. In our bank. I don't know the -- I don't know. I don't have them. Where are they held?

Q. Yeah.

A. By Selective.

Q. Okay. But you don't have any understanding of whether the reserve is held in a money market fund, if it's held in some other type of investment vehicle? Where is that -- if you know, how is that 10.5 million dollars held?

A. I don't know.

Q. Do you know if it's earning income, that 10.5 million dollars?

A. I don't know.

Q. All right. You just know that there's something called a reserve?

29 (Pages 110 to 113)

---

110

A.   Yes.

Q.   Okay.  And what does that mean to you, that there's a reserve of 10.5 million dollars?

A.   At this particular time, that is what based off, excuse me, facts that we'd know at the time that we anticipate possible exposure for the claim.

Q.   Okay.  So you think -- at this point, you believe that possible or potential exposure is approximately 10.5 million dollars?

A.   That's correct.

Q.   Okay.  So if we go to Exhibit 10, it's a letter from yourself to Assured Partners.  Are you familiar with this letter?

A.   Yes.

Q.   Okay.  You actually sent that letter to Assured Partners; correct?

A.   Yes.

Q.   Okay.  And you're notifying Assured Partners that the incurred loss on this claim has been revised to 10.5 million dollars approximately; correct?

A.   Correct.

Q.   Why are you advising Assured Partners

---

111

that the loss claim has been revised at 10.5 million dollars?

A.   That's one of our protocols, to keep our agency partners abreast of claims and their current status.

Q.   Okay.  You also state in this letter that the or indicate please refer to the overview log notes on this file in Claim Inquiry for updated information.  Do you see that?

A.   I do.

Q.   Is the overview log notes, is that what we've been looking at in Exhibit 2?

A.   No.

Q.   Okay.  What are the overview log notes, then?

A.   An overview log note is just a category that can be selected by a writer that gives certain agencies access to view the log note.

Q.   Okay.  And where are those log notes found or kept?  Is it in the CCM?

A.   They are kept in the log notes.

Q.   In the log notes?

A.   In the claim notes.

Q.   In the claim notes.  What's the overview

---

112

log notes, I guess, is my question?  These are the log notes -- Exhibit 2 are the log notes; right?

A.   Correct.

Q.   Okay.  Is there something different that's called the overview log notes?

A.   It's not a separate system, no.

Q.   Okay.  But is there a separate entry that's called overview?

A.   There is a separate entry that a writer can pick that's called overview.

Q.   Okay.  What does that show, the overview?

A.   It is just another category selector that a writer could pick to categorize the notes.

Q.   Okay.  What's a writer?

A.   The person who is writing the notes.

Q.   Okay.  So if we go back -- I get it.  So if we go back to Exhibit 2, Selective 117, there's something here, supervisor -- I'm looking in the middle of the page -- overview note completed by Walton, Carl W.  Do you see that?

A.   I do.

Q.   Is that the overview log notes referenced?

---

113

A.   I believe that category would be supervisor overview.

Q.   Got it, got it.  So when you sign on to this system, there is certain, I guess, field selections that you could make so you could narrow down the entire -- so you're not looking at the entirety of the log entries; is that correct?

A.   You can do that, yes.

Q.   Okay.

(WHEREUPON, Exhibit 11 was presented to the witness.)

BY MR. GOLDWASSER:

Q.   If you take a look at Exhibit 11, it's another e-mail from you to a distribution list, including a DL reinsurance distribution list.  Do you see that?

A.   Yes.

Q.   Okay.  You actually sent this e-mail on August 19th, 2023?

A.   Yes.

Q.   And you're attaching the SLR, significant loss report?

A.   Yes.

Q.   Okay.  And who is on this distribution

---

**CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.**
RONALD RUDOW
2/17/2026

30 (Pages 114 to 117)

114

list, the SLR distribution list?

A. Can you be more specific?

Q. Well, it looks like it's being sent to a distribution list; correct?

A. Yes.

Q. Okay. Well, let's look at the first one. It says DL SLR Distribution List - Property Claim All; correct?

A. Yes.

Q. Okay. So when you select that and you send an e-mail to that distribution list, who is it going to?

A. Honestly, I don't know the exact parties of that distribution list.

Q. Okay.

A. It can possibly change depending on who is involved.

Q. Okay. What does DL stand for?

A. Distribution list.

Q. So you have distribution -- DL, distribution list, SLR, distribution -- just cumulative. It appears that distribution list is referenced twice in that e-mail address?

A. It appears that way.

115

Q. Okay. It also says DL Reinsurance Redistribution List. Do you see that?

A. Yes.

Q. Was there reinsurance for this claim?

A. I believe so.

Q. Okay. And who was that placed with?

A. I believe there are multiple parties at the time. There's typically multiple -- for this particular loss involving COI, I don't know those exact parties. They may have changed since then.

Q. Okay. So some of the individuals included on this e-mail have an aon.com e-mail address. Was it Aon?

A. They would have been one of them.

Q. Okay. And then there's Munich America. Would they have been also one of the reinsurers?

A. It appears that way.

Q. And then there's something SwissRe. Does that name mean anything to you?

A. They would have been another one.

Q. Okay. And SwissRe, is that just a shortened name of something else or is that the full name?

A. That might be how my Outlook or how it's

116

categorized in Outlook.

Q. Okay. But do you know the full e-mail or the full reinsurer here?

A. I don't know the actual e-mail if you're looking for something at SwissRe.com.

Q. Or just the full name of SwissRe. Is SwissRe the full name of the reinsurer or there's something -- is that shortened?

MR. BANIAK: Objection; asked and answered.

THE WITNESS: I would guess that it's shortened.

MR. GOLDWASSER: Okay.

BY MR. GOLDWASSER:

Q. Do you know the amount of the reinsurance for this claim?

A. I believe it was 5 million.

Q. Okay. Are there any documents that would indicate with certainty what that is?

A. Our reinsurers probably have those documents.

Q. Okay. Anything that Selective would have?

A. Our reinsurance department would

117

probably have those documents.

Q. Okay. If I wanted to reach out or if you wanted to reach out to somebody in the reinsurance department, who would you reach out to?

A. At the time of this loss?

Q. Right now.

A. I believe right now I would reach out to a gentleman called Patrick Callen.

Q. Could you spell the last name.

A. I believe it's C-A-L-L-E-N.

Q. Okay. Going back to Exhibit 2, your claim notes, Selective 117, in the Supervisor Overview note completed by Carl Walton, he says, "EGA has been sent many documents relating to the work being completed at the loss location and items being replaced. The documents are numerous and voluminous and will take a considerable amount of time to work through and account for all charges."

Did you have all the documents you needed to adjust the claim at that time?

A. Can you specify the date you're looking for?

CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.
RONALD RUDOW
2/17/2026

31 (Pages 118 to 121)

Page 118

Q. August 30th, 2023.

A. No.

Q. Okay. What didn't you have that you needed to adjust the loss?

MR. BANIAK: Object to form.

THE WITNESS: I think there would have been many documents not yet obtained within the first 60 days of this loss to determine a final value.

MR. GOLDWASSER: Okay.

BY MR. GOLDWASSER:

Q. And would you have requested those from COI?

A. Probably.

Q. Okay. Did you request them from COI?

A. There would have been conversations about them.

Q. Do you recall those conversations?

A. Not without reviewing a log note.

Q. Okay. Do you recall any specific conversation with Mr. Samek?

A. Any one specific conversation, no.

Q. Okay. Did you have conversations with anyone else at COI other than Mr. Samek?

Page 119

A. Yes.

Q. Who?

A. I believe your partner, Munish, was on a few phone calls, conference calls.

Q. Okay.

A. I believe.

Q. Other than those few conference calls, all other oral communication was directed through Mr. Samek; is that correct?

A. Correct.

Q. I don't suppose you remember any of those specific instances in which Mr. Mehta was party to, do you?

A. No.

Q. Okay.

(WHEREUPON, Exhibit 12 was presented to the witness.)

BY MR. GOLDWASSER:

Q. If you take a look at Exhibit 12, there are two e-mails part of this chain, one from you to Mr. Samek and one from Mr. Samek to you, spanning August 29th, 2023 to August 30th, 2023. Do you see that?

A. I do.

Page 120

Q. Okay. And you actually sent the first e-mail and received the second e-mail; correct?

A. Correct.

Q. Okay. And Mr. Samek was asking you for the status of the claims review; correct?

A. Yes.

Q. Okay. In response to this e-mail on the 30th of August 2023, what did you do?

A. There would have either been a phone call or maybe a response e-mail.

Q. Okay. And if there was response e-mail, we can expect that that would be in the log notes or the CCM system; correct?

A. Correct.

Q. Okay.

(WHEREUPON, Exhibit 13 was presented to the witness.)

BY MR. GOLDWASSER:

Q. If you take a look at Exhibit 13, there's an e-mail exchange between you and Mr. Samek on August 31st, 2023 regarding leasing auxiliary space or temporary space; correct?

A. It appears that way.

Q. Okay. And you understood that COI due

Page 121

to the loss needed to lease space to continue their business; correct?

A. Correct.

Q. Okay. And you subsequently reviewed and approved a lease that COI entered into; correct?

A. I believe we received one, yes.

Q. Okay. And did you approve payment for that?

A. I don't recall if we specifically issued a payment for the lease, the rental space specifically, in addition to at this point in time had been a couple of million dollars that had already been issued to him.

Q. You reviewed the lease; correct?

A. Correct.

Q. Okay. Take a look at Exhibit 14.

(WHEREUPON, Exhibit 14 was presented to the witness.)

BY MR. GOLDWASSER:

Q. This is a rather large e-mail chain. If you can, take a look through it. It spans August 22nd, 2023 through September 1st, 2023.

MR. BANIAK: Rich, am I correct that this is the same e-mail chain repeated once in

CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.
RONALD RUDOW
2/17/2026

32 (Pages 122 to 125)

**122**

color and once in black-and-white?

MR. GOLDWASSER: You know, it's -- yeah, yeah, that's correct.

MR. BANIAK: Okay.

MS. JOSSERAND: The first half is Bates --

MR. BANIAK: The second half isn't Bates stamped.

MR. GOLDWASSER: Yeah. If you take a look -- so just for the record, COI 26261 through 26267.

BY MR. GOLDWASSER:

Q. So my question here is did you send and receive the e-mails contained in this chain?

A. It looks that way, yes.

Q. Okay. Let's turn to Exhibit 15.

(WHEREUPON, Exhibit 15 presented to the witness.)

BY MR. GOLDWASSER:

Q. This is a letter from COI's counsel at the time, Mr. Morrissey, to you, on September 1st, 2023 sent by e-mail. Do you recognize this letter?

A. Yeah.

**123**

Q. Okay. You actually received this letter at or around that time?

A. It appears that way.

Q. Okay. Was this your first introduction to Mr. Morrissey?

A. No.

Q. When was your first introduction to Mr. Morrissey?

A. During the site inspection.

Q. Oh, he was present at the site inspection?

A. He was.

Q. Okay. And did Mr. Morrissey say anything during the site inspection?

A. I'm sure he did.

Q. Okay. Can you recall anything he said?

A. Pretty basic, that he was COI's counsel in the matter and mostly there to observe, I believe.

Q. Okay. Anything else?

A. I don't recall.

Q. Okay. Is there anything that would refresh your recollection?

A. Possibly.

**124**

Q. Okay. And what would that be?

A. If you have an e-mail or if there was a reference in a claim note somewhere that had additional information.

Q. Okay. And between the initial site inspection visit and this letter, had you had any interaction with Mr. Morrissey?

A. I don't recall any, but it doesn't mean he wasn't on e-mail chains of any nature included by COI or somebody else.

Q. Okay. And eventually you started -- there were some written correspondences and e-mails between you and Mr. Morrissey; correct?

A. I would venture to say yes.

Q. Yeah. And would there be times that you would request from Mr. Morrissey additional information or documentation?

A. I would assume so, yes.

Q. And is it fair to say that Mr. Morrissey would respond to you with the requested information or documents in a timely manner?

A. I would say that he was tasked with the responsibility of securing those documents, yes.

Q. Okay. And he would, in fact, get you

**125**

those documents in a timely manner?

A. I would have to look at date of request versus time of receipt to determine if that is considered timely.

Q. Okay. Well, sitting here today, do you have any reason to believe that his responses were not timely?

A. I do believe there were some communications from him that -- for requests that were made that we did not receive information back in a quick manner.

Again how you define timely is potentially different than everybody else.

Q. Okay. How do you define it?

A. I mean, if a request has been made and you either provide the documentation and/or you provide a response as to a request as to its status or an expectation of when it can be gathered and received or when it's made available.

Q. Do you recall any instance in which Mr. Morrissey's response was lacking in any of those regards?

A. I would have to review the communications back and forth to determine if the

33 (Pages 126 to 129)

126

requests that were made in his responses provided the information.

Q. Is there anything that you can recall that you requested that Mr. Morrissey ultimately did not provide you with?

A. I don't recall that off memory.

Q. Is there anything that would refresh your recollection?

A. It would be reviewing the entirety of any communications between myself and Mr. Morrissey as to what requests were made and what again he provided.

Q. Okay. So in this letter to you of September 1st, 2023, Mr. Morrissey says, "Please contact me at your earliest convenience to discuss the timing of receipt of your interim claim adjustment of the equipment property portion of this claim as the insured has exhausted the initial unallocated claim payment and Selective either needs to provide a supplemental interim claim payment or, preferably, adjust the equipment portion of the property claim based on the documentation provided and deliver a claim payment to COI." Do you see that?

127

A. Yes.

Q. And Mr. Morrissey enclosed with that a draft list of a portion of the claim that identifies over 3 and a half million dollars of equipment property losses, that's right; correct?

MR. BANIAK: Object to form. Are you asking him if the chart is right or if it was -- if your statement is right?

MR. GOLDWASSER: If the statement is right.

THE WITNESS: Correct, and your statement is that he did provide a high level chart.

MR. GOLDWASSER: Okay.

BY MR. GOLDWASSER:

Q. When you received this letter, what did you do next?

A. I believe I would have considered the information and whether or not we needed to address an additional payment per his request.

Q. Okay. Did you follow up and set up a call with Mr. Morrissey?

A. I don't recall.

Q. Okay. Let's look at Exhibit 16.

128

(WHEREUPON, Exhibit 16 was presented to the witness.)

BY MR. GOLDWASSER:

Q. This is an e-mail from Elliott Ritter at BDO to you on September 6th, 2023. Did you actually receive this e-mail?

A. I believe so.

Q. Okay. And Mr. Ritter attaches a claim submission in the amount of a little over 7.2 million dollars; correct?

A. It looks that way.

Q. Okay. And the 7.2 million dollars did not include any claim for loss to the building; correct?

A. Can you clarify in any aspect to the building?

Q. Well, there's building coverage; right?

A. That is correct.

Q. Okay. And the policy limits for that building coverage are a little over 9.2 million dollars; correct?

A. Correct.

Q. Okay. And is there any portion of this claim that he attached that related to a claim for

129

that building coverage?

A. Yes.

Q. Okay. And point that to me, if you can.

A. These legal-size letters, where it says Page 1 of 33.

Q. Uh-huh.

A. Row 1 says Emergency Services and Debris Removal of 1 -- just shy of 1.1 million dollars.

Q. Okay.

A. As well as Building Reconstruction of another $177,808 as part of the total.

Q. Okay. Well, emergency services is separate coverage; correct?

A. No.

Q. No. It's part of the building coverage?

A. That's correct.

Q. Okay. And that's part of the 9.2 million dollar policy limit?

A. That's correct.

Q. Okay. And take a look at the comments on that second column for building reconstruction. It says, "Does not include cost to replace the damage to the building, an estimate is forthcoming." Correct?

**CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.**
**RONALD RUDOW**

2/17/2026

34 (Pages 130 to 133)

130

A.   That is correct, that is what it says.

Q.   Okay.

MS. JOSSERAND:  Rich, will you clarify what page you're on?

MR. GOLDWASSER:  Yeah, because this is a -- so if you go to the -- it's the first legal-size document.

MS. JOSSERAND:  Okay.  Just Page 1?

MR. GOLDWASSER:  Yeah.

MS. JOSSERAND:  Okay.  Sorry.

(WHEREUPON, Exhibit 17 was presented to the witness.)

BY MR. GOLDWASSER:

Q.   If you go to Exhibit 17, there's an e-mail in this chain from Mr. Morrissey to you on September 5th, 2023; correct?

A.   Yes.  This exhibit does have an e-mail on September 5th from Mr. Morrissey.

Q.   To you; correct?

A.   Correct.

Q.   And you received that e-mail; correct?

A.   Correct.

Q.   And Mr. Morrissey is updating you on the negotiations for the temporary space; correct?

131

A.   Yes, it appears that way.

Q.   Okay.  Let's turn to Exhibit 18.

(WHEREUPON, Exhibit 18 was presented to the witness.)

BY MR. GOLDWASSER:

Q.   Included in this exhibit is an e-mail from Mr. Morrissey to you on September 11th, 2023; correct?

A.   Correct.

Q.   Okay.  And here Mr. Morrissey is -- and you received this e-mail; right?

A.   Yes.

Q.   Okay.  And Mr. Morrissey is telling you that you owe him a return call and reply to four e-mails; right?

A.   That's what he states, yes.

Q.   He says I left you a voice-mail; right?

A.   He does.

Q.   Okay.  Was that true that you owed him a return call and a reply to four e-mails?

A.   It's certainly possible.

Q.   Okay.  And do you recall if he left you a voice-mail?

A.   I don't recall.

132

Q.   Okay.

A.   It's possible.

Q.   Okay.  And Mr. Morrissey is complaining -- he says the delays here are unreasonable, vexatious and are not going to continue.  Do you see that?

A.   Yes.

Q.   Okay.  He further states I'm not going to continue to send you e-mails and call you to get no response.  Do you see that?

A.   Yes.

Q.   Okay.  You state or he states, "Your handling of this claim has been completely unprofessional and, quite frankly, dilatory every step of the way."  Do you see that?

A.   I do.

Q.   Okay.  So if you take a look -- let's go back to Exhibit 2, Selective 117.  From August 31st, 2023 through September 11th, 2023, you entered no claim notes; is that correct?

A.   Correct.

Q.   So I'm just trying to figure out, were you doing anything to adjust this claim between August 30th, 2023 and the date Mr. Morrissey sent

133

you this letter on September 11th, 2023?

A.   I would assume, yes.

Q.   Okay.  And if any of it was of significance, we would have expected it to be logged in your claim notes; correct?

MR. BANIAK:  Object to form.

THE WITNESS:  They should be logged in my log notes at some point.  I would -- there are going to be occasions where it doesn't happen immediately.

MR. GOLDWASSER:  Okay.

BY MR. GOLDWASSER:

Q.   So sometimes you log notes for something that's happened in the past, is that what you're saying?

A.   Well, technically it's all happened in the past.

Q.   Okay.  Well, not contemporaneously, not on the same day?

A.   Not always, no.

Q.   Okay.  And does Selective have any policy regarding maintaining contemporaneous notes?

A.   Where it needs to be entered the same

**www.ChimniakCourtReporting.com**

312.781.9111                                          630.983.0030

**CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.**
RONALD RUDOW
2/17/2026

35 (Pages 134 to 137)

134

day?

Q. Or about the same day.

A. No. I believe our policy would be it should document what happens in the file.

Q. Okay. How do we know by looking at your claim notes whether or not the note was entered on the same day or related to some time previously, a week or two in the past? Is there any way to tell?

A. Well, the date that it was entered is timestamped.

Q. Correct.

A. As to when that conversation happened, there may be a reference in the log notes to it as to when it happened or maybe when I received an e-mail, but I don't believe that that's the focus of what should be in the log note. It should be what is discussed, not necessarily when it happened to the exact date.

Q. Well, timely adjustment of a claim is an obligation, isn't it, on behalf of Selective?

A. Yes.

MR. BANIAK: Object to form. Too late.

BY MR. GOLDWASSER:

135

Q. So you'd agree with me, would you not, that the dates of the conversations or activity is relevant to making a determination as to timeliness; correct?

MR. BANIAK: Objection to form, calls for a legal conclusion.

THE WITNESS: I believe that the notes were entered in a fashion that documented the conversation that happened, even if they didn't happen contemporaneously with the conversation.

MR. GOLDWASSER: Okay. But that wasn't my question.

BY MR. GOLDWASSER:

Q. My question is, in view of the fact that Selective has an obligation to timely adjust the claim, knowing when certain activity occurred is certainly relevant in making that assessment; correct?

MR. BANIAK: Object to form, legal conclusion.

THE WITNESS: I believe the date stamp that's in the notes signifies an approximate time frame of when that happened.

BY MR. GOLDWASSER:

136

Q. An approximate time. Within a day, two days? Are you able to give an answer? A week, two weeks?

A. I don't -- I don't have an answer for that, no.

Q. Okay. And the reason I'm asking is because I noted that there was no activity between August 31st, 2023 and September 11th, 2023 until Mr. Morrissey sent you his letter and you had stated, well, you know, just because there's nothing dated as of September 11th doesn't mean something didn't occur previously.

So I'm -- if you could take a look at the next -- following, I don't know, entries, a week, and let me know if any of those activities occurred in that interim, I think that would answer my question.

A. I don't believe that you can solely look at the claim notes that you're referencing as to whether or not there was activity between the August 31st and September 11th dates.

Q. Okay. So -- but my question is I'm asking you to take a look at your claim notes and let me know if any of the notes after

137

September 11th, 2023 reflected activity that occurred prior to September 11th, 2023.

A. How far forward would you like me to review?

Q. How far forward as you think you may have logged that activity.

A. I would say again since all of this documentation came in prior to when I logged the notes, there's a lot of entries on the 12th of September of 2023, as well as the 13th of September 2023 that I would assume at this point without cross-referencing what was received and what was uploaded, that that all came in during that time frame.

Q. Okay. That came in but it wasn't uploaded until the 12th and 13th is what you're saying?

A. That's correct.

Q. Okay. And is there anything in there that indicated that you reviewed it previously, the information that came in?

A. No, not that I had reviewed it previously, no.

Q. Okay. Exhibit 19.

**CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.**
RONALD RUDOW                                                                        2/17/2026

36 (Pages 138 to 141)

138

(WHEREUPON, Exhibit 19 was presented to the witness.)

BY MR. GOLDWASSER:

Q. It's an e-mail from Mr. Rudow -- from Mr. -- from you to Jon, okay. You tell him, "Our building consultant has provided their initial estimate for reconstruction work identified thus far at your building." Do you see that?

A. Yes.

Q. Okay. And who is your building consultant, JDH?

A. Correct.

Q. Okay. And do you recall what their initial estimate was?

A. No, not without reviewing the submission.

Q. Okay. Let's turn to Exhibit 2. I'm looking at an entry titled Statement of Loss completed by you on September 18th, 2023. It's 111, Selective 111.

It says about the middle of the entry total ACV approved total SLR approved is 10,556,749. Do you see that?

A. Yes.

139

Q. And it says which building is $5,212,749. Do you see that?

A. Yes.

Q. Okay. So tell me what it means when it says total ACV approved total SLR approved is $10,556,749.

A. Because of how the printing happens here, the total ACV approved aligns with the prior row where it says 648,079.17, because if you continue to backtrack from there -- I won't go through the math calculation.

Q. Okay. So the actual cash value here that's been approved is $648,079.17?

A. That's correct.

Q. Okay. And above that it says total RCV approved is 3,913 -- is that -- it's $3,913.68?

A. Yes. The correct value is 3,913.68.

Q. And the RCV, that is the replacement cost value for what?

A. Based on earlier in the log note, it involves BluSky Restoration emergency services for an undisputed value as of September 18th, 2023.

It also includes a reconstruction estimate associated to the offices, bathrooms, and

140

warehouse, breakrooms.

It also includes a proposal provided for $1,425, which off the top of my head I don't recall what that was for.

Q. Okay.

MS. JOSSERAND: Rich, can I -- my copy has -- these pages are missing from my copy.

MR. GOLDWASSER: Pages from 111?

MS. JOSSERAND: Yeah.

(WHEREUPON, a discussion was held off the record.)

BY MR. GOLDWASSER:

Q. So let's get back to the total SLR approved is 10.5 million; correct?

A. Correct.

Q. And the building is 5.2 million dollars; correct?

A. Correct, that's what the note says.

Q. Okay. And what -- that 5.2 million dollars, is that an actual cash value? Is that a replacement cost value?

A. That is -- the 5,212,749?

Q. Yeah.

A. Is a part of or a portion of the

141

approved SLR.

Q. Okay. And so is it correct to say that you see potential liability for the building coverage at a little over 5.2 million dollars as of 9-18-2023?

A. Yes.

Q. Okay.

A. As of that date, but also previously when it was distributed, which we already covered.

Q. Okay. So that was the -- so when this significant loss report was initially distributed, the amount of potential liability for the building coverage was a little over 5.2 million dollars; is that correct?

A. That's a correct interpretation.

Q. Okay. And you understood that when the SLR was first issued, okay, and approved that approximately a third of the building had been damaged; correct?

A. Correct.

Q. Okay. So this 5.2 million dollar figure here that's accounted for in the SLR is a value assigned to -- what, to repair and replace that third of the building?

CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.
RONALD RUDOW
2/17/2026

37 (Pages 142 to 145)

142

A. And also to mitigate that third of the building.

Q. And to mitigate the -- okay. And by mitigate, what do you mean?

A. Performing demo, emergency services in reference to the water that entered the building --

Q. Okay.

A. -- in conjunction with the repairs necessary.

Q. Okay. You then say total RCV for building above is within the approved SLR; right?

A. Yes, I do say that.

Q. Okay. And so the RCV -- the total RCV for building, is there an amount that you have for the total RCV for building?

A. Yes.

Q. And that's the 5.2 million dollar figure?

A. No.

Q. Okay. What is the total RCV for the building that you are referencing there?

A. It is the fifth row down, 651,992.85.

Q. So the total recovery cost value for the

143

building as of 9-18-2023 was you said 651,000; is that right?

A. That is correct.

Q. Okay. And how do you calculate that number?

A. The first four lines of that log note which I previously read add up to that.

Q. Okay. Let's turn to Exhibit 21.

(WHEREUPON, Exhibit 21 was
presented to the witness.)

BY MR. GOLDWASSER:

Q. Do you recognize that document Mr. Rudow?

A. Did you say 21?

Q. Yeah.

A. Yes, I do recognize this.

Q. Okay. You prepared this?

A. Yes.

Q. And it reads at the top Summary as of 9-15-2023. Do you see that?

A. Yes.

Q. Okay. And that's, in fact, when you prepared this document; correct?

A. Correct.

144

Q. Okay. If you would take a look at the second to last page of that exhibit, there's a Building Depreciation Schedule. Do you see that?

A. Yes.

Q. And it's got -- it looks like it's just incomplete, unfilled out; correct?

A. I would agree with that.

Q. Okay. And there's a column where it says Depreciation Percentage. Do you see that?

A. Yes.

Q. And those are all zeroes; correct?

A. Yes.

Q. Eventually you get to a point where you do apply a depreciation percentage. Is that correct?

A. Yes.

Q. Okay. And there are different percentages assigned to different elements of the building; is that right?

A. Yes.

Q. Where do you get those percentages when you eventually complete this form?

A. We utilize an estimating software system that helps give us useful life expectancies of

145

various building materials, whether that's any one of these categories that you see here in this page.

Q. Okay. And what's that software called?

A. Xactimate.

Q. Okay. And is the depreciation for each of these elements, is that constant like throughout the years? Like, for example, the date of loss here was July 2023.

A. Uh-huh.

Q. We're now, you know, in February 2026. Would the depreciation percentage be the same now as it was then?

A. Yes.

Q. Okay. And how do you know that the or do you know whether or not the depreciation percentage provided in Xactimate is a reasonable or accurate depreciation number?

A. We believe it to be reasonable based on market standards.

Q. Okay. And who makes that determination, you?

A. As far as who applies or what depreciation is applied?

**CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.**
RONALD RUDOW                                                    2/17/2026

38 (Pages 146 to 149)

146

Q.   What's reasonable, what's market standards.

A.   We use that as a guideline.  It doesn't mean that that's always how it works.

Q.   Okay.  So you take whatever number Xactimate spits out?

MR. BANIAK:  Object to form.

THE WITNESS:  We use it as a guide.  So if the depreciation rate that's listed in there is 5 percent, that's what market standard or market industry standard has said that this particular material depreciates 5 percent per year.

BY MR. GOLDWASSER:

Q.   How do you know that's what the market says?

A.   It's a tool again that we get information from them, but it doesn't always mean that that's how it's applied.

Q.   Okay.  But you have no independent basis or experience on which to say that the number Xactimate comes up with is actually the market depreciation rate; correct?

A.   I don't --

Q.   You just accept it as a given?

147

A.   I don't have any research on the topic directly, no.

Q.   Okay.  Indirectly?

A.   Is Xactimate indirectly?

Q.   No.  Do you have any indirect knowledge that the Xactimate depreciation percentage is what the market says it is?

A.   That's the guide that we're using.

Q.   That's the guide you use.

A.   Yeah.

Q.   And so my question is are you just accepting that guide or do you have an independent basis to say, yeah, I know that the number Xactimate is using is correct?

MR. BANIAK:  Object to form; asked and answered.  Can we move on?

MR. GOLDWASSER:  No.

MR. BANIAK:  He's answered the question.

MR. GOLDWASSER:  He hasn't.

MR. BANIAK:  Yes, he has.

THE WITNESS:  I would say we use it as a guide.

MR. GOLDWASSER:  That wasn't my question.

148

BY MR. GOLDWASSER:

Q.   My question is do you have any independent basis to know that Xactimate is using the market rate for a depreciation percentage?

MR. BANIAK:  Same objection.

THE WITNESS:  I do not have any indirect knowledge, no.

BY MR. GOLDWASSER:

Q.   No direct knowledge, nor do you have indirect knowledge?

MR. BANIAK:  You asked that question about three times.  Move on, please.

THE WITNESS:  Correct.

BY MR. GOLDWASSER:

Q.   It sounded like from your previous answers that there are occasions in which you deviate from the Xactimate number.  Is that correct?

MR. BANIAK:  Objection; mischaracterizes his testimony.

THE WITNESS:  I would say that Xactimate is a tool that we use, and we are allowed to utilize its pricing.  And if there are reasons to deviate from it, we can.

149

MR. GOLDWASSER:  Okay.

BY MR. GOLDWASSER:

Q.   And who makes that decision?

A.   To deviate from the --

Q.   To deviate.

A.   The claim rep.

Q.   And that would be you?

A.   That's correct.

Q.   Okay.  Do you recall ever deviating from the percentage -- the depreciation percentage used or put out by Xactimate?

A.   I'd have to review the estimate in order to do that.

Q.   Okay.  What would be a reason to deviate from the Xactimate number?

A.   You could deviate it based on when the work was done.  It might not be as old as the building.

You know, he had done -- as I mentioned earlier, he had done renovations to the building, so depreciation on structure would be different than renovations he completed two years before or however long the time frame would be.

Q.   The percentage would be different?

39 (Pages 150 to 153)

---

150

A. Yeah. The percentage is different based on the materials involved.

Q. Uh-huh. Well, my question is what would be a basis to deviate from the percentage, the depreciation percentage?

A. That Xactimate would guide?

Q. Yes.

A. It would just be discretion.

Q. Okay. And what would that discretion be based on?

A. Potentially quality of materials, again when the work was done.

Q. Okay. Turn to the next page, please.

A. Okay.

Q. It's a page entitled Coinsurance Calculation. It shows here a replacement cost value of the entire structure, ITV360, a little over 4.8 million dollars. Do you see that?

A. Replacement cost of building for MSB, yes.

Q. What did you say?

A. Replacement cost of building MSB.

Q. I'm actually -- okay. Well --

A. Oh, you're up above there?

---

151

Q. Yeah, yeah, yeah.

A. It's the same number.

Q. Okay. So as of September 15th, 2023, your replacement cost value estimate for the entire structure was 4.8 million dollars?

A. No.

Q. Okay. That's what this document says, though; correct?

A. That is what it says, yes.

Q. Okay. So tell me what I'm missing.

A. This document that was created here in this particular exhibit incorporates a coinsurance calculation tab that's already formatted, and this had not been updated as of the time of September 15th, 2023.

Q. When was the last time it was updated?

A. It had not been updated.

Q. Okay. So you provided -- you produced a statement of loss on September 15th, 2023 with a coinsurance calculation that shows an RCV of 4.8 million dollars, and you're telling us that the 4.8 million dollars is just not operative?

A. Correct.

Q. Okay. Is there anything else in this

---

152

statement that we should disregard or is incorrect?

A. I'm not aware of anything else that would be incorrect.

I will also state that a lot of the other pages included within this did change frequently, so there may be information that is potentially not up-to-date on those other tabs as well.

Q. Okay. Let's go to Exhibit 23.

(WHEREUPON, Exhibit 23 was presented to the witness.)

BY MR. GOLDWASSER:

Q. This was an e-mail from Mr. Morrissey to you on October 3rd, 2023; correct?

A. Correct. This is an e-mail that's part of the exhibit.

Q. Okay. And Mr. Morrissey is referencing a draft confidentiality agreement that he had previously sent you?

A. It appears that way, yes.

Q. Okay. What was the purpose of the confidentiality agreement?

A. Mr. Morrissey and Jon believed that it

---

153

was necessary in order to disclose information relevant to the claim.

Q. Okay. Let's go back to Exhibit 2. Let's go to Selective 108. The second entry from the bottom says Statement of Loss note completed by you on October 6, 2023. You actually made this entry; correct?

A. Yes.

Q. Okay. It says, "Initial reconstruction estimate for the entire building has been received from building consultant. EGA audited and have multiple questions and requested revisions." Do you see that?

A. Yes.

Q. "Building consultant made revisions and EGA verified these were completed." Right?

A. Yes.

Q. And you are the EGA, executive general adjuster; correct?

A. Yes.

Q. Building consultant is JDH; correct?

A. Yes.

Q. And that would be Margaret Stanfield?

A. Yes.

---

**CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.**
**RONALD RUDOW**          **2/17/2026**

40 (Pages 154 to 157)

---

154

Q. Okay. Help me out because, you know, the formatting here is a little wonky, but it looks to me like it says reconstruction estimate approved, and then there's a number $3,807,000 and change. Do you see that?

A. Yes.

Q. Okay. Was the 3.8 million dollar figure the reconstruction estimate which was approved?

A. No.

Q. Okay. What was the reconstruction estimate that was approved?

A. It's the line above, $3,207,023.72.

Q. Okay. What's the 3.8 million dollars?

A. It is the total RCV approved.

Q. Which includes the building?

A. Correct.

Q. Okay. Then it looks like it says -- there's a 3.566 million dollar number, and it says Total ACV Approved. Does that ACV include the building and other elements of the claim?

A. Yes.

Q. Okay. What's the status at this point of your coinsurance review?

A. At this point, I -- without reading the

---

155

entirety of the notes, I don't seem to reference coinsurance, at least in the notes that you have pointed out thus far.

Q. Okay. Does that indicate that you no longer had a coinsurance concern?

A. Not necessarily.

Q. Okay. But if you did have a coinsurance concern, we could expect it to be found in these log notes; correct?

A. I would say yes.

Q. Okay. And when I say coinsurance, I mean specifically for this question for the building.

A. A coinsurance problem with the building?

Q. Yeah.

A. If there was a coinsurance problem or an additional review that was needed, then it would be in the log notes.

Q. Okay. In the note two notes above, it looks like it's a supervisor overview note completed by Mr. Walton. He indicates that received request for payment of the ACV of the building damages for 2.9 million dollars. Do you see that?

---

156

A. I do.

Q. And it says which is based on our consultant's estimate. Okay.

Is it your understanding based on these notes that the ACV of the building damages was 2.9 million dollars as of October 10th, 2023?

A. Yes.

Q. Okay. Did Selective ever perform an analysis or an evaluation of the actual cash value of the building?

A. Yes.

Q. Okay. And when was that?

A. I believe in 2024.

Q. Okay. And what was the conclusion as to the actual cash value of the building?

A. I don't remember the exact number, if that's what you're asking for.

Q. Okay. How was that analysis performed?

A. We would have used or I would have used the ISO 360 system.

Q. Okay. For the actual cash value?

A. (nodding)

Q. That's yes?

A. Yes. Sorry.

---

157

Q. Okay. So ISO 360 can perform not only replacement cost value but actual cost value; correct?

A. That's correct.

Q. Okay. And we would expect to see an actual cash value reflected in your log notes; correct?

A. Yes.

Q. Okay. And where would we find the report that was generated from ISO 360?

A. You could find it in ISO 360.

Q. Okay. Is that where it's maintained?

A. That's the software system we use.

Q. So once the report is, you know, run, it's saved in that system?

A. Yeah. It's in there.

Q. Okay. Is it uploaded to the CCM system?

A. It should be.

Q. Okay. And you believe that this was done sometime in 2024?

A. The analysis of the ACV?

Q. Yes.

A. Yes, I do believe it was sometime in 2024.

---

CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.
RONALD RUDOW
2/17/2026

41 (Pages 158 to 161)

158

Q.   Okay.  And do you recall whether or not the ACV was higher or lower than the RCV generated by ISO 360?

A.   It has to be lower.

Q.   Okay.  It has to be lower because there's a depreciation component to that; is that correct?

A.   That is correct.

Q.   Okay.  And do you recall generally what percentage the total depreciation would have been?

A.   I believe it was somewhere around 20 to 25 percent, but I don't recall without -- I believe I documented it somewhere.

Q.   Okay.  And do you recall the RCV that was calculated by ISO 360 for this property?

A.   The one from 2024?

Q.   If you performed one in 2024, yes.

A.   I don't recall the exact number.  I believe an evaluation was done in 2024 that had it in multiple scenarios based on documents we had available at the time, ranging anywhere from 12 million to 15 million.

Q.   This was 2024?

A.   Correct.

159

Q.   Okay.  And you believe just off the top of your head that there would have been a depreciation of 20 to 25 percent to arrive at the ACV?

A.   I believe so.

Q.   Okay.  As of October 24th, 2023, had Selective issued a reservation of rights letter to COI?

A.   Without reviewing materials, I don't know what the date would be.

Q.   Okay.

(WHEREUPON, Exhibit 26 was presented to the witness.)

BY MR. GOLDWASSER:

Q.   If you take a look at Exhibit 26, it's another e-mail chain.  The first e-mail -- the most recent e-mail is Mr. Morrissey to you on October 24th, 2023.  Do you recognize this e-mail chain?

A.   Yeah.

Q.   These e-mails were sent and received by you; correct?

A.   I am a part of them, yes.

Q.   Okay.  Attached to Mr. Morrissey's

160

e-mail on October 24th is a redline version of a confidentiality agreement.  I reference COI 54760 for the Bates stamp number.  Do you see that?

A.   Yep.

Q.   Okay.  On the second page of that agreement, which is COI 54761, Mr. Morrissey strikes out the language in the confidentiality agreement that says, "Whereas Selective's continuing investigation of the COI matter is subject to a full reservation of rights under the Policy, at law or otherwise."  And in the margin he comments, "We were not provided a copy of Selective's Reservation of Rights letter, please provide it."  Do you see that?

A.   I do.

Q.   When you received this e-mail from Mr. Morrissey on October 24th, did you provide Mr. Morrissey with a reservation of rights letter?

A.   Based on reading this exhibit, I cannot tell skimming through the e-mail chains if it had been provided to him already or occurred subsequent to the 10-24 e-mail.

Q.   Okay.  Do you have any recollection of sending Mr. Morrissey or COI a reservation of

161

rights letter prior to receiving the e-mail?

A.   Without reviewing the notes and when things were documented in the log notes in totality, I don't recall the exact date.

Q.   Okay.  Let's turn to 106, Selective 106 in Exhibit 2.  I want to direct your attention to your note logged on 10-27.

You indicate that the policyholder asked about differences in the estimate, and they have done review and believe that the items in our estimate do not seem to be like and kind, examples being windows, masonry, precast panels for a roof deck.  Do you see that?

A.   Yes, I do.

Q.   Okay.  And then you say EGA -- which is you; correct?

A.   Correct.

Q.   -- advised that our estimating software is a tool for us to estimate these buildings.  Correct?

A.   Correct.

Q.   Okay.  And then you say, "And that not every time in their software is going to be an exact match as to what was there.  But we utilize

CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.
RONALD RUDOW                                                                    2/17/2026

42 (Pages 162 to 165)

### 162

the tool log to get an undisputed RCV and ACV value while the remainder of the items get discussed and worked out from a material perspective, cost perspective, and so on." Right?

A. Correct.

Q. You then acknowledge that your estimate likely needs revisions and you are okay with that; correct?

A. Correct.

Q. Okay.

(WHEREUPON, Exhibit 28 was presented to the witness.)

BY MR. GOLDWASSER:

Q. If we turn the page to Exhibit 28, in this e-mail or in this exhibit there's an e-mail from Mr. Morrissey to you on November 7th; correct?

A. Correct.

Q. You received this e-mail; right?

A. Correct.

Q. He tells you that BDO is prepared to submit COI's business interruption and extra expense claim but have yet to hear back from you regarding the confidentiality agreement; correct?

### 163

A. Yes, that's what it says.

Q. Okay.

(WHEREUPON, Exhibit 29 was presented to the witness.)

BY MR. GOLDWASSER:

Q. If you turn to Exhibit 29, it's an e-mail from you to Mr. Morrissey; correct?

A. Yes, on Page 1.

Q. Okay. And you actually sent that e-mail on Page 1; correct?

A. Yes.

Q. And you revised the proposed confidentiality order; correct?

A. Yes, it was revised.

Q. Okay. And if you take a look at the attached revised agreement, draft agreement, I direct your attention to COI 56957. It's still stricken, a portion that says Selective's continuing investigation of the COI matter is subject to a full reservation of rights under the policy, at law or otherwise. Correct?

A. Yes.

Q. Okay. And Mr. Morrissey's note that they were not provided a copy of the reservation

### 164

of rights is still there; correct?

A. Correct.

Q. Okay.

MR. GOLDWASSER: Why don't we take a five-minute break here.

MR. BANIAK: Sounds good.

(WHEREUPON, a break was taken.)

MR. GOLDWASSER: We're back on the record.

BY MR. GOLDWASSER:

Q. Let's go back to Exhibit 2, Selective 108. Okay. So it's the -- I'm looking at the third entry from the top, Supervisor Overview note completed by Carl Walton. This notes that -- correct, that the RCV and ACV of our PH -- that's policyholder -- estimate is much higher, over 4.5 million dollars. Do you see that?

A. Yes.

Q. Okay. And is it your understanding based on this note that COI's RCV and ACV for the building estimate was in excess of 4 and a half million dollars?

A. I do not know what the intention that Carl writes that note for.

### 165

Q. Okay. Had that been conveyed to you by COI that their replacement cost value or their actual cash value was in excess of 4 and a half million dollars as of October 10th, 2023?

A. Can you restate that again?

Q. Was it your understanding that COI was placing an RCV or an ACV value on the building in excess of 4 and a half million dollars?

A. I would have to review what was submitted. I know we recently -- in one of the other exhibits, you covered a claim submission. I don't know if that's what he is referencing here.

Q. Okay. Do you review other log entries by other people?

A. I do.

Q. Okay. And did you review this entry at or about the time it was made?

A. Probably.

Q. Okay. Did you have any questions about what Mr. Walton meant when he wrote the RCV and ACV of our policyholder estimate is much higher, over 4 and a half million dollars?

A. We may have discussed it.

Q. Okay. Let's turn to Exhibit 25. Let me

**CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.**
**RONALD RUDOW**
**2/17/2026**

43 (Pages 166 to 169)

---

166

know when you're there.

(WHEREUPON, Exhibit 25 was presented to the witness.)

THE WITNESS: Okay.

MR. GOLDWASSER: Okay.

BY MR. GOLDWASSER:

Q. This is an e-mail from you to Jon Samek on 10-23-2023. Do you see this?

A. Yes.

Q. And it's an e-mail that you sent to Mr. Samek; correct?

A. Correct.

Q. Okay. And attached to it was an updated Statement of Loss; correct?

A. Yes.

Q. In fact, also attached was a reconstruction estimate as of 10-23-23; correct?

A. Yes.

Q. Okay. And that was put together by JDH. That's your building consultant; correct?

A. Correct.

Q. Okay. And if you take a look at the updated Statement of Loss, that's where the -- I think it's the last page of the exhibit. It's a

---

167

legal-sized document, where you have -- are you there?

A. Yes.

Q. Okay. And you show a total RCV of 3.8 million dollars. Do you see that?

A. Yes.

Q. Okay. And this was as of October 23rd, 2023; right?

A. Yes.

Q. Okay. So you understood that the -- that JDH's estimate of RCV as of 10-23-2023 to reconstruct a third of the building was a little over 3.8 million dollars; correct?

A. No.

Q. No. Okay. What am I missing?

A. That JDH's estimate is not 3.8 million dollars.

Q. Okay. Well, Selective has a total RCV of 3.8 million dollars; correct?

A. Yes.

Q. Okay. Did this give you any concern over a coinsurance penalty?

A. No.

Q. And why is that?

---

168

A. Based on previous valuations done up until 10-23-23.

Q. And what valuations were those?

A. The ones that we've already covered.

Q. The 10 million -- the 10.1 million dollar estimate?

A. The 10.1 million dollar insurance to value, ITV?

Q. Yes.

A. Yes.

Q. Okay. Any others?

A. Any other estimates?

Q. That you're relying upon that led you to believe that there was no coinsurance issue at this point.

A. No.

Q. Okay. Let's -- if we turn to Exhibit 2, Selective 101, the middle of the page is a Statement of Loss note completed by you on January 4th, 2024, and it says total ACV approved that 3.7 million dollars. Do you see that?

A. Yes.

Q. What does that -- what's covered by that 3.7 million dollars? Is it building plus or is

---

169

that just an ACV for the building?

A. That is the total ACV for the building as of that note on that date.

Q. Okay. And the 3.7 million dollar figure that precedes that, is that the RCV for the building?

A. No.

Q. Okay. So to get the RCV for the building at this point, we would have to add back the depreciation?

A. Correct.

Q. Okay. Did you have any coinsurance concerns at this point?

A. It does not appear that way.

Q. Okay. And why not?

A. For the same answer I gave previously.

Q. You're relying on the 10.1 million dollar RCV estimate?

A. To clarify, the 10.1 million dollar ISO 360.

Q. Okay.

A. It's not an estimate.

Q. Okay. What is it?

A. It's a valuation.

---

CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.
RONALD RUDOW
2/17/2026

44  (Pages 170 to 173)

170

Q.    A valuation.  Okay.  Is there a difference between an estimate and a valuation?

A.    The way it has been documented today, I would say yes.

Q.    Okay.  What's the difference?

A.    An estimate is what was written for the cost to actually do the work, and the valuation was what the building was worth.

Q.    So are you saying that the ISO 360 valuation was an actual cash valuation?

A.    No.

Q.    It was a replacement valuation; correct?

A.    Yes.

Q.    Okay.  So it's not what the building was worth; it's what the software put out for a replacement cost?

A.    Yeah.  What the -- what the software system would advise us is what it would cost from a value perspective to build the building.

Q.    Okay.  At what point did you decide that the ISO 360 valuation no longer reflected the actual cost to build the building?

A.    It was in 2024.

Q.    Okay.  At what point in 2024?

171

A.    I believe we notified COI in the spring.

Q.    Okay.  And what led you to notify COI in the spring?

A.    The estimates for reconstruction and repairs to the building for materials that were like kind and quality were higher than what the valuation was advising us.

Q.    Okay.  I'm looking at this note that you made on January 4th, 2024, and it says 4,030,000 and change Total RCV Approved.  Do you see that?

A.    Yes.

Q.    Is that the RCV for the building?

A.    Yes.

Q.    Okay.  And what does it mean when it says approved?

A.    That is my notation that after my review of the items incorporated into that 4 million dollar figure that you read --

Q.    Yes.

A.    -- that those are the items I am recommending for approval.

Q.    I thought you were the one that made the approval.

A.    I am.

172

Q.    Okay.  So who are you recommending the approval to?

A.    Let me restate, is I have to -- because the value of the loss is over my authority, I do have to get approval to issue the payment.

Q.    Okay.  But you've approved the value.  You just can't write a check without somebody else approving it; correct?

A.    That is correct.

Q.    Okay.  And it's 4 million dollars to reconstruct the third of the building that was damaged by the roof collapse; correct?

A.    For clarity, it's incorporated in the four lines above that as to what that number constitutes.

Q.    Okay.  When did you receive the Rankin reconstruction estimate?

A.    I don't know.

Q.    Okay.  And is it fair to say from the reading of your note here that the Rankin estimate was 3.2 million dollars?

A.    No.

Q.    Okay.  What is the 3.2 million dollars attached to in this entry?

173

A.    It should be the reconstruction estimate, the wording that is after that.

Q.    Okay.  Let's stay on Exhibit 2.  Let's go to Selective 99.  It's a note you made on January 8th, 2024.  I'm looking at a number here of $4,055,000 and change.  Can you explain what that number is?

A.    The 4,055,490 and some change, the total RCV approved, incorporates the five or so line items above that and those dollar values from various vendors, estimate invoices.

Q.    Okay.  And is that for the building coverage?

A.    Yes, it is for the building coverage.

Q.    Okay.  Did this give you any concern about a coinsurance issue?

A.    No.

Q.    And why is that?

A.    For the same answer as before.

Q.    The ISO 360 showed a valuation of 10.1 million dollars; correct?

A.    Correct.

Q.    Okay.  Let's turn to Selective 96 in Exhibit 2, the second entry -- maybe the first

**CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.**
RONALD RUDOW
2/17/2026

45 (Pages 174 to 177)

174

full entry, supervisor overview note completed by Matthew Caton. He indicates that the Large Loss Committee has approved increasing reserves to $13,849,879. Do you see that?

A. Yes.

Q. Okay. Why was that increased? Why was the reserve increased to 13.8 million dollars?

A. To give you a more of an exact answer, I would need to see the SLR.

Q. Did you make a request to have the reserves increased?

A. Yes.

Q. Okay. And do you recall why?

A. Again you just asked me that, and I said if you could show me the SLR I could give you a better answer.

Q. Okay. On let's -- we're sticking on Exhibit 2, Selective 93. Toward the bottom, there is a general note completed by you on February 29th, 2024. It says policyholder counsel submits Proof of Loss, 20.266 million. Do you see that?

MR. BANIAK: The third one from the bottom.

175

THE WITNESS: Oh. Yes.

MR. GOLDWASSER: Okay.

BY MR. GOLDWASSER:

Q. Upon receipt of the proof of loss, did that give you any cause for concern about a coinsurance penalty?

A. It's possible.

Q. Okay. At the time you didn't note any -- any concern about a coinsurance penalty, did you?

A. I do not see one on 2-29-24.

Q. Okay. Now staying on Exhibit 2, Selective 90, we see a litigation note completed by you on April 8th, 2024. What does it mean when you log something as a litigation note?

A. As mentioned earlier in the deposition, the litigation is just a category selector. It appears as I just chose that category to enter this note.

Q. Why would that -- why would you have chosen litigation?

A. Well, based on the context of the log note, it looks like I am discussing with legal counsel.

176

Q. Okay. If you go down to the entry below that, it's Statement of Loss note completed by you on March 26th, 2024, and I direct your attention to a number that's about four lines from the bottom, little over 4 and a half million dollars Reconstruction Estimate, All Areas.

A. Okay.

Q. Can you explain what that entry means?

A. It means the reconstruction estimate was 4.5 million and some change.

Q. Okay. And you approved it?

A. That's correct.

Q. Okay. Any concern here about a coinsurance penalty at this point on March 26, 2024?

A. I believe so.

Q. Okay. Is that noted here?

A. It doesn't appear that I put anything in there on the note dated March 26th, 2024.

Q. Okay. But there is a notation on April 8th, 2024; correct?

A. There is a note entered on 4-8-2024, yes.

Q. Okay. And it says EGA recommended the

177

re-review of coinsurance relative to the building portion of the loss; correct?

A. Correct.

Q. At a certain -- at what point did you stop reviewing the coinsurance portion for the loss?

A. I don't recall an exact date.

Q. Okay. Staying in Exhibit 2, Selective 81, on August 19th -- this is the last entry on the page -- there is a number a little north of 5.3 million dollars, Total RCV approved. Do you see that?

A. Yes.

Q. Is that for the building portion of the loss?

A. Yes.

Q. Okay. And it shows the total ACV approved of 4.9 million dollars; correct?

A. Yes.

Q. Okay. And then RCV also relates to the building portion of the loss; correct?

A. Yes.

Q. Okay. Staying on Exhibit 2, Selective 80, there's a general note completed by

178

it looks like Jonathan Qualls on 12-19-24.

(WHEREUPON, there was a short interruption in the proceedings.)

BY MR. GOLDWASSER:

Q. So we're looking at a note on 12-19-24 from Jonathan Qualls. Who is Jonathan Qualls?

MR. BANIAK: Could we go off the record for a second?

MR. GOLDWASSER: Yeah.

(WHEREUPON, a discussion was held off the record.)

BY MR. GOLDWASSER:

Q. Let's go to -- we're staying on Exhibit 2, Selective 78. There's a note 1-30-2025 where you say, "Review of the submitted documents appear sufficient to show policyholder replaced inventory for the business. The policyholder docs provided do not clarify enough information that warrants a comparison of the items replaced versus the approved inventory."

What other documents were you looking for there?

A. In general, we typically would need invoices for the replacement of inventory, you

179

know, equipment, tools, all those types of things.

In this particular case, we got a lot of spreadsheets that logged basically from a -- I believe like a QuickBooks account or, you know, something similar of everything purchased. So we just utilized that to document purchases versus an exact comparison of what was lost versus what was replaced.

Q. Okay. You didn't have any invoices?

A. I didn't say we didn't have any.

Q. Okay. What were you missing that would have helped you to compare the items replaced versus the approved inventory?

A. At this point, based on how the log note reads, I considered what was submitted sufficient and resolved the problem.

Q. Okay. You did resolve the problem here. Okay. And was a further payment issued?

A. It looks like -- the fourth line from the bottom, it looks like a payment of $490,456.08 was issued.

Q. Okay. Let's go to Selective 76. This is a note from you on April 15th, 2025. You indicate that we have confirmed that there is no

180

Peddinghaus report evaluating the machine post-loss.

Are you referring to no Peddinghaus report from Selective or no Peddinghaus report from COI?

A. Reading through that, I believe my intention from that statement is that through discussion -- and it appears to be with our policyholder's counsel -- that there was no report for the Peddinghaus machine post-loss.

Q. Okay. Did Selective obtain a report from the Peddinghaus machine post-loss?

A. We received feedback from and had discussions with Envista, who we had originally retained and covered earlier to evaluate the equipment.

Q. Okay. And did you get a report from them?

A. I believe we already covered that, and there was no formal report. It would have been discussions, conversations, e-mails, things of that nature.

Q. Okay. You write it does not appear -- this is about halfway through your note. "It does

181

not appear that Envista reevaluated the machine after concluding that a new transformer was needed." That's a true statement?

A. Where are you at approximately?

Q. About the middle of the entry, after the $186,000 figure.

A. Thank you. Based on how the note is structured, I don't believe that comment is in reference to the Peddinghaus machine.

Q. Okay. So that refers to what, to the LS Blaster?

A. I would believe so, yes.

Q. Okay. Let's look at Selective 74, the top entry. It says LS Blaster repair for eBay receipt for replacement transformer approved. Was payment sent on this?

A. I believe so. There should be a corresponding statement of loss.

Q. Okay. I want to discuss the Peddinghaus machine now. Do you know when the Peddinghaus machine was first put into use at the property?

A. To the best of my knowledge, based on information from the claim, it's just prior to the loss event.

47 (Pages 182 to 185)

## 182

Q. Okay. And do you know where it was located with regard to the roof collapse?

A. Yes.

Q. And where was it?

A. I believe it was in the -- what I'll reference as the center section of the building.

Q. Okay. And do you know whether or not it was within the area where the roof collapsed?

A. I do know.

Q. And?

A. It was not.

Q. Okay. Do you know whether or not the sprinkler system fell within the area of the Peddinghaus machine?

A. I'm not aware of that.

Q. Okay. Have you -- you haven't seen any pictures of that; is that right?

A. I've seen pictures of the Peddinghaus machine and where it was located in the building, yes.

Q. Okay. And you haven't seen any pictures showing a sprinkler system near the Peddinghaus machine, is that what you're telling me?

A. Correct.

## 183

Q. Okay. Do you know whether or not the Peddinghaus machine was exposed to water from the roof collapse?

A. Can you further clarify exposed?

Q. Whether it got wet.

A. There would have been water running across the floor to get to where it was, yes.

Q. Okay. Do you know whether the water would have come from above rather than from the floor?

A. The water would not have come from the roof based on where it was located in the building.

Q. Okay. And how about from the sprinkler system?

A. As I already answered, I'm -- I haven't seen a picture to show a sprinkler system above the Peddinghaus machine.

Q. Okay. And if you were to see those photos, would that change your adjustment decision with regard to the Peddinghaus machine?

A. Not necessarily.

Q. Okay. Your decision -- your adjustment decision based on -- for the Peddinghaus machine

## 184

was based on the Envista investigation; is that correct?

A. Correct.

Q. And that was performed by Mark Ewing; is that correct?

A. Yes.

Q. Anyone else at Envista?

A. Not that I'm aware of.

MR. GOLDWASSER: Let's take five.

(WHEREUPON, a break was taken.)

MR. GOLDWASSER: Okay. We're back on the record.

Let's turn to Exhibit 76.

(WHEREUPON, Exhibit 76 was presented to the witness.)

BY MR. GOLDWASSER:

Q. Mr. Rudow, Exhibit 76 looks to be some sort of memorandum or report from Mr. Ewing, Mark Ewing, to you, dated February 7th, 2024. Do you see that?

A. Okay.

Q. Okay. Do you recognize that?

A. Yes.

Q. Okay. And you actually received this

## 185

document; isn't that true?

A. Yes.

Q. Okay. Mr. Ewing states with respect to the LS Blaster that the machine was relatively new and had just been put into production prior to the loss of it; correct?

A. Yes.

Q. Okay. And he stated did not appear to sustain top-down water but that water from the ground level appeared to be approximately 3 and a half inches, which was just below the four suction motors. Do you see that?

A. Yes.

Q. Okay. And this is an e-mail that he sent you on February 7th, 2024. Do you know when he actually reviewed the LS Blaster?

A. No, I do not.

Q. Okay. In the beginning, you know, in the second paragraph, he says to start I did meet with Jon Samek on January 20th, 2024. He related to me that there was several outstanding issues, included in that was the LS Blaster and the Peddinghaus drill and saw. Do you see this?

A. Yes.

48  (Pages 186 to 189)

186

Q.   Okay.  So you know he was out there at the property on January 20th, 2024; correct?

A.   I would agree.

Q.   Okay.  And then on the following page, Mr. Ewing states under the section titled Peddinghaus drill and saw that Jon reported that this unit has exhibited a significantly increased level of maintenance issues and a drop in productivity since being put back into service. The unit was recommended for cleaning by Arepa, A-R-E-P-A, but this was not done for the same reason discussed for the Scotchman notcher.

Do you know who Arepa is?

A.   Yes.

Q.   Who is Arepa?

A.   Arepa is a company that can clean equipment.

Q.   Okay.  And so your understanding is that Mr. Ewing was recommending that Arepa clean this equipment?

A.   That's not how I interpret that wording.

Q.   How do you interpret it?

A.   I interpret it as the unit was recommended by Arepa for cleaning.

187

Q.   Okay.  So your understanding is that Arepa came out to investigate it?

A.   That's correct.

Q.   And do you know when that was?

A.   To the best of my knowledge, it would have been after initial site visits and inspections by Mark Ewing after the loss occurred.

Q.   Okay.  Toward the end of -- is Arepa a company owned by Envista?

A.   That, I can't answer.

Q.   Okay.  And near the bottom of this second page, Mr. Ewing concludes these reported production problems could be the result of one or more -- one of or a combination, several issues to include, moisture into the power and/or communication cables on floor level; electrical arcing from above; moisture into the controls, motors, sensors; and corrosion to guides, screws, and mechanical components.  Okay.

Have you received any further communications or reports from Envista after this February 7th, 2024 letter?

MR. BANIAK:  Objection to form, characterization.

188

THE WITNESS:  It is possible that we had additional communications after this.

BY MR. GOLDWASSER:

Q.   But you understand that Mr. Ewing held out the possibility that one or a combination of issues contributed to the problems that COI was having with the Peddinghaus machine; correct?

MR. BANIAK:  Object to form again.

THE WITNESS:  I don't agree with that statement, no.

MR. GOLDWASSER:  You don't.  Okay.

BY MR. GOLDWASSER:

Q.   What was wrong about that statement?

A.   His -- he references in this e-mail communication that the reported problems could be, not that they were.

Q.   Okay.  Could be the result, okay.  And included in that, one or a combination of issues, was moisture into the controls, motors, and sensors, et cetera; correct?

A.   Yes.  That is one of the bullet points, correct.

Q.   As is moisture into the power and/or communication cables on floor level; correct?

189

A.   Correct.

Q.   Okay.  If you could, turn to Exhibit 87. It's the last exhibit.

(WHEREUPON, Exhibit 87 was presented to the witness.)

BY MR. GOLDWASSER:

Q.   This is a January 11th, 2025 letter from Philip Anderson of AIG to Mr. Samek, and it was attached to the complaint.  There's a file stamp on the left-hand margin.

Have you seen this letter before?

A.   It's possible.

Q.   Okay.  You've received a copy of the complaint filed in this case; correct?

A.   Yes.

Q.   And you reviewed it in preparation for this deposition; correct?

A.   This specific letter, no.

Q.   Okay.  But the complaint you did; correct?

A.   I would have reviewed the complaint a while back.

Q.   Okay.  You would have reviewed -- you assisted in preparing the answer to the complaint;

CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.
RONALD RUDOW
2/17/2026

49 (Pages 190 to 193)

190

correct?

A. Yes.

Q. Okay. And in doing so, you reviewed the complaint and the attachments to the complaint; correct?

A. Correct.

Q. Okay. This letter in the third sentence begins, "Most likely moisture entered through the connector and caused one or more of the conductors to short out, causing the cable to overheat, which melted the insulation." Do you see that?

A. Yes.

Q. It goes on and says, "The melted insulation allowed the power cable to short out with other cables in the electrical cabinet, which in turn rendered the proportional valve inoperable. One cable was repaired, the power cable for the proportional valve was replaced, and proportional valve for the horizontal clamp was replaced." Do you see that?

A. Yes.

Q. He then concludes that paragraph by saying, "The system is now functioning as it should." Right?

191

A. He does.

Q. He then says these issues will continue due to the exposure of water. It is impossible to tell which components have been affected or that will fail just through visual inspections. Numerous components have already been replaced, and I foresee many more needing replacement in the future, in the near future. Do you see that?

A. I do.

Q. He then goes on to state, "Due to the exposure of water and the sensitivity that these machines have to it, I would recommend replacing the machine in its entirety. This would be the quickest way to get the machine back up and running in a reliable state." Do you see that?

A. I do.

Q. Do you have any reason to disbelieve any of these statements or to think that they are not correct?

MR. BANIAK: Object to form, calls for a hearsay conclusion.

THE WITNESS: I don't -- I don't have any cause to believe that that's not what Mr. Philip Anderson believes.

192

MR. GOLDWASSER: Okay.

BY MR. GOLDWASSER:

Q. Do you have any cause to believe that that's not the truth?

MR. BANIAK: Same objection; calls for hearsay.

THE WITNESS: No.

MR. GOLDWASSER: Okay. If you could turn to Exhibit 45.

(WHEREUPON, Exhibit 45 was presented to the witness.)

BY MR. GOLDWASSER:

Q. Exhibit 45 has an e-mail chain, and the first page is an e-mail from you to Mr. Samek on April 16th. Do you see that?

A. Yes.

Q. Okay. And there's several e-mails, and attached to this chain is a letter dated April 15th, 2024. Do you recognize this letter?

A. Yes.

Q. Okay. You actually sent this letter to Mr. Samek; correct?

A. Yes.

Q. Okay. And I want to direct your

193

attention to the second paragraph on the first page. It says Chicago Ornamental Iron Inc. (COI) presented Selective with an initial outline of Building damages, including some supporting estimates/proposal, totaling 4.5 -- a little over 4.5 million dollars on September 29th, 2023. Do you see that?

A. Yes.

Q. Okay. And that's a true statement; right?

A. I don't have any reason to believe it not to be.

Q. Okay. You actually received an estimate from COI for the building damages a little bit over 4 and a half million dollars; correct?

A. I believe so.

Q. And we saw that in the claim notes; right?

A. I don't know if we pointed it out directly, but maybe.

Q. Okay. And those building damages you understood related to the loss of about a third of its building; correct?

A. Correct?

50 (Pages 194 to 197)

194

Q.  Okay.  And you go on to say on October 23rd, 2023, Selective provided COI with an initial approved estimate for the reconstruction repairs to the building, totaling a little over 3.2 million dollars.  Do you see that?

A.  Yes.

Q.  Okay.  What's an initial approved estimate as opposed to an approved estimate?  Is there a difference?

A.  No.  Just the first one we gave him.

Q.  Okay.  You then say on December 4th, 2023, COI and its contractors submitted responses to these identified differences, and you say that December 4th, 2023 submission also included a modified outline of the building damages now totaling $4,402,042.  Do you see that?

A.  Yes.

Q.  Okay.  And then you set forth -- in the following paragraph, you say, "Below is an outline of the updated building approvals and the remaining differences between COI's December 2023 submission of repairs and Selective's revised estimate."  Do you see that?

A.  Yes.

195

Q.  And you have kind of like a table that follows that, and midway through the table there's an entry for Replacement Cost Value Estimate, offices, bathrooms, kitchen space, all other areas.  Do you see that?

A.  Yes.

Q.  Okay.  And the total replacement cost value indicated is $4,503,920.62; right?

A.  Yes.

Q.  Okay.  And this doesn't include payments or claims relating to the law and ordinance endorsement in the ElitePac; correct?

A.  It does not.

Q.  Okay.  And, in fact, the payments that are due under the law and ordinance endorsement in the ElitePac are not counted toward calculation of a coinsurance penalty; that's correct?

A.  That's correct.

Q.  Okay.  So what you show here, if you go on -- there's a line that says total approved RCV of $5,355,700.  Do you see that?

A.  Yes.

Q.  Okay.  What does it mean when you say Total Approved RCV?

196

A.  Similar to the past answers I provided, it's a total of all the numbers that are above that.

Q.  Which you have approved for payment?

A.  Yes.

Q.  Okay.  The paragraph that follows reads, "The approved RCV for all Building damage, as outlined above, is $5,355,700.42."  Correct?

A.  Yes.

Q.  "The Approved RCV for the eastern section of the Building where the roof collapsed, which is currently being discussed, is outlined above as $4,452,179.83."  Right?

A.  That's what it says.

Q.  Okay.  And you had these numbers, according to this letter, at least the 4.5 million dollar figure as early as September 29th, 2023; correct?

A.  Yes.  It looks like that's when I documented that we got their -- we got COI's initial estimate, yes.

Q.  Okay.  And I think we've covered this before, but you didn't believe at that time that there was a coinsurance issue; is that correct?

197

A.  Back in September, no.  We've covered that.

Q.  Okay.  At the -- the last sentence on that second page reads, "Unapproved scope of work charges, expenses, or change orders will not be covered."  Do you see that?

A.  Yes.

Q.  So in order for Selective to pay on work that was being done to the building, Selective would have first have had to approve the scope of the work; correct?

MR. BANIAK:  Sorry, can you repeat that?

BY MR. GOLDWASSER:

Q.  Selective isn't going to pay on work that they don't approve; correct?

A.  Correct.

Q.  Okay.  And that goes for the law and ordinance endorsement as well; correct?

A.  Correct.

Q.  Okay.  So before the work is undertaken, Selective must first approve the work; correct?

A.  Not always, but that is generally the fashion that it works out best.

Q.  Okay.  Well, in this letter, you're

**CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.**
**RONALD RUDOW**                                                                    **2/17/2026**

198

telling COI that unapproved scope of work charges, expenses, and change orders will not be covered; right?

A. Correct.

Q. So aren't you telling COI that before you do any work you better get our approval; right?

A. Okay.

Q. That's right; correct?

A. Okay.

Q. Is that a yes?

A. Yeah.

Q. Okay. And that applies to work that is done under the law and ordinance endorsement; correct?

A. Correct.

Q. Okay. So I note on the following page you state -- it's the second paragraph from the bottom -- to collect the repair/replacement cost balance, recoverable depreciation -- you have a number of $374,000 and change -- the policy requires that you notify us of your intent to claim the balance within 180 days of the loss, which we believe you have already done. Correct?

199

A. That's what the letter says.

Q. Okay. So COI had already communicated their intent to claim the balance, correct, within 180 days of the loss?

A. That's what the letter says.

Q. Okay. And you wrote the letter?

A. Yeah.

Q. Okay. And what the letter says is correct?

A. Yes. In reference to what you just asked, yes.

Q. Okay. And on the following page, the first full paragraph states, "We previously communicated the policy includes ordinance or law increased cost of construction with a limit of insurance of $500,000, but this is a coverage extension of the policy and is not included in the Building Limit of Insurance." Correct?

A. Correct.

Q. As we just discussed, when we started going down this road with this letter; correct?

A. Correct.

Q. Okay. On the following page, you write Selective also wants to advise you of a potential

200

coverage issue under the policy, the policy contains the following condition, and it looks like you excerpt that the additional conditions are an additional condition of coinsurance; right?

A. Yes.

Q. Okay. You state, "Our initial evaluations did not indicate there was a coinsurance concern. However, as we have obtained additional estimates and further evaluated the repair costs, it appears that there might be a coinsurance issue." Do you see that?

A. Yes.

Q. You say, "Based on the building value of $9,244,293, COI will begin to incur a coinsurance penalty when the value of the building exceeds $10,271,437." Do you see that?

A. Yes.

Q. Okay. So what additional estimates have you obtained between your initial evaluation and this letter?

A. Since this letter has brought up I believe on page 1 of the letter, which was skipped over, there is a reference to also in October of 2023 we requested a summary review of the

201

differences of COI's estimate and our estimate.

So the additional information that we had requested based on the differences between the two estimates, that's additional information that we were looking for.

Q. Okay. Well, it doesn't say additional information. It says, however, as we have obtained additional estimates.

Were there other estimates that you obtained?

A. Where does it say additional estimates?

Q. It's on the second to last page of your letter.

A. So my reference to that would have probably been the different documents that COI presented in reference to the repairs to the building.

Q. Okay. But you understood at the time that COI had a reconstruction value of over 4.5 million dollars; correct?

A. Correct.

Q. Okay. You say based on the building value of $9,244,293. Where are you getting a building value of 9.2 million dollars?

**CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.**
**RONALD RUDOW**
**2/17/2026**

52 (Pages 202 to 205)

---

202

A.   Based on that, this looks as though I should have referenced it as the building limit of insurance.

Q.   Okay.  It then says -- your letter then states, "The Stephen Rankin Associates architectural proposal, dated July 19th, 2023, identifies a reconstruction area of approximately 22,800 square feet.  Selective believes the total square footage of the building is approximately 62,115 square feet.  Based on Selective's estimated outline above, the estimated cost to replace the building is $12,129,261."  Okay.

How do you calculate the $12,129,261?

A.   I believe that was in a previous letter that was provided to COI, letter or e-mail.  I'm not exactly sure which one without seeing it, but I believe that 12,129,261 was referenced in a prior communication.

Q.   Okay.  How did you arrive at that?

A.   I believe the prior communication outlines that.

Q.   Okay.  Do you understand from reading this document how you arrived at that figure?

---

203

A.   No.

Q.   Okay.  You then say, "Therefore, it appears that the building is underinsured.  This could impact the possibility for any further payments in relation to the Building portion of this loss including the Recoverable Depreciation."

It says, "Selective is continuing to evaluate this issue.  In the interim, Selective reserves all rights concerning the coinsurance condition.  Selective also continues to reserve all rights and defenses under the Policy and applicable law."  Do you see that?

A.   Yes.

Q.   Okay.  In fact, this is the first communication certainly in writing that you have made and given to COI with regard to coinsurance; correct?

A.   I would like to see the prior communication that references the 12 million.

Q.   Okay.  And this is April 15th, 2024, so that's about, what, ten months after the loss?

A.   Yeah, nine, somewhere between nine and ten.

Q.   Okay.  And you understand that COI was

---

204

making decisions during the interim on how they were going to reconstruct their building; correct?

A.   More than likely.

Q.   Well, you were kept in the loop; correct?

A.   Correct.

Q.   I mean, they were submitting estimates and invoices and you were paying on those; correct?

A.   Can you clarify estimates and invoices for what?

Q.   For reconstruction of the building.

A.   There were no invoices for reconstruction of the building.

Q.   Between -- between the date of loss and April 2024, there were no invoices?

A.   For reconstruction?

Q.   Yeah.

A.   Not that I'm aware of.

Q.   Okay.  It looks like -- and you'll correct me if I'm wrong -- that the basis of the position that you're asserting here for the reservation of rights is you've taken about a third of the building, right?  You did a square

---

205

foot analysis.  You said if you have a, you know, 4 million dollar cost to repair a third of the building, the RCV for the entire building is about 12 million dollars.  Is that a fair characterization?

A.   It's probably along the right lines.

Q.   Okay, okay.  And isn't it true that as of September 29th, you knew it was COI's position that the RCV for the third of the building was in excess of 4 and a half million dollars; correct?

A.   I did know back in September that that's what they had presented, yes.

Q.   Okay.  So applying the same analysis that you've -- that you're apparently applying in April of 2024, you could have done the same on September 29th, 2023 and arrived at the same conclusion that there was a coinsurance issue; correct?

A.   I think based on the approved values from Selective at the time, we were not close to that value in September of 2023 for me to do that evaluation.

Q.   Okay.  By the time you wrote this letter nine or ten months later, it turns out that COI's

---

Case: 1:25-cv-05131 Document #: 67-3 Filed: 04/09/26 Page 55 of 73 PageID #:1060

CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.
RONALD RUDOW                                                                    2/17/2026

53 (Pages 206 to 209)

206

position of 4.5 million dollars was accurate; correct?

A.   After months of additional information.

Q.   Okay.  So in retrospect, right.  You know, had you gone -- were to do this again, wouldn't you have issued a reservation of rights letter back on September 29th, 2023 to advise COI that there's a coinsurance issue?

A.   Possibly.

Q.   Well, not -- probably, for sure you would have, no?

MR. BANIAK:  Objection; argumentative.

THE WITNESS:  Possibly.

BY MR. GOLDWASSER:

Q.   Well, why wouldn't you have?

A.   The assessment that -- like I already answered, the assessments we had made did not constitute damages of 4 and a half million dollars in September.

Q.   But COI was telling you it was 4 and a half million dollars; correct?

A.   That's what they had presented, yes.

Q.   Okay.  So here they are, they presented 4 and a half million dollars, and you eventually

207

approved 4 and a half million dollars, and they're making decisions based on this, and now you tell them that they're facing a coinsurance penalty?

A.   Yes, that's what I'm stating.

Q.   Okay.  Let's go to Exhibit 52.

(WHEREUPON, Exhibit 52 was presented to the witness.)

BY MR. GOLDWASSER:

Q.   And just to -- so at the April 15th letter, you were merely stating that there was -- you weren't actually invoking a coinsurance penalty, you were just reserving your rights to do so; correct?

A.   Correct.

Q.   Okay.  So now let's look at Exhibit 52, and this is an e-mail from you to Jon again on August 19th, 2024.  You sent this letter, correct, or this e-mail --

A.   Yes.

Q.   -- to Jon?  Okay.  And attached to the e-mail was a letter dated the same date, August 19th, 2024; right?

A.   Correct.

Q.   And in this letter you assert -- you

208

actually invoke the coinsurance penalty; correct?

MS. JOSSERAND:  Rich, could you let us know what page you're on?

MR. GOLDWASSER:  I'm just talking generally for now.

BY MR. GOLDWASSER:

Q.   But let's go to Page 2.  Okay.  It's near the top.  I think it's the third paragraph, I suppose.  You write, "I sent a letter to you on April 15th, 2024 outlining many adjustment issues including in relation to the Building, specifically including the window repairs.  That April 15th, 2024 letter also identified a coinsurance issue based on COI's estimated cost of repairs."  Correct?

A.   Yes.

Q.   So the coinsurance issue was based on COI's estimated cost of repairs; correct?

A.   It looks like that's what I state here, yes.

Q.   Okay.  You then say, "We advised COI that it appears that the building was underinsured.  The window repair estimate submitted by COI highlights this issue."

209

You then go on to say, "As stated in our prior correspondence, we calculated a $12,129,261 Building value.  This was based on the following:  the approved Building Estimate for the east section of the building is $4,452,179.83."  Correct?

A.   Yes.

Q.   Okay.  That's A, and then you have a B, Stephen Rankin's architectural proposal identified the reconstruction area of 22,800 square feet; correct?

A.   Yes.

Q.   You then do math.  You divide the building estimate by the square footage and arrive at a figure of $195.27 per square foot; correct?

A.   Yes.

Q.   And you say the square foot of the -- total square footage of the building appears to be 62,115; correct?

A.   Yes.

Q.   You then multiply the $195.27 per square foot times the total square footage and arrive at a little over 12 million dollars; correct?

A.   Yes.

CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.
RONALD RUDOW 2/17/2026

54 (Pages 210 to 213)

210

Q. So you're simply taking the square footage of the reconstruction area, getting a square footage price and then applying that to the entire building; correct?

A. Correct.

Q. Okay. Do you think that's a proper basis to -- and this is for you to arrive at, what, the RCV?

A. Can you clarify?

Q. This 12 million dollars, is that the RCV for the building portion of the claim or the ACV of the building portion of the claim?

A. It's the RCV.

Q. Okay. And is there a calculation for the ACV portion of the building, a portion of the claim for the building?

A. Yeah.

Q. There is?

A. Yeah.

Q. Okay. So is this a proper basis to arrive at the RCV, by taking the square footage of the third of the building and essentially multiplying it by 3?

A. It's a reasonable one.

211

Q. What makes you think it's a reasonable one?

A. Because the rest of the building was constructed in the same fashion as the part that was damaged.

Q. Okay. And are there other ways to calculate the RCV?

A. Yes.

Q. And what are those?

A. You can do market value.

Q. Okay. What else?

A. I'm drawing a blank. I'm not recalling the other way to do that.

Q. Okay. The way you've chosen here -- and did you undertake a market value?

A. No.

Q. And why not?

A. Because the State of Illinois allows you to generate the value less depreciation to get both our replacement cost value and actual cost value.

Q. Okay. But it doesn't limit you to do that; correct?

A. I'd have to review the statute.

212

Q. Okay. But you said there were other ways?

A. There are other ways, yes.

Q. Did you explore those other ways?

A. No.

Q. And why not?

A. I previously already answered that as to Illinois allows for the development of the value based on RCV.

Q. Okay. But, as I think you stated, you don't know whether or not you're prohibited from valuing in another way; correct?

A. Without reviewing the statute, no.

Q. Okay. Doing it this way, by taking the -- basically tripling the estimate for the one-third of the building, you lose the economies of scale, don't you?

A. In a sense.

Q. I mean, if you're going to rebuild, you know, you're taking all this heavy machinery, you're doing this work for a third of the building, it's not necessarily the case that the same cost could be tripled to arrive at the total cost; correct?

213

A. It's possible.

Q. Okay. Did you do anything to investigate that possibility?

A. No.

Q. Okay. And why not?

A. Because the damages didn't consist of the entire building, so we're utilizing the information that's available to us.

Q. Okay. So you then state that the 4.4 million dollar approved estimate includes a window approval of $168,000, yada yada, and then you say below we calculate the impact of coinsurance based on different scenarios, right, and then you have three scenarios, one with a $682,000 penalty, one with a penalty of $1,076,000, and a third with a penalty of 1.6 million dollars and change; correct?

A. Yes.

Q. And then you say, "As you can see, it appears there's a significant coinsurance issue based on the approved repair costs." Correct?

A. Yes.

Q. And the repair costs were approved by you; correct?

55 (Pages 214 to 217)

214

A.   Yes.

Q.   And you say, "The amount of the coinsurance penalty simply increases if we accept COI's new window estimates."  Do you see that?

A.   Yes.

Q.   And you state, "Accordingly, it appears that COI has already been paid, has already been more than fully paid for the Building portion of this claim."  Correct?

A.   Correct.

Q.   Okay.  And then you say please note that Scenarios 1 through 3 could be calculated at actual cash value as well.

First scenario, it says the building insured the value correctly at ACV, no penalty; right?

A.   Correct.

Q.   And you're using a depreciation percentage of 20.26 percent; correct?

A.   Yes.

Q.   How do you arrive at that depreciation percentage?

A.   The letter indicates it was outlined in a previous communication.

215

Q.   Okay.  But you don't know sitting here today where you got that number?

A.   To remember it exactly, no.  I would reference the prior communication.

Q.   Okay.  Scenario 2 would mean that COI would make a claim to ACV and then take a 12 percent -- 12 to 13 percent penalty; correct?

A.   Yes.

Q.   Scenario 3, you arrive at a 21 to 22 percent penalty; is that right?

A.   Yes.

Q.   Okay.  Let's look at a February 28th, 2025 letter, which is Exhibit 62.

(WHEREUPON, Exhibit 62 was presented to the witness.)

MR. GOLDWASSER:  We'll go a little bit and then we'll take a break.  I want to save some time for Carrie.

BY MR. GOLDWASSER:

Q.   This is a letter that was sent, directed to me, from Dennis Dolan at Litchfield Cavo dated February 28th, and you are copied on it.  Do you see it?

A.   Yes.

216

Q.   Okay.  And I imagine you saw this letter before it went out?

A.   Probably.

Q.   Okay.  Before it went out, did you make any changes or corrections to the draft that was presented to you?

A.   I don't recall that.

Q.   Okay.  So you believe everything in here is correct?

A.   I would believe so, yes.

Q.   Okay.  I want to direct your attention to Page 5 of the letter.  It says, "Selective performed the ITV360 calculation early in the claim process.  A copy is included."  Do you see that?

A.   Yes.

Q.   And Mr. Dolan indicates that the calculation shows that although the building was properly insured from a coinsurance perspective, it was undervalued by approximately 1 million dollars.  Do you see that?

A.   Yes.

Q.   Do you understand what it means when he says it was properly insured from a coinsurance

217

perspective and then he says it was undervalued by approximately a million dollars?

A.   I'm -- since the attachment isn't included that's referenced in the line --

Q.   Uh-huh.

A.   -- one there, it's possible to have a building that is properly insured from a coinsurance evaluation but still be underinsured.

As we've talked about at the original -- at the onset, the initial value completed was over 10.1 million dollars.

Q.   Okay.  So -- at an RVC; correct?

A.   Correct.

Q.   Okay.  And -- but I'm just trying to understand what this statement means, that it was properly insured from a coinsurance perspective, but it was undervalued by a million dollars.

So is he saying at that point or is it your understanding that what he's saying is that there is no coinsurance issue?

A.   I believe his intent here is since he references the ITV360 that he includes that that's the calculation that shows at -- when it was completed at that time, based on facts known at

CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.
RONALD RUDOW
2/17/2026

56 (Pages 218 to 221)

218

that time, that from a coinsurance perspective it was okay.

Q. Okay.

A. But it doesn't mean that it's not undervalued by a million dollars.

Q. Okay. But it could still be undervalued by a million dollars without invoking a coinsurance issue; correct?

A. That's what it says.

Q. Okay. Because there's a 90 percent coinsurance figure; correct?

A. Correct.

Q. Okay. So then it says, "Please note that ITV360 is a tool used to generate estimates to get a general sense of the insured value and replacement costs. It is not based on the specific parameters of a building. It can be adjusted to address specific materials and other specifications, such as the windows and roof deck in COI's building." Correct?

A. Correct.

Q. Okay. He then says, "As this claim progressed, more specific information was developed (like the window claim) it became clear

219

that the building was significantly underinsured. It was at that point that Selective advised COI of the potential coinsurance problem." Do you see that?

A. I do.

Q. Okay. Mr. Dolan then says, "Selective is in the process of performing an updated analysis to try and determine a more precise estimate of the underinsurance and coinsurance penalty." Do you see that?

A. I do.

Q. Okay. Did Selective, in fact, perform an updated analysis?

A. To the best of my memory, I re-reviewed the information we've already covered and felt that it was accurate.

I would also continue to state that the last -- maybe not the last exhibit we looked at, only gave you scenarios in reference to windows, where there -- as it's referenced in this particular paragraph from counsel's firm is that there were other aspects of the building that came in much higher based on the materials identified than versus what comes back and, as Mr. Dolan

220

writes, it gets a general sense of the value but needs to be potentially adjusted to specific parameters of a building.

Q. I want to quickly call your attention, on the same page, under the paragraph Ninth.

A. Okay.

Q. It says, "Claim expenses, Selective has reviewed this further and will pay the $1,322.50 balance on this coverage." Do you see that?

A. Yeah.

Q. Has that been paid?

A. To the best of my knowledge, yes.

Q. Okay. And if it hasn't been paid, can we expect a check?

A. I don't see why not.

Q. Okay. Can you think of any reason why it would not have been paid?

A. No.

Q. Okay. Under Additional Costs, it says Selective has reviewed this further and will pay the $25,000 balance on this coverage. Do you know if that's been paid?

A. Again, to the best of my knowledge, I believe so.

221

Q. Okay. Do you know any reason why it would not have been paid?

A. No.

Q. Do you know any reason why it would have taken until February 28th, 2025 for Selective to complete its review of this portion or these portions of the claim and agree to issue payment?

A. I would ask to see a statement of loss to clarify what was incorporated into those two coverages.

Q. I want to direct your attention to the second page of this letter. Under the paragraph First, Mr. Dolan writes, "Many of these issues (including the ordinance and law coverage) were addressed in the February 11th, 2024 letter and our phone call the same day."

It says, "I sent an e-mail on February 23rd, 2025 concerning the discussion between the consultants as to the ordinance and law issue. Although that discussion has not yet taken place, it is still Selective's understanding that the ordinance COI cited to support the drain and sewer work applies to new construction and not existing structures like the COI building."

**CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.**
**RONALD RUDOW**
**2/17/2026**

57 (Pages 222 to 225)

222

Is this where you had a consultant, J.S. Held, perform an analysis for the ordinance and law coverage?

A. Yes.

Q. Okay. And they provided some report or communication that indicated that the specific building code sections only apply to new construction and not existing structures?

A. Again I don't think there was a formal report. I think it was discussions via phone and maybe some e-mail correspondence.

Q. Okay. Mr. Dolan then says, "As to the ordinance and law costs previously approved, the ordinance and law coverage is not owed until the work has been performed." Do you see that?

A. Yes.

Q. Okay. So it's your understanding that -- well, you know because you were the one who would have approved it -- that you approved ordinance and law coverage; correct?

A. Yes.

Q. Okay. And once that work has been done, that will be paid; is that correct?

A. That is how the form works.

223

Q. Okay. In the following paragraph, Mr. Dolan states, "In particular, Selective has addressed the underground plumbing work and the related architect and engineering proposals. Based on Selective's consultants' review, the damage to the pipes was not caused by this loss." Do you see that?

A. Yes.

Q. Okay. The consultant is JDH, is that correct, and Margaret Stanfield?

A. Yes.

Q. Okay. On the following page, the first full paragraph, Mr. Dolan writes, "Selective acknowledges that part of the slab was likely damaged during the collapse and some portion of the costs owed. However, Selective has only been provided estimates of the slab costs. It has not been provided any backup to support the scope of the work. Selective has not been provided the bid documents or slab repair plans or specifications. Please provide this backup documentation. In the absence of those documents, it is not possible to determine what costs are related to this loss." Do you see that?

224

A. Yes.

Q. Okay. Is it your position that more information is needed?

A. Based on my review of this and at the time this letter was written, yes.

Q. Okay. And -- but you acknowledge that an adjustment will be made upon receipt of additional documents?

A. I would agree to that.

Q. Okay. And the slab work, that's -- that excludes any coinsurance issue; am I correct?

A. Yes. Foundations and concrete slabs are not incorporated into a coinsurance valuation.

Q. Okay. On the following page, Fourth, under the paragraph Fourth, you say or Mr. Dolan says, "The value of the emergency services labor has been a moving target throughout the claim process. In February 2024, a representative from COI submitted a summary of their loss referenced as Claim Submission number 2."

He goes on to state that, "As we previously pointed out, COI's submission was for its entire payroll. COI represents that its entire work force was working on emergency service

225

tasks. This also does not appear to be accurate. Based on the income information supplied, COI did not suffer a significant if any dropoff in revenue during this time period. This indicates that COI did have staff working on production and not just emergency services." Do you see that?

A. Yes.

Q. Mr. Dolan then states, "Selective does not dispute that some employee time was used for emergency services. However, the claim appears overstated. Selective is open to a compromise on the issue." Do you see that?

A. Yes.

Q. So was it your determination based on review of income information that COI's labor force was also performing labor, production labor for their materials in addition to doing the emergency cleanup?

MR. BANIAK: I'm going to object to this one. I'm pretty sure this conclusion was formulated based on legal analysis subsequent to our involvement in the claim.

MR. GOLDWASSER: I asked him if he did it, and if his answer is no, then it's fine.

**CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.**
RONALD RUDOW
2/17/2026

58 (Pages 226 to 229)

226

MR. BANIAK: That's what I'm saying. I'm asserting that there is going to be work product privilege.

MR. GOLDWASSER: Okay.

THE WITNESS: To answer the question, no, I don't think -- I would not have been the one to be the person evaluating labor documents, records of that nature.

MR. GOLDWASSER: Okay.

BY MR. GOLDWASSER:

Q. Is this what you had the accounting firm do?

A. That's correct.

Q. Okay. So the accounting firm produced a report showing that COI's income stayed level, so they then inferred that the labor force had to have been manufacturing and fabricating steel?

A. I'd have to go back and review whether or not we actually received schedules and at what time frames, but the financial documents were provided by COI.

Q. Yeah, yeah.

A. Not -- and any schedules that were produced would have been based off the numbers

227

that COI presented, not that were developed by us.

Q. No, I understand that. I'm just -- I'm trying to figure out, it -- the position appears to be from this letter that COI's work force, their workers, were during this specific period of time for which a claim was made was not only doing emergency cleanup but was also fabricating steel, and that seems to be an argument or conclusion that the accounting firm or someone is inferring because the income stayed level, and I'm just trying to understand what the defense is here. Is that the argument?

MR. BANIAK: Objection. This calls for legal conclusion. That's a legal argument.

MR. GOLDWASSER: It's not a legal --

MR. BANIAK: This letter wasn't written by him.

MR. GOLDWASSER: I know, I know.

BY MR. GOLDWASSER:

Q. So I'm asking, is it your position, because you're approving or denying the claims, okay, that this denial or partial denial of the claim for emergency services is based on an inference that COI's employees continue to

228

fabricate steel during this period of time?

MR. BANIAK: Any conclusion that he would be reaching here would be based on conversations with counsel, so I'm going to object on a privilege basis and instruct him not to answer.

MR. GOLDWASSER: Okay. Let's take five minutes.

(WHEREUPON, a break was taken.)

BY MR. GOLDWASSER:

Q. Let's stay on -- we're back on the record, and we'll stay on the February 28th letter. What was it? Exhibit 52, I believe.

A. 62.

Q. 62. Okay. I want to direct your attention to Page 6 of the letter in which Mr. Dolan states, "Selective agrees that COI is entitled to the actual cash value of the original windows. However, as was discussed on February 11th and in Selective's prior correspondence, the amount claimed for the windows only highlights the coinsurance problem and the fact that the building was underinsured. Selective is in the process of calculating the

229

coinsurance penalty to determine what if anything is owed for the ACV of the windows." Do you see that?

A. Yes.

Q. And you agree with that, that putting aside the coinsurance issue, that COI is entitled to the actual cash value of the original windows?

A. I would agree. They are entitled to the actual cash value of like kind and quality materials.

Q. And your understanding is that COI obtained a proposal for the like kind of material windows of an amount of approximately $950,000; correct?

A. That number sounds about right.

Q. Okay. And to determine the actual cash value, there would have to be a depreciation figure applied; is that correct?

A. Correct.

Q. Okay. And what percent would you use as depreciation?

A. I don't know that off the top of my head.

Q. Okay. And the reason COI went out and

59 (Pages 230 to 233)

230

got a proposal for the windows was because you originally told COI that you didn't want to pay for the smaller double-paned aluminum windows but would agree to pay for the pre-loss windows; is that right?

A. I would not agree with that.

Q. Okay. What's your recollection of the discussion you had with COI with regard to the windows?

A. In one of the prior communications, I believe in our approved estimate, we approved the windows that were double-paned for 168,000. Those were within our approved estimate that we provided.

Q. Okay.

A. So I don't agree with us saying that we would not.

Q. Okay. If you could turn to Exhibit 61.

(WHEREUPON, Exhibit 61 was presented to the witness.)

BY MR. GOLDWASSER:

Q. It's a letter from me to Mr. Dolan and Mr. Baniak dated February 20th. Did you receive a copy of this letter?

231

A. Yes, I believe so.

Q. Okay. I want to direct your attention to Page 7.

A. Of the letter or of the exhibit?

Q. Of the letter, Page 7 of the letter. About the middle of the page, in the section, sentence that begins Eleventh, I write, "We have yet to receive from Selective a statement about which coverages under the ElitePac and the policy in general apply to this loss and which payments are being assigned to which category of coverage." I write the Current Status, "during our call, you agreed that Selective would provide the requested statement. Please advise when we can expect it."

Then we received the letter in Exhibit 2 -- Exhibit 62, and I would direct your attention to Page 6. This is in the letter from Mr. Dolan to me in response under paragraph Eleventh.

Mr. Dolan says, "During our call, we referred you to the statement of loss, which provides a comprehensive statement of what has been paid and what has been approved for payment.

232

You asserted it was not sufficient. We stated we would look into it further, but invited COI to point out what coverage it believes has not been paid or overlooked. Please advise. Selective is continuing to evaluate as well." Do you see that?

A. I do.

Q. You received a copy of this letter from Mr. Dolan, you were cc'd on it; correct?

A. Correct.

Q. What, if anything, has Selective done to continue to evaluate that request?

A. I believe I re-reviewed the coverages that I outlined on the statement of loss and felt that those were the ones that were applicable.

Q. Okay. And so is it -- is it Selective's position that no further documentation in this regard will be forthcoming?

A. I don't -- I don't see any other avenues that we need to make COI aware of.

Q. Okay. So the answer to my question was, that is that we should not expect any further documentation from Selective; correct?

A. Correct.

Q. Okay. I am going to hand these out.

233

We'll call this 90. This is going to be Rudow Exhibit 90.

(WHEREUPON, Exhibit 90 was marked for identification.)

MR. BANIAK: While we're talking exhibit numbers, I have a couple Post-Its on 85 and 83. Were those intentionally blank or --

MR. GOLDWASSER: Yeah.

MR. BANIAK: Okay. Just making sure.

BY MR. GOLDWASSER:

Q. So what we marked as Deposition Exhibit 90 is Defendant Selective Insurance Company of America's Answer and Affirmative Defenses to Plaintiffs' Complaint, and you participated in the preparation of this answer; correct?

A. Correct.

Q. If you could turn to Paragraph 78, the allegation is that on February 28th, 2025, pursuant to plaintiffs' earlier request, Selective sent plaintiffs a letter disclosing for the first time the replacement cost appraisal for the building, which Selective prepared on July 7th, 2023, five days after the catastrophic roof

CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.
RONALD RUDOW
2/17/2026

60 (Pages 234 to 237)

234

collapse. A copy of the February 28th, 2025 letter is attached as Exhibit U.

In its letter, Selective admitted that its appraisal showed that the building was properly insured from a coinsurance perspective. Meanwhile, Selective had withheld its replacement cost appraisal and told plaintiffs that their recovery would be limited under the policy's coinsurance provision which Selective's own valuation showed was patently false. Okay.

The answer here is that Selective admit only that on February 28th, 2025, Selective sent plaintiffs a letter disclosing the replacement cost for the building, that Exhibit U appears to be Selective's February 28th, 2025 letter, and that the letter contains the quoted language. Selective denies all characterizations, assertions, and accusations contained therein, as well as the remaining allegations contained in Paragraph 78.

Did I read that correctly?

A. It appears that way.

Q. Okay. So I want to take this sentence by sentence. It states on February 28th, pursuant

235

to plaintiffs' earlier request, Selective sent plaintiffs a letter disclosing for the first time the replacement cost appraisal for the building, which Selective prepared on July 7th, 2023, five days after the catastrophic roof collapse.

Is that a true statement?

MR. BANIAK: I'm going to object to any questions about our answer to this since it was -- this answer was created in discussions with Mr. Rudow but it involves attorney/client communications as well as work product.

If you're asking him if the allegations are true, the answer to that question is our answer.

MR. GOLDWASSER: I'm asking about an allegation in a complaint to which was answered. I'm entitled to ask him about it.

MR. BANIAK: You have an answer.

MR. GOLDWASSER: Well, I don't have to accept that answer. I could delve into the allegation.

BY MR. GOLDWASSER:

Q. Is that a true statement? Is the first sentence a true statement?

236

MR. BANIAK: I'm going to make a continuing objection here.

THE WITNESS: I believe so.

MR. GOLDWASSER: Okay.

BY MR. GOLDWASSER:

Q. I want to ask you about the sentence that says, "In its letter Selective admitted that" -- I'm going to skip that.

Let's go on to the sentence "Meanwhile, Selective had withheld its replacement cost appraisal and told plaintiffs that recovery would be limited under the policy's coinsurance provision which Selective's own valuation showed was patently false." Okay. Is that a true statement?

MR. BANIAK: Same objection.

THE WITNESS: I would -- I would answer and say that the -- that we had not provided the report that's referenced in the February 28th, 2025 letter until then.

MR. GOLDWASSER: Okay.

BY MR. GOLDWASSER:

Q. And it's true that Selective's own valuation showed that there was no basis for the

237

coinsurance provision; correct?

MR. BANIAK: Objection to characterization.

THE WITNESS: Based on the report being completed July 7th, 2023, at that time, no.

BY MR. GOLDWASSER:

Q. So I just want to make a -- so when we read the sentence as a whole, meanwhile, Selective had withheld its replacement cost appraisal and told plaintiffs that their recovery would be limited under the policy's coinsurance provision which Selective's own valuation showed was patently false, that's a true statement; correct?

MR. BANIAK: Objection; asked and answered. Don't answer that. You've already answered.

MR. GOLDWASSER: Are you directing him not to answer?

MR. BANIAK: Yes. He already has answered.

MR. GOLDWASSER: No, he hasn't.

MR. BANIAK: He did. You broke the sentence into pieces and he answered both parts.

MR. GOLDWASSER: It's a yes or no.

CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.
RONALD RUDOW
2/17/2026

61 (Pages 238 to 241)

238

BY MR. GOLDWASSER:

Q. Is that a true statement?

MR. BANIAK: I'm sorry, Rich. He already answered that question.

BY MR. GOLDWASSER:

Q. Is that a true statement?

MR. BANIAK: I direct him not to answer.

MR. GOLDWASSER: Okay.

BY MR. GOLDWASSER:

Q. Is there anything incorrect about that statement?

MR. BANIAK: It's the same question. Same objection, same instruction.

BY MR. GOLDWASSER:

Q. Tell me what's incorrect about that statement.

MR. BANIAK: Same question, same objection, same instruction. Don't answer.

MR. GOLDWASSER: Okay. That's -- wow. Okay.

BY MR. GOLDWASSER:

Q. Let's look at the allegation in Paragraph 79, okay. It says, "Selective's own replacement cost appraisal, prepared by its

239

Executive Adjuster, Ronald Rudow, five days after the loss, estimated the replacement cost for the building was $10,161,303.78. With a 90 percent coinsurance calculation, as set forth in the policy, the coinsurance amount based on Selective's valuation was $9,145,173.40. That amount is less than the $9,244,293 amount of coverage limits plaintiffs obtained for the building." Do you see that?

A. Yes.

Q. Okay. And the answer is Selective denies the allegations contained in Paragraph 79. Okay.

I'm going to ask you for the first sentence, isn't that a true statement?

A. Yes, the first sentence is correct.

Q. Okay. And, likewise, the second sentence is correct?

A. I will trust your math and say that is correct.

Q. Okay. And how about the third sentence? The third sentence is correct, too, correct?

A. Yes.

Q. Let's look at 81, the allegation in 81.

240

It says, "Despite plaintiffs' requests, Selective has failed and refused to provide the replacement cost valuation Selective calculated prior to issuing the policy." Do you see that?

A. Yes.

Q. And that's -- that's a denial here, selective denies the allegations contained in Paragraph 81, but isn't that a true statement?

A. I don't know if I know that answer without some clarity as to -- and maybe some recollection as to the valuation prior to issuing a policy.

Q. Okay. Well, we've gone through some exhibits early in the deposition referencing valuations, correct, replacement cost valuations; correct?

A. Correct.

Q. Okay. Were those provided to COI?

A. I'll need you to clarify which ones, because we've talked about multiple.

Q. Any. Any valuation that was performed before the policy was issued, was any of those valuations provided to COI?

A. Prior to the issuing of the policy?

241

Q. Correct. The valuations performed prior to issuing the policy, have those been provided at the time of this complaint to COI?

A. I believe they have been provided --

Q. Okay.

A. -- prior to this complaint in May of '25.

Q. Okay. The complaint was filed April of '25, but fair enough. And you believe that the valuations had been provided?

A. Prior to April of '25?

Q. Yeah.

A. I believe so.

Q. Okay. Let's look at 82. "In short, less than a week after the loss, Selective (a) determined that plaintiffs had purchased appropriate coverage limits for the building and that the policy's coinsurance provision would not limit plaintiffs' recovery but (b) withheld the valuation, and (c) then informed plaintiffs that they their recovery would be limited by the coinsurance provision." Isn't that a true statement?

MR. BANIAK: Object to form, compound.

**242**

THE WITNESS: I would agree that it's a true statement for (b) and (c) within allegation 82. I would not agree that to (a).

BY MR. GOLDWASSER:

Q. What's wrong about (a)?

A. The assessment of coinsurance is an ongoing process, as we've previously covered.

Q. Okay. But certainly shortly after the loss event in July 2023, Selective had determined at that point that plaintiffs had purchased appropriate coverage limits for the building; correct?

A. The initial evaluation completed shows -- shows that the 10.1 million, which I believe you're referencing, appeared adequate from a coinsurance perspective, but again it's an ongoing evaluation.

Q. Okay. Let's look at Paragraph 105. COI alleges that plaintiffs performed the material obligations under the policy, includes paying for all premiums. Do you see that?

A. Yes.

Q. And then the answer is that Selective admits that plaintiffs paid insurance policy

**243**

premiums under the policy. Selective denies all remaining allegations contained in Paragraph 105. Okay.

What material obligations did COI not perform?

MR. BANIAK: I'll object to this to the extent that the answer requires him to recall conversations with counsel.

But if you can answer that question independent of any conversations you had with Dennis or me, go ahead, or any legal counsel.

THE WITNESS: I don't necessarily recall at this moment what any other material obligations would have been.

MR. GOLDWASSER: Okay.

BY MR. GOLDWASSER:

Q. Let's look at Paragraph 134. I'll read it. It says, "By way of example, although COI's Peddinghaus machine was significantly diminished to the point that it needs to be replaced and has as a replacement value in excess of 1.8 million dollars, Selective continued to charge and receive from plaintiffs premiums for coverage of the Peddinghaus machine. Similarly, Selective

**244**

continued to charge and receive from plaintiffs premiums for coverage for the building commensurate with its prior value as if there was no loss." Do you see that?

A. Yes.

Q. And the answer, Selective admits that it continued to charge and receive from plaintiffs premiums for coverage for the building. You then state that Selective denies all remaining allegations in Paragraph 134; correct?

MR. BANIAK: Objection. He didn't state that.

BY MR. GOLDWASSER:

Q. Selective's answer states that; correct?

A. That is what the page says.

Q. Okay. So the first -- it seems to be that Selective is denying that it charged premiums to insure the Peddinghaus machine; is that correct?

A. To the best of my knowledge, based on this response, yes.

Q. What I'm trying to find out is if Selective continued to charge premiums to insure the Peddinghaus machine.

**245**

A. I would answer and say that if it's still in the policy, then yes.

Q. Okay. And so would you agree that at least the building does not have the same value today as it did prior to the loss?

A. Today?

Q. Yeah.

A. I don't know that I can answer that question.

Q. Okay. You think the building is worth today what it was prior to the loss or more?

A. As of today?

Q. Yeah.

A. I don't know what condition the building is in.

Q. Okay. Let's look at Paragraph 57. Paragraph 57 states -- let me know when you get there.

A. Okay.

Q. "Neither Rudow or anyone else at Selective disclosed that Selective had previously completed a replacement cost appraisal for the building in the amount of $10,161,303.78 five days after the roof collapsed." Okay. That's a true

63 (Pages 246 to 249)

246

statement; correct?

A. Yes.

Q. Okay. It then says, "With a 90 percent coinsurance calculation, as set forth in the policy, the relevant coinsurance calculation based on Selective's replacement cost appraisal was $9,145,173.40 less than the coverage limits purchased by plaintiffs." That's a correct statement; am I right?

A. Again I will trust your math, and I believe so.

Q. Okay. And the last sentence in that paragraph states, "Based on Selective's replacement cost appraisal, no coinsurance limit or penalty applies, and plaintiffs are entitled to recover for the full extent of their losses." That's a true statement; correct?

A. I would not agree, no.

Q. Okay. And what's the basis for your disagreement?

A. As I previously answered, the coinsurance evaluation is an ongoing process.

Q. Okay. Fair enough. But the allegation here says based on Selective's replacement cost

247

appraisal. Okay. So if we're basing it on Selective's replacement cost appraisal, no coinsurance limit or penalty applies and plaintiffs are entitled to recover for the full extent of their losses; correct?

A. That's what it says.

Q. Okay. But it's true? It's a true statement?

A. I will again answer and say that the coinsurance evaluation is an going process.

Q. I understand that's your statement and that's your position. It's a fair enough position to take. I'm trying to get an answer to the allegation. Okay.

MR. BANIAK: Just to be clear, I think -- I'm not trying to interrupt. I think he did give you an answer to the allegation.

I think if you want to ask him a different question, like if you want to change it so it says based on Selective's cost appraisal done five days after the loss.

MR. GOLDWASSER: Fair enough.

MR. BANIAK: I think that was the disconnect.

248

MR. GOLDWASSER: I'll take the help.

BY MR. GOLDWASSER:

Q. Based on Selective's cost appraisal in the amount of $10,161,303,.78, no coinsurance limit or penalty applies and plaintiffs are entitled to recover for the full extent of their losses, that's a true statement; correct?

A. Five days after the loss?

Q. Yes.

A. Then yes.

Q. Okay. Let's go to your affirmative defenses, which are attached to an answer on Page 39 of the answer.

MR. BANIAK: I'll represent just for the record that Mr. Rudow didn't have a hand in drafting these.

MR. GOLDWASSER: Okay. I presume not.

MR. BANIAK: Yeah.

MR. GOLDWASSER: Okay.

BY MR. GOLDWASSER:

Q. Mr. Rudow, I understand you didn't have a hand in drafting any of these affirmative defenses, but I'd like to know if you have any information or knowledge with respect to any of

249

them. Okay.

Do you have any knowledge as to whether or not the plaintiffs either mitigated or failed to mitigate their claimed damages?

MR. BANIAK: Objection; calls for a legal conclusion. Actually, withdraw.

THE WITNESS: Can you tell me which one you're reading?

MR. GOLDWASSER: Paragraph 4.

THE WITNESS: And can you restate your question?

MR. GOLDWASSER: Yeah.

BY MR. GOLDWASSER:

Q. Do you have any knowledge or information that would show whether or not plaintiffs either mitigated their claimed damages or failed to mitigate their claimed damages?

A. No.

Q. You don't have any information, I presume, as to whether or not plaintiffs' claims are barred by the doctrine of waiver, estoppel, laches or unclean hands; correct?

A. I don't have any other information to provide.

**CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.**
**RONALD RUDOW**                                                      **2/17/2026**

---

250

Q.   Okay.

MR. GOLDWASSER:  Give me five minutes and then I'll wrap up and I can hand it over to Carrie.

MR. BANIAK:  Okay.

(WHEREUPON, a break was taken.)

MR. GOLDWASSER:  Back on the record.

BY MR. GOLDWASSER:

Q.   In referencing Exhibit 1, which is the policy.  Mr. Rudow, I'd ask you if you could turn to the Systems Power Pac coverage endorsement, which follows the Building Coverage form, comes after Business Income.  It's 1 of 6.

MR. BANIAK:  There you go.

MR. GOLDWASSER:  There you go.  Okay.

BY MR. GOLDWASSER:

Q.   So this is additional coverage that Selective is providing COI; correct?

A.   Yes.

Q.   Okay.  And Section 1A shows Additional Coverage - Equipment Breakdown.  Do you see that?

A.   Yes.

Q.   Okay.  And the term Covered Cause of Loss includes the Additional Coverage Equipment

---

251

Breakdown as described in limited below.

It says we will pay for direct physical damage to covered property that is the direct result of an accident; as used in this additional coverage, accident means a fortuitous event that causes direct physical damage to covered equipment; the event must be one of the following, includes A, mechanical breakdown; B, artificially generated electrical, magnetic or electromagnetic energy, including electric arcing, that damages, disturbs, disrupts or otherwise interferes with any electrical or electronic wire, device, appliance, system or network.

Do you see that?

A.   Yes.

Q.   Okay.  In adjusting this loss, did you consider this endorsement?

A.   Yes.

Q.   Okay.  And do you believe that this endorsement applies?

A.   No.

Q.   And why not?

A.   Because the cause of the loss is the weight of the water on the roof.

---

252

Q.   The cause of the loss is the weight of the water on the roof.  Okay.  So it's not the direct result of an accident?

A.   The damages are a direct result of the water failing to get off of the roof.  That's the cause.

Q.   Okay.  It says as used in this Additional Coverage, accident means a fortuitous event that causes direct physical damage to covered equipment.

Was this rainstorm not a fortuitous event that caused direct physical damage to covered equipment?

A.   Yeah, it's a fortuitous event.

Q.   Okay.  And -- but as used in this endorsement, it was an accident; correct?

A.   Based on how it is defined, yeah, it's an accident, fortuitous event.

Q.   Okay.  And so would you agree with me that the equipment lost, including the Peddinghaus machine, the LS Blaster, these other equipment, welders, were covered equipment; right?  They're covered equipment?

A.   We've already acknowledged that a long

---

253

time ago.

Q.   Okay.  So there was an accident as used in this endorsement and there was covered equipment.  And wouldn't you agree with me that the accident caused the damage to the covered equipment?

A.   No.

Q.   Okay.  What was the cause to the damage of the covered equipment?

A.   I mean, the damages are from water.

Q.   Okay.  I understand that.  But the water was the result of an accident; correct?

A.   I mean, the policy covers special causes of loss, which I assume you understand since we're talking about this endorsement.  All of that equipment is already covered under the BPP limit.

Q.   Okay.  But it is additional coverage; correct?

A.   It is additional coverage.

Q.   Okay.  And under this endorsement, COI is entitled to expediting expenses; correct?

A.   That is a coverage listed on the form, yeah.

Q.   Okay.  And it says with respect to your

---

**CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.**
RONALD RUDOW
2/17/2026

65 (Pages 254 to 257)

254

damaged Covered Property, we will pay the reasonable extra cause to 1, make temporary repairs; correct? 2, expedite permanent repairs or permanent replacement; correct?

A. That's what it says.

Q. Okay. It then says the most we will pay for loss or expense under this coverage is $250,000 unless otherwise shown in a schedule; correct?

A. That's also what it says.

Q. Okay. So you would agree with me, then, that Selective should adjust the claim for damage to covered equipment under this endorsement; correct?

A. No.

Q. Okay. And why not? What am I missing?

A. I don't -- I don't believe that it fits the qualification under B that you've previously read.

Q. Artificially generated electrical, magnetic or electromagnetic energy, including electric arcing, that damages, disturbs, disrupts or otherwise interferes with any electrical or electronic wire, device, appliance, system or

255

network, isn't that what happened to the welders, to the Peddinghaus Machine, to the LS Blaster?

A. I mean, again we've already paid for all those items.

Q. Okay. But in addition, there's additional coverage that's available; right? I mean, that's the whole point of getting this endorsement.

A. So -- but if they've already been paid for, why would you need this endorsement?

Q. Because it was -- there's a premium charged for this endorsement, and it provides additional coverage such as making temporary repairs and expediting permanent repairs or permanent replacement. Okay.

It says the most we will pay for loss or expense under this coverage is $250,000, unless otherwise shown in a schedule.

So you would agree with me that this endorsement applies; correct?

A. No.

Q. Okay. If you take a look at Page 4 of the endorsement, it talks about covered equipment. It defines covered equipment as covered property

256

that generates, transmits or utilizes energy. Don't all those pieces of equipment utilize energy?

A. Yeah.

Q. Okay. Are there any notes in your claim notes that refer to your review of available coverage under this endorsement?

A. I would have to review them all to know.

Q. Okay. Now if you had reviewed it, right, and made a determination that it doesn't apply for some reason, we would expect that to be in your claim notes; correct?

A. No.

Q. No. Okay. So you review and cover -- you review policy endorsements, decide that they're not applicable and don't include those in your claim notes?

A. I think it's unreasonable to document every coverage within this Exhibit 1 as to whether or not it applies or doesn't apply in every aspect of every claim.

Q. Okay.

MR. GOLDWASSER: That's all I have. I'll turn it over to Carrie if there's anything

257

left.

MS. JOSSERAND: Are we on 91?

MR. GOLDWASSER: Yeah.

MS. JOSSERAND: Okay.

(WHEREUPON, Exhibit 91 marked for identification.)

CROSS-EXAMINATION

BY MS. JOSSERAND:

Q. So I'm going to -- let me introduce myself. I'm Carrie Josserand. We've been sitting here all day, but I'm one of the attorneys for Assured Partners of Illinois, the broker.

A. Okay.

Q. I have handed you a document that is discovery responses. My understanding is you were involved with responding to discovery in this case on behalf of Selective?

A. Correct.

Q. And I'm going to call your attention to request for production Number 9. This would be -- the requests for production I'm showing you would be where my client has asked your client for documents.

So we're going to see there produce

66 (Pages 258 to 261)

258

all documents relating to any inspection, valuation, or appraisal that Selective or its agents conducted of the insured building after the policy was issued or renewed. Do you see that?

A. I do.

Q. Okay. I'm going to go over some valuations that you've identified today and see if you can help me find them and figure out whether they've been produced. Okay?

A. Okay.

Q. Let's go first to -- we can go back to what was marked as Exhibit 4. It should be -- the first page is an e-mail from Carlee Edrington July 6, 2023.

A. Yes.

Q. Are you there? Okay. Let's start earlier in the e-mails, to the page that says Selective 1081. You had already talked about that with plaintiffs' counsel, about that e-mail.

A. Okay.

Q. Are you there? Okay. In that e-mail, you mention -- you're asking about the building valuation and why it had changed. Why were you questioning that?

259

A. Could I just be clear and reference that it's -- in reference to the 8 million 888?

Q. Yes.

A. At this stage of the claim, when I wrote this e-mail on July 6th of 2023, I would have been looking for as much information as possible as to how limits of insurance were generated and what we did and did not know potentially in reference to the property.

Q. Okay. So there's some responses, and then going up there is a response from Carlee Edrington, who appears is an underwriter; is that correct?

A. Yes, it appears that way.

Q. And do you see Carlee's e-mail on July 6 at 10:39 a.m.?

A. Yes.

Q. And in that e-mail, you're discussing that Assured Partners had told you that they want to increase the coverage based on their estimations that they ran. Is that your understanding?

A. When you say their, are you referencing Assured Partners?

260

Q. Yes, yes.

A. Yes, that's how I interpret that.

Q. And you're asking if Carlee had a copy of that report, that estimation?

A. In --

Q. In the prior or in your prior -- or she's responding that she doesn't have a copy of that report; is that correct?

A. Correct. That's my understanding.

Q. And she says and we were okay with the limit since ISO 360 was saying it was at 143 percent?

A. Correct.

Q. So does that mean at the time that this policy renewed for this policy period prior to December of 2022 Selective would have ran its own value estimation prior to renewal?

A. It's -- based on this e-mail, it's certainly possible that --

Q. Well, she's referencing ISO 360. Isn't that the program that Selective uses to estimate values?

A. That is correct.

Q. So there was an estimation done prior to

261

this policy period that estimated the value of this building?

A. Based on the context here, I don't know if that was before it was renewed.

Q. All right. But it was performed at some time or point? There is -- ISO 360 was saying that it was 143 percent ITV?

A. Yes, I would agree that at some point it was done.

Q. So that valuation would exist somewhere in Selective's control; correct?

A. I would have to agree.

Q. Okay. So that's the first one that we need to get, right, that hasn't been produced to us. Okay.

So let's move on to the next -- the next newest e-mail in this string, and here you are responding to Carlee and discussing in November 2022 survey from Safety Management. Do you see where I'm talking about there?

A. Yes, I do.

Q. Is Safety Management within Selective? Is that a department within Selective?

A. Correct.

67 (Pages 262 to 265)

262

Q.   And so they completed an ITV showing the valuation of almost 12 million dollars, creating a 32 percent variance.  Do you see that?

A.   Yes, I do.

Q.   So that is a document that you were able to reference when you were looking at this claim and value for this building?

A.   Yes, I believe so.

Q.   So that's our second valuation that hasn't been produced that we need to get produced in this discovery, isn't it?

MS. JOSSERAND:  Is that something we can provide?

MR. BANIAK:  I'll just go on record, I'm not sure that it hasn't been produced.  I can't look for it.  I looked for it yesterday after Rich sent an e-mail asking for these.  I'll look again, and if it does exist I'll grab it.

MS. JOSSERAND:  I will tell you, I've looked for these and I haven't seen them, too.

MR. BANIAK:  Yeah, yeah.

MS. JOSSERAND:  So if it exists, they're hidden.  So can we look for that one?

MR. BANIAK:  Yeah.

263

MS. JOSSERAND:  Okay.  So that's Number 2.

BY MS. JOSSERAND:

Q.   And then there seems to be -- if you go up to the most -- the newest entry in this e-mail stream, Carlee is responding to you on Thursday, July 6, 2023, do you see that, at 12:24?

A.   Yes.

Q.   And she says, I just ran the replacement cost right now and it is saying we're still at 111 ITV.

Do we have Carlee's version of the replacement cost that she ran on July 6?

A.   Again I can only -- I do see up in the e-mail that there is what appears to be an attachment.  I don't know --

Q.   Okay.  I will tell you, it's not attached to this e-mail.  So that's Number 3.  Okay.

MS. JOSSERAND:  Can we get that?

MR. BANIAK:  Uh-huh.

BY MS. JOSSERAND:

Q.   You also discuss in 2024 that you did both a -- you did analysis sometime in 2024 using

264

the program, using the 360 program, ISO 360.  You didn't remember the dates of that.  Do you remember that testimony earlier today, that you performed additional valuations?

A.   I do remember -- I do remember testifying to that.  I don't recall that I was using -- that I referenced ISO 360.

Q.   Okay.  We can go back and look at it, but we had a discussion and you were asked where those would be, and you said they would be in the program.  But that would be something you could retrieve and produce in this case, isn't it?

A.   If it's within ISO 360, then it can be produced.

Q.   Okay.

MS. JOSSERAND:  Could I make a -- could we go through and find all of the valuations that were done in this property and when they were done?

MR. BANIAK:  Sure.

BY MS. JOSSERAND:

Q.   So it looks from these files that when this last renewal came through, Selective took a look at this and did their own valuation.  There

265

was one prior renewal that would have been at the beginning of the prior year policy period, which would have been '21 to '22.  Do you -- would Selective have gone through -- gone in and made its own valuation then?  Do you know if that's their normal course of business?

A.   I don't know what underwriting's protocol is other than the brief snippet that you can see in the exhibit you've pointed out.

Q.   So that would be something we'd need to ask underwriting?

A.   I would -- yes.  I would agree that that's a protocol that they would have instituted.

Q.   And what about when the policy was -- when this building was purchased and brought under plaintiffs' policy, so it's new coverage?  Would that also be underwriting who would do that analysis?

A.   It is possible that they would have done something.

Q.   Okay.  And you don't have any knowledge of whether that was done?

A.   Not here today, no.

MS. JOSSERAND:  Can I ask -- can I ask

**CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.**
**RONALD RUDOW**
**2/17/2026**

68 (Pages 266 to 269)

266

you to look to see if there was any valuations that were done at those times?

MR. BANIAK: I will.

MS. JOSSERAND: Okay.

MR. BANIAK: Yeah, I'll ask underwriting and I'll see if there's anything in the file that we didn't produce. I don't think there is. So I'll ask again.

MS. JOSSERAND: Let's see if I have anything else on this.

BY MS. JOSSERAND:

Q. You also talked about guidelines, Selective's guidelines for a claim, for how you process claims. Does that document have a name?

A. No.

Q. It's just called --

A. I think it's just -- I think we just refer to it as our claims guidelines.

Q. Okay. And are you aware whether that document has been produced?

A. I'm not aware.

Q. Do the guidelines speak to how Selective adjusters are to value property for evaluating losses?

267

A. I believe it references that we're to use the ISO 360 system.

Q. Okay. Do they reference how coinsurance provisions are applied?

A. I don't believe so.

Q. Does it reference how valuations are calculated for purposes of coinsurance application?

A. I don't believe so.

Q. What about your authority to deviate from the ISO 360? You testified earlier that you had the authority to do that. Is that set out in the guidelines?

A. I'd have to review that to determine that, but --

Q. Where do you -- if it's not in the guidelines, where do you -- and you just told me that the guidelines, that you use ISO 360. Where did you come up with the idea that you have the authority to deviate?

A. Because the language of the policy says that we owe for like kind and quality materials as what they had at the time of the loss, and if the ISO 360 program doesn't provide that quality of

268

the material, then that would constitute why we would have to make variations.

Q. And when you made the determination that ISO 360 valuation no longer accurately reflected the quality and material of the actual value, did you consult anyone else within your organization or outside the organization in making that decision?

A. I'm confident that there would have been some sort of discussion with my director at the time.

Q. And who was that?

A. Carl Walton.

Q. Okay. And beyond that, did the two of you have any discussions with any construction experts or evaluation experts or any of the consultants that you had employed in this case to make that determination?

A. We did have our building consultant reviewing the information that was presented as far as ensuring what was being quoted was a like kind and quality material in order to validate a cost for that.

Q. Which consultant are you referencing?

269

A. That would have been JDH Incorporated.

Q. JDH. Is there a -- do you have any documents in which you retained their services for this particular claim that sets out the scope of their -- what they were going to provide?

A. There might be an initial e-mail that I had sent to them that would have included like some basic information about the file.

I don't know that I would have written in that e-mail exactly what I was expecting from it. It might have been an evolving process as the claim moved forward.

Q. And to whom at JDH would that e-mail have been addressed?

A. It would have been to either Margaret Stanfield who worked the file. I also do know they have like a -- for lack of a better term, like a general inbox where everything can go to, so that way in case they're out in the field and whatnot, that would --

Q. Like an intake?

A. Correct.

Q. Yeah. And you would have been the one to send that e-mail?

CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.
RONALD RUDOW
2/17/2026

69 (Pages 270 to 273)

270

A.   Correct.

Q.   Do you know if -- do you happen to know if that e-mail has been produced?

A.   If there was one that outlined any of that information, I would assume it would have been in the file and produced.

Q.   And going -- I'm sorry, I'm trying not to cover the same things that have already been covered, so I apologize if I'm jumping around.

Did you have any discussions with JDH when you made the determination I'm no longer using the estimator, I'm using these numbers to determine the value?

A.   Did I have a direct discussion with them that I was doing that?

Q.   Yes, yes, about that decision.

A.   I don't a hundred percent recall that other than it might have been referenced that we're reviewing this information in order to appropriately determine the value.

Q.   Okay.

MS. JOSSERAND:  Did I ask if we could get the guidelines?

MR. BANIAK:  I don't think so.

271

MS. JOSSERAND:  Can we get the guidelines?  Is there a reason why we haven't been provided the guidelines if they providing guidance on how to value these claims?

MR. BANIAK:  I don't know that they've been requested.  I'd have to go back --

MS. JOSSERAND:  I'm pretty sure they have been requested.

MR. BANIAK:  I don't think they've been produced.

MR. GOLDWASSER:  They haven't been produced.

MS. JOSSERAND:  I'm pretty sure they've been requested.

MR. GOLDWASSER:  We'll have to follow up.

MS. JOSSERAND:  Yeah.

MR. BANIAK:  Okay.

BY MS. JOSSERAND:

Q.   So Selective typically uses -- its first recourse is a software estimator to figure out the -- what the -- predict what the construction costs will be and assign a value based on that; is that correct?

272

A.   Correct.  It's a tool to help us, yes.

Q.   And that tool will calculate I believe you said both the ACV and the RCV?

A.   Correct.

Q.   All right.  Are you familiar with other programs or softwares that do the same thing?

A.   Yes.

Q.   Are you familiar with the CoreLogic program?

A.   Yes.

Q.   Are you aware of any fundamental differences between CoreLogic and ISO 360?

A.   I would assume that there have to be differences.  What they are exactly, I don't know.

Q.   All right.  You earlier talked about that you would report to the broker, Assured Partners -- Corkill I think was their former name -- from time to time.  Do you recall who you dealt with at Assured Partners?

A.   I believe it was Todd Jones.

Q.   And can you characterize what your dealings with Todd were in general?

A.   He would typically just reach out to ask for status updates as what was going on.

273

Q.   Did you ever have any discussions with Mr. Jones or anyone else at Assured Partners about the valuation at the building?

A.   I mean, it's possible, but without -- without reading through the entirety of the log notes, I don't know.

Q.   Do you recall ever having a discussion with them about coinsurance concerns?

A.   I don't recall.

Q.   Do you have to -- do you recall ever having discussions with anyone at Assured Partners regarding how the building had been valued for purposes of determining the amount of coverage for the policy period in question, so '22 to '23?

A.   I mean, I would -- I would have -- I would expect myself to have that conversation at some point.  When it occurred, I don't exactly recall.

Q.   With whom did you have that conversation?

A.   I believe it would have been with Todd Jones, if anybody.

Q.   Did you have any discussions with anyone else at Assured Partners that you can remember?

274

A. I do remember a gentleman by the name of Paul. I'm not sure of the last name. I don't recall if I ever had any phone conversation with him exactly, but I do remember seeing him on some e-mails.

Q. What did you do to prepare for your deposition today?

A. Met with counsel and discussed just varying topics in reference to the claim itself.

Q. Did you look at any documents?

A. Yes.

Q. Do you know what -- do you remember what documents you looked at?

A. I remember reviewing a February I believe 2024 document, letter written and an August 2024.

Q. And those are the only two documents you looked at?

A. Correct.

Q. Did you review the claim notes prior to your deposition?

A. I did not.

Q. You also mentioned at some point that you've taken handwritten notes when you went to

275

visit the property after the initial loss. Do you keep handwritten notes alongside the claim notes regularly?

A. I will usually jot something down if I need to before if -- in order to remember to put it in the file.

Q. And are those uploaded to the system or are they just in your file cabinet at your desk or somewhere else?

A. At this point, I mean, if they were notes that I took in 2023 on a sketch pad, a legal pad, if I entered in the notes, I probably don't have them anymore.

Q. Okay.

MS. JOSSERAND: I don't think I have anything else.

MR. GOLDWASSER: We're good. Thank you.

MR. BANIAK: I actually have a couple, annoyingly. This will be short, I promise. Mike Baniak. Obviously you know me.

CROSS-EXAMINATION

BY MR. BANIAK:

Q. You were asked some questions about the Systems Power Pac coverage form. I just want to

276

ask you a couple follow-up questions.

I'm going to direct your attention to -- this is Exhibit 1, Rudow Exhibit 1. As used in this additional coverage, accident means a fortuitous event that causes direct physical damage to covered equipment. The event must be one of the following, mechanical breakdown, artificially generated electrical, et cetera.

Do any of the listed events, those events being listed at A, B, C, D, E, were those events the fortuitous event that caused direct physical damage in this case?

A. No.

Q. What did cause the direct physical damage in this case?

A. The roof failing to drain and the roof subsequently falling into the water or into the building.

Q. As part of your review of the policy, would you also have reviewed the Nuclear Energy Liability Exclusion Endorsement?

A. Typically.

Q. Did you put a log note in as to why that part of the policy doesn't apply?

277

A. No.

Q. Why not?

A. Because I don't see that it's applicable to this loss.

MR. BANIAK: Thanks.

MR. GOLDWASSER: We're good.

MS. JOSSERAND: So going forward, do you -- on dealing with exhibits, do you want to --

MR. GOLDWASSER: Off the record.

(WHEREUPON, a discussion was held off the record.)

COURT REPORTER: Could I get a transcript order on the record.

MR. GOLDWASSER: Yeah, we'd like it, yeah, regular.

MR. BANIAK: He'll reserve signature, by the way. We'll take a copy, please.

MS. JOSSERAND: I'd like a copy, too.

(WHEREUPON, the proceedings concluded at 6:31 p.m.)

FURTHER DEPONENT SAYETH NAUGHT

- - - -

CHICAGO ORNAMENTAL IRON, INC, et al. v. SELECTIVE INSURANCE CO. OF AMERICA, et al.
RONALD RUDOW                                                                    2/17/2026

71 (Pages 278 to 279)

278

REPORTER'S CERTIFICATE

I, SHERYL A. NOMMENSEN, Certified Shorthand Reporter for the State of Illinois, do hereby certify that the foregoing was reported by stenographic means, which matter was held on the date, and at the time and place set out on the title page hereof and that the foregoing constitutes a true and accurate transcript of same.

I further certify that I am not related to any of the parties, nor am I an employee of or related to any of the attorneys representing the parties, and I have no financial interest in the outcome of this matter.

I have hereunder subscribed my hand on the 28th day of February, 2026.

Reading and signing was requested.

_____
SHERYL A. NOMMENSEN, C.S.R.
Certificate No. 084-003471

279

STATE OF ILLINOIS  )
                   )  ss:
  COUNTY OF COOK  )

I, the undersigned, declare under penalty of perjury that I have read the foregoing transcript, and I have made any corrections, additions, or deletions that I was desirous of making; that the foregoing is a true and correct transcript of my testimony contained therein.

EXECUTED this _____ day of _____, 2026, at _____, Illinois.

_____
RONALD RUDOW

subscribed and sworn to before me this _____ day of _____, A.D. 2026.

_____
Notary Public in and for said County and State